# EXHIBIT A

1   Wyatt A. Lison (SBN – 316775)
    Joseph N. Kravec, Jr. (*Pro hac vice* application to be filed)
2   **FEINSTEIN DOYLE PAYNE**
    **& KRAVEC, LLC**
3   429 Fourth Avenue
    Law & Finance Building, Suite 1300
4   Pittsburgh, PA 15219
    Tel.: 412-281-8400
5   Fax: 412-281-1007
    Email: wlison@fdpklaw.com
6   Email: jkravec@fdpklaw.com

7   *ATTORNEYS FOR PLAINTIFFS*
    *AND THE PROPOSED CLASS*

8

9   Benjamin Blakeman (SBN – 60596)
    **BLAKEMAN LAW**
10  11601 Wilshire Boulevard, Suite 2080
    Los Angeles, CA 90025
11  Tel: 213-629-9922
    Fax: 213-232-3230
12  Email: ben@lifeinsurance-law.com

13  *ATTORNEY FOR PLAINTIFFS*

14

15  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
    **FOR THE COUNTY OF ALAMEDA**

16

17  BRIAN GUTHRIE and GRADY LEE          Case No. RG21098977
    HARRIS, JR., on behalf of and themselves
18  and all others similarly situated,

19                        Plaintiffs,          **CLASS ACTION COMPLAINT FOR:**

20          vs.                                 **(1) "Unfair" Business Practices in**
                                                **Violation of the Unfair Competition Law**
21  TRANSAMERICA LIFE INSURANCE             **("UCL"), Bus. & Prof. Code §§ 17200, *et seq.***
    COMPANY,
22                                              **(2) "Unlawful" Business Practices in**
                                                **Violation of the Unfair Competition Law**
23                        Defendant.            **("UCL"), Bus. & Prof. Code §§ 17200, *et seq.***

24                                              **(3) "Fraudulent" Business Practices in**
                                                **Violation of the UCL, Bus. & Prof. Code §§**
25                                              **17200, *et seq.***

26

27                                              **DEMAND FOR JURY TRIAL**

28

Class Action Complaint
Case No.:

FILED
ALAMEDA COUNTY
MAY 11 2021
CLERK OF THE SUPERIOR COURT
By
                    Deputy

FILE VIA FAX

Plaintiffs Brian Guthrie and Grady Lee Harris, Jr. ("Plaintiffs"), by their attorneys, bring this class action on their own behalf and on behalf of all others similarly situated ("Class Members") and make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action against Transamerica Life Insurance Company ("Transamerica" or "Defendant") on behalf themselves and other similarly situated persons in the state of California to whom Transamerica issued a Trendsetter LB individual term life insurance policy with a 30 day right to cancel and return wherein the policy misleadingly represented the Chronic and Critical Illness Accelerated Death Benefit "Riders" as being included at "NO CHARGE." This misleadingly portrayed the Trendsetter LB policy as costing the same as a Trendsetter level premium term policy without the Riders which simply was not true. In fact, Transamerica had another Trendsetter policy called Trendsetter Super that offered the same basic Trendsetter Series level premium term life insurance coverage without all of the "Riders" for a significantly lower level premium (i.e., approximately 14% to 27% lower). Transamerica had to duty to disclose this material information about its Trendsetter Super policy as part of its obligations under Cal. Ins. Code § 330-32, its duty to correct its materially misleading "NO CHARGE" representation and otherwise as explained herein. Because this misleading "NO CHARGE" representation was made by Transamerica to Plaintiffs and the Class, as further defined herein, in each Trendsetter LB policy issued to them and at a time when they had a 30 day right to examine the policy and decide whether to keep or return it for a full refund, Transamerica's misleading statement made without disclosing the cost of a comparable Trendsetter Super policy was both unfair and deceptive to Plaintiffs and the Class and materially affected their decision whether to keep the policy or return it for a full refund. As a result, Plaintiffs and the Class have paid (and will continue to pay) higher premiums for the same basic term life insurance coverage they could have had in a Trendsetter Super policy for substantially lower level premiums.

1

2.     Since at least January 2006, Transamerica has marketed and sold individual term life insurance policies under the product branding "Trendsetter Series." The Trendsetter Series consists of several products, all of which offer the same basic underlying individual term life insurance with a level premium for a specified number of years. In California, Transamerica offers two products within its Trendsetter Series: (1) the "Trendsetter LB"; and (2) the "Trendsetter Super."

3.     Transamerica sells its Trendsetter LB policy as a bundled product, through which it provides insureds with the Trendsetter Series basic individual term life insurance coverage and the following two accelerated death benefit riders in the policy purportedly at "NO CHARGE": (1) a Chronic Illness Accelerated Death Benefit Rider ("CHI Rider"); and (2) a Critical Illness Accelerated Death Benefit Rider ("CRI Rider") (collectively "Riders").[1] Transamerica sells its Trendsetter Super policy as an unbundled product through which insureds receive the same basic Trendsetter Series individual term coverage as the Trendsetter LB without the Riders.

4.     Other than the Riders being automatically included in the Trendsetter LB policy purportedly at "NO CHARGE," the Trendsetter LB and Trendsetter Super policies provide the same basic individual term life insurance coverage. Both policies provide insureds with the same basic underlying term coverage[2] in identical durational increments. Both policies have the same risk class designations for policyholders, which is used to determine policyholders' insurability and premium rate. Both policies' premiums are also set at a fixed rate for the duration of their initial level premium term periods, and after the initial term period expires, Transamerica increases the policies' premiums annually thereafter at a dramatic rate.  Multiple actuarial studies show the shock of these dramatic premium increases after the level premium period ends causes the vast majority of policyholders to lapse their term life insurance

---

[1] Trendsetter LB policies also automatically provide a Terminal Illness Accelerated Death Benefit Rider (sometimes called an "Endorsement") ("TI Rider"), and a TI Rider is an option that may be added to the Trendsetter Super policy.  No additional charge is reflected for the TI Rider in either the Trendsetter LB or Trendsetter Super policies.

[2] Both Trendsetter policies provide basic term life insurance for face amounts between $25,000 and $2,000,000. The maximum face amount insureds can receive under the Trendsetter LB policy is $2,000,000, while the maximum face amount insureds can receive under the Trendsetter Super policy is $10,000,000 (and above based upon an individualized determination).  *See Term Life Insurance,* TRANSAMERICA, https://www.transamerica.com/individual/what-we-offer/products/insurance/term-life/.

2

policies at the time or shortly after the level premium period expires (a/k/a "shock lapses"). This so-called "shock lapse" rate is expected to increase in future years so it is even more material to the Trendsetter LB policies at issue here issued over the past four years that will end their level premium at the end of 10 to 30 years.[3] In fact, one study in which Transamerica participated revealed multiple insurers assumed the shock lapse rate would be 100% at the end of the level premium period.[4] Thus, the level premium period is of critical importance to policyholders of level premium term life insurance because most (or virtually all) policyholders will not keep the policy after the level premium period ends.

5.    Despite providing the same basic term life insurance policy coverage, Transamerica charges insureds substantially higher level premiums for its bundled Trendsetter LB policy with the Riders than its unbundled Trendsetter Super policy without the Riders. Indeed, as the price quote comparison of the two policies attached hereto as Exhibit 1 illustrate, Transamerica charges insureds in California as much as 26.7% more in level premiums for its Trendsetter LB policy than its Trendsetter Super policy when both policies provide the same basic term life insurance. Upon information and belief, Plaintiff Guthrie paid approximately an extra 14% in level premiums (or $4,050 over his 15-year level premium period), and Plaintiff Harris paid approximately an extra 16.2% (or $13,200 over his 30-year level premium period) for the Trendsetter LB policies over what they would have paid for Trendsetter Super policies with the same basic level term insurance coverage.

6.    In its standardized Trendsetter LB policy, Transamerica explicitly and uniformly states, in all capital letters and without qualification, that there is "NO CHARGE" for the automatically included Riders and affirms the premium is "EXCLUDING RIDERS." The term "no charge" is not specifically defined in the Trendsetter LB policy and is commonly understood to mean that there is no fee for an item

---

[3] U.S. Individual Life Insurance Persistency – A Joint Study Sponsored by the Society of Actuaries and LIMR, published 2019: "Shock lapse rates for level premium guarantee term plans continue to be high, with shock lapse rates of 66.7 percent on a policy basis for 10-year level premium term plans in the eleventh policy year." (p.12), and for 15-year level premium term plans "Average shock lapse rates topped off at 53 percent in policy year 15 and 86 percent in policy year 16 on a policy basis." (p.44). "[S]hock lapse rates at the end of the level premium term period may be lower than future results" for level premium term plans issued after the end of the Study's observation period in 2013 (p.12).

[4] Report on the Survey of Post-Level Premium Period Lapse and Mortality Assumptions and Experience for Level Premium Term Plans, Society of Actuaries, published May, 2007, pp. vi and B-1.

Class Action Complaint
Case No.:

or service. In other words, the item or service is free. *See e.g.,* Merriam-Webster Dictionary, At No Charge, https://www.merriam-webster.com/dictionary/no%20charge (described as an idiom that means "without having to pay). Consequently, when reasonable consumers see the term "NO CHARGE" in a Transamerica Trendsetter LB life insurance policy in reference to the automatically included Riders, they ascribe this ordinary and common meaning to it and form the reasonable impression that they are getting these Riders for free, and are only paying the same amount of premium that they would otherwise be paying for the same basic underlying level premium term life insurance absent the Riders.

7.    Transamerica's representation that the Riders are included in the Trendsetter LB policy at "NO CHARGE" is misleading and deceptive, even if technically true from an actuarial standpoint.  This is because by representing the Riders as having "NO CHARGE" and affirming the premium is "EXCLUDING RIDERS" in Transamerica's Trendsetter LB policy, it gives consumers the false impression that they are only paying the same amount of level premium that they would otherwise be paying for Transamerica's Trendsetter Series basic underlying term life insurance without the Riders, and thus could not obtain that level premium term life insurance coverage at a cheaper price.  In fact, consumers can purchase the same basic Transamerica Trendsetter Series term life insurance at a significantly cheaper level premium through purchase of the unbundled Trendsetter Super policy without having to include the Riders in their policies.

8.    Transamerica made this misleading and deceptive "NO CHARGE" statement by delivering the Trendsetter LB policies containing that statement on the "Policy Data" page to Plaintiffs and the Class. Under those Trendsetter LB policies, Plaintiffs and the Class had 30 days after the delivery date to examine the policies and decide whether they wanted to cancel them for a full refund.  Yet, Transamerica failed to correct the misleading "NO CHARGE" statement, and did not inform Plaintiffs and the Class in any correspondence, written solicitations, proposals, or other written communications that the Trendsetter Super policy provided the same basic Trendsetter Series term life insurance absent the Riders at a lower level premium than the Trendsetter LB policy with the Riders.

9.    Transamerica's misleading "NO CHARGE" statement and attendant non-disclosure about the lower cost of the same basic level premium term life insurance under Trendsetter Super policy deprived

Class Action Complaint
Case No.:

1    Plaintiffs and the Class of an opportunity to meaningfully review and understand all of the terms,

2    conditions and costs of the Trendsetter LB policy before their contractual and statutory rights to cancel

3    the policy expired, frustrating the Trendsetter LB's 30 day free look contract provision as well as the

4    purpose and intent of the California Insurance Code's free look statute. *See* Cal. Ins. Code § 10127.9.

5    Specifically, Transamerica's "NO CHARGE" statement discourages Trendsetter LB policyholders from

6    closely examining the Riders during their free look period to determine if they want the coverages

7    provided by the Riders.   This is because the misleading "NO CHARGE" statement combined with

8    affirmation the premium is "EXCLUDING RIDERS" creates the reasonable impression that they are

9    getting the Riders for free and as a result are getting the Trendsetter Series basic term life insurance at the

10   only and cheapest level premium price Transamerica offers when in fact this in not the case. As such,

11   consumers have no reason to carefully review the purportedly free Riders or to ask if Transamerica

12   provides the same basic Trendsetter term life insurance at a lower level premium without the Riders, as

13   the Riders do not appear to impact the price of the for the basic life insurance coverage.

14         10.     Had Trendsetter LB policyholders not been misled to believe that they were getting the

15   Trendsetter Series basic term life insurance for the same level premium price with or without the Riders,

16   they would have had a reason to weigh the potential benefits, if any, the Riders provide, and could have

17   made an informed decision concerning whether having the Riders in their bundled Trendsetter LB policies

18   justifies paying approximately 14% to 27% more for the same level premium term life insurance coverage

19   offered by Transamerica's unbundled Trendsetter Super product. Indeed, the terms of the Riders

20   themselves create a substantial risk that consumers will only receive a nominal accelerated death benefit

21   payout in exchange for having to surrender a significant and valuable portion of their total death benefit –

22   a fact that is no doubt of far greater significance to consumers in evaluating whether to keep or cancel the

23   policy in the 30 day free look period when they know the cost of the level premium term coverage with

24   these Riders is some 14% to 27% more as opposed to no additional cost as the "NO CHARGE" statement

25   misleadingly portrays.[5] Thus, Transamerica's misleading and deceptive conduct denied consumers a fair

26   and effective free look period, impacting their purchasing decisions.

27   _____

28   [5] As discussed *infra*, the CHI Rider only guarantees that insureds will receive an accelerated death benefit payout of at least $300 in exchange for surrendering anywhere between 24% and 90% of their total death

5

Class Action Complaint
Case No.:

11. Because Transamerica's misleading and deceptive "NO CHARGE" statement reasonably conveys the message that consumers were not charged more than Transamerica charges for the same basic Trendsetter term life insurance without the Riders when, in fact, Transamerica offers the same term life insurance without the Riders at a dramatically lower level premium price, Transamerica's failure to disclose these material facts constitutes unfair and fraudulent business practices in violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* Accordingly, Plaintiffs bring this action on behalf of themselves and others who are similarly situated in the state of California (as described below), asking that they be awarded restitution in the amounts of extra premiums they paid during the level premium period over that which they would have paid for a Trendsetter Super policy with the same basic term insurance coverage or in such other amount the Court deems appropriate.

## **PARTIES**

12. Plaintiff Brian Guthrie is a resident of Riverside County, California. Mr. Guthrie is the owner and insured of a Trendsetter LB 15-year level premium term life insurance policy with a $500,000 death benefit that Transamerica issued to him initially on May 18, 2017 (subsequently changed to June 2, 2017). *See* Exhibit 2. The "Policy Data" page of the policy states the Riders are as being provided at "NO CHARGE" and the premium for the policy is "EXCLUDING RIDERS." *Id.* The application attached to the policy identifies Mr. Guthrie's home address in Riverside, California. *Id.* Mr. Guthrie did not cancel or return the policy to Transamerica within the applicable 30-day free look period. Mr. Guthrie paid all premiums on his policy that Transamerica has charged to date.

13. Plaintiff Grady Lee Harris, Jr. is currently a resident of San Joaquin County, California. Mr. Harris is the owner and insured of a Trendsetter LB 30-year level premium term life insurance policy with a $250,000 death benefit that Transamerica issued to him on October 8, 2019. *See* Exhibit 3. The "Policy Data" page of the policy states the Riders are as being provided at "NO CHARGE" and the premium for the policy is "EXCLUDING RIDERS." *Id.* The application attached to the policy identifies Mr. Harris's home address in Hayward, California where he resided in Alameda County at the time the

---

benefit while the CRI Rider only guarantees that insured will receive $1,000 in exchange for surrendering up to 90% of their total death benefit.

6

1  policy was issued. *Id.* Mr. Harris did not cancel or return the policy within the applicable 30-day free look

2  period. Mr. Harris paid all premiums on his policy that Transamerica has charged to date.

3      14.    Plaintiffs purchased their Trendsetter LB policies based, in part, on Transamerica's

4  materially identical representations that the Riders were included at "NO CHARGE" and the premium for

5  the policy is "EXCLUDING RIDERS." Based upon that representation, Plaintiffs believed they would

6  be paying the same amount of premium for their Trendsetter LB policies with the "NO CHARGE" Riders

7  that they would otherwise be paying for any of Transamerica's Trendsetter Series basic underlying level

8  premium term life insurance without the Riders and thus could not obtain that term life insurance at a

9  cheaper level premium price at least as part of Transamerica's Trendsetter Series of term life insurance

10 products. Had Transamerica not made this unqualified "NO CHARGE" for the Riders statement in their

11 policies, or had Transamerica given them a proposal showing that they could obtain the same basic

12 Trendsetter Series level premium term life insurance without the Riders at a lower level premium,

13 Plaintiffs would not have been misled or deceived, and this would have affected their purchasing

14 decisions, including their decision not to cancel and return the policies within the 30-day free look period.

15     15.    Defendant Transamerica Life Insurance Company is the eighth largest provider of life

16 insurance in the United States.[6] Defendant is an Iowa corporation with a principal place of business in

17 Cedar Rapids, Iowa. Defendant is, and at all relevant times was, licensed to do business and doing business

18 in the State of California. Defendant previously had its principal place of business in San Francisco,

19 California.

20                             **JURISDICTION AND VENUE**

21     16.    This Court has jurisdiction and venue pursuant to Cal. Civ. Proc. Code §§ 395, 395.5 and

22 410.10 over the claims raised in this Complaint. Defendant does not reside in California, and is doing

23 business in Alameda County as it regularly sells, advertises, markets and/or provides its services in

24 Alameda County and throughout the State of California, with Defendant receiving substantial

25 compensation from such transactions and business activity in this State and County, including as the result

26 of purchases of Trendsetter LB policies, and the trade and commerce described herein is and has been

27

28 [6] Barbara Marquand, *The Top 20 Life Insurance Companies*, NERDWALLET (Apr. 14, 2020), https://www.nerdwallet.com/article/insurance/life-insurance-biggest-companies.

carried out in part within this State and County. Plaintiffs are citizens and residents of California who purchased their policies in California. At the time Plaintiff Grady Lee Harris, Jr. applied for and was issued his Trendsetter LB policy, he resided in Hayward, Alameda County, California.

### FACTS COMMON TO ALL CAUSES OF ACTION

**I.    Defendant's Corporate Background**

17.    Transamerica is a subsidiary of the Transamerica Corporation, a holding company established in 1930 by Amadeo P. Giannini when his San Francisco-based bank – now commonly known as Bank of America – acquired Occidental Life Insurance Company.[7]

18.    From 1930 until 1956, Giannini's banking and insurance businesses operated under the Transamerica Corporation holding company. However, after Congress passed the Bank Holding Company Act of 1956, Transamerica Corporation decided to divest its non-banking interests and focus on the business of selling insurance.[8] From the late 1950s through the 1990s, Transamerica Corporation garnered much success in the business of selling insurance through its many subsidiaries, including Defendant. Defendant, established in 1961, engages in the business of selling and providing life insurance and annuities to consumers across the United States.[9]

19.    In 1999, Aegon N.V. ("Aegon"), an international financial services company headquartered in The Hague, Netherlands, acquired Transamerica Corporation and its subsidiaries. Aegon still uses the holding company name Transamerica in its United States markets, as Transamerica has become a nationally recognized insurance brand and is a leading provider of insurance in the United States. Currently, Aegon, Transamerica Corporation and its subsidiaries serve 13 million people in the United States, as the Americas is Aegon's largest market.[10] Aegon reports that, in 2020, Transamerica

---

[7] *A History of Innovation*, TRANSAMERICA, https://www.transamerica.com/individual/why-transamerica/who-we-are/history/#:~:text=Transamerica%20has%20stood%20for%20innovation,pursuit%20of%20their%20financial%20success.

[8] *Id.*

[9] *Id. See also Transamerica – Financial Strength*, TRANSAMERICA, https://www.transamerica.com/individual/why-transamerica/how-we-are-different/financial-strength/.

[10] *A History of Innovation*, TRANSAMERICA, https://www.transamerica.com/individual/why-transamerica/who-we-are/history/#:~:text=Transamerica%20has%20stood%20for%20innovation,pursuit%20of%20their%20financial%20success; *Fact Sheet Americas*, AEGON (Feb. 2021),

8

1  Corporation and its subsidiaries generated $936 million in revenue, more than half of Aegon's total

2  earnings.[11]

3       20.    On its own, Defendant typically generates over $500 million in revenue annually and

4  employs more than 1,000 people.[12] As of December 31, 2019, Defendant held $130,257,065,405 in assets,

5  and $1,693,802,942 in cash, cash equivalents and short-term investments. Although Defendant sells life

6  insurance in many states across the United States, Defendant's largest market by far is California. In 2019

7  alone, Defendant received $460,172,226 in life insurance premiums from life insurance policies held by

8  consumers in California.[13]

9  **II.     The Trendsetter Series Products Provide Materially Identical Term Life Insurance**

10       21.    Transamerica sells various types of group and individual life insurance policies to

11  consumers in California. Since at least January 2006, Transamerica has marketed and sold individual its

12  term life insurance policies under the branding "Trendsetter Series," all of which provide consumers with

13  the same Trendsetter Series basic term life insurance. In California, Transamerica offers two products

14  within its Trendsetter Series: (1) the Trendsetter LB, a bundled policy; and (2) the Trendsetter Super, an

15  unbundled policy.

16       22.    The bundled Trendsetter LB policy and the unbundled Trendsetter Super policy provide

17  insureds with the same basic underlying term life insurance coverage.[14] Both policies provide level

18  premium term life insurance in identical durational increments. Specifically, Transamerica offers both

19

20  ────────────────

    https://www.aegon.com/contentassets/765456e8cf3b486b89d5779de11a3733/fact-sheet-aegon-

21  americas---february-2021.pdf.
    [11] *Fact Sheet Americas*, *supra* note 6.

22      [12] Transamerica    Life    Insurance    Revenue,    Growth    &    Competitor    Profile,
    https://incfact.com/company/transamericalifeinsurance-

23  cedarrapidsia/#:~:text=Transamerica%20Life%20Insurance's%20annual%20revenues,in%20the%20Ins
    urance%20Carriers%20industry (last updated Mar. 15, 2021).

24      [13] *See Annual Statement for the Year Ended December 31, 2019 of the Condition and Affairs of the*

25  *Transamerica Life Insurance Company* at p. 2-5, Schedule T (2019).
    [14] Both Trendsetter policies provide basic term life insurance for face amounts between $25,000 and

26  $2,000,000. The maximum face amount insureds can receive under the Trendsetter LB policy is
    $2,000,000, whereas the maximum face amount insureds can receive under the Trendsetter Super policy

27  is $10,000,000 (and above based upon determined on a case-by-case basis). *See Term Life Insurance*,
    Transamerica,  https://www.transamerica.com/individual/what-we-offer/products/insurance/term-life/.

28

9

1    policies in 10, 15, 20, 25, and 30-year durational increments. Both policies have the same risk class

2    designations for policyholders, used to determine policyholders' insurability and premium rate.

3    Transamerica also sets premiums in the same manner for both Trendsetter Series policies in that it sets

4    premiums at a fixed rate for the duration of the policies' level premium term periods. Once the level

5    premium term periods expire, Transamerica dramatically increases the premiums of both policies annually

6    thereafter. Multiple actuarial studies show the shock of these dramatic premium increases after the level

7    premium period ends causes the vast majority of policyholders to lapse their term life insurance policies

8    at the time or shortly after the level premium period expires (a/k/a "shock lapses"). This so-called "shock

9    lapse" rate is expected to increase in future years so it is even more material to the Trendsetter LB policies

10   at issue here issued over the past four years that will end their level premium at the end of 10 to 30 years.[15]

11   In fact, one study in which Transamerica participated revealed multiple insurers assumed the shock lapse

12   rate would be 100% at the end of the level premium period.[16] Thus, the level premium period is of critical

13   importance to policyholders of level premium term life insurance because most (or virtually all)

14   policyholders will not keep the policy after the level premium period ends.

15        23.    Despite the two policies providing materially identical term life insurance, Transamerica

16   charges substantially higher level premiums for the term life insurance in its Trendsetter LB policy than

17   for the same level term coverage in its Trendsetter Super policy. In fact, the cost comparison quote

18   attached hereto as Exhibit 1 illustrates just how much more Transamerica charges consumers for

19   purchasing its Trendsetter LB policy than its Trendsetter Super in California. This quote, generated for a

20   65-year-old, non-smoking female in California for a 25-year term Trendsetter Series policy with a face

21   amount of $2,000,000, reveals that Transamerica would only charge this consumer an annual level

22

---

23   [15] U.S. Individual Life Insurance Persistency – A Joint Study Sponsored by the Society of Actuaries and

24   LIMR, published 2019: "Shock lapse rates for level premium guarantee term plans continue to be high, with shock lapse rates of 66.7 percent on a policy basis for 10-year level premium term plans in the

25   eleventh policy year." (p.12), and for 15-year level premium term plans "Average shock lapse rates topped off at 53 percent in policy year 15 and 86 percent in policy year 16 on a policy basis." (p.44). "[S]hock

26   lapse rates at the end of the level premium term period may be lower than future results" for level premium term plans issued after the end of the Study's observation period in 2013 (p.12).

27

28   [16] Report on the Survey of Post-Level Premium Period Lapse and Mortality Assumptions and Experience for Level Premium Term Plans, Society of Actuaries, published May, 2007, p.p. vi and B-1.

Class Action Complaint
Case No.:

1   premium of $30,110.00 for the level term life insurance in the unbundled Trendsetter Super policy, but it

2   would charge her an annual level premium of $38,150.00 for the term life insurance in the bundled

3   Trendsetter LB policy. This difference represents an $8,040, or 26.7%, increase in level premium price

4   for the term life insurance in the bundled Trendsetter LB, a policy that provides the exact same type,

5   amount, and length of term life insurance as the less expensive unbundled Trendsetter Super policy. Given

6   that the Trendsetter Series policies provide the same basic term life insurance coverage, one would not

7   reasonably expect Transamerica would charge consumers almost 27% higher level premiums for the exact

8   same coverage if there is "NO CHARGE" for the Riders as Transamerica's Trendsetter LB policies

9   represent.  On information and belief, cost comparisons for each of the Plaintiffs reveal similar level

10  premium disparities between the Trendsetter LB and Super policies, *i.e.*, about a 14% cheaper 15-year

11  level premium for Mr. Guthrie and about a 16.2% cheaper 30-year level premium for Mr. Harris for the

12  Trendsetter Super policy versus the Trendsetter LB policy for the same Trendsetter term life insurance

13  coverage.

14  **III.    Defendant's Unfair and Deceptive Practices**

15          24.     As described *supra*, Transamerica provides California insureds with its Trendsetter Series

16  basic term life insurance in both the Trendsetter LB and Trendsetter Super policies. However, as a bundled

17  product, Transamerica automatically includes the CHI Rider and CRI Rider in the Trendsetter LB policy.

18  These Riders provide insureds with accelerated death benefits during the lifetime of the insured if they

19  become chronically or critically ill as defined by the Riders' terms and conditions. Importantly,

20  Transamerica represents on its Trendsetter LB policy documents that it includes these Riders in the

21  Trendsetter LB policy at "NO CHARGE" and affirms the premium is "EXCLUDING RIDERS," meaning

22  that Transamerica is only charging Trendsetter LB insureds premiums for the Trendsetter Series basic

23  term life insurance it provides through the policy.

24          25.     On page 2 titled "POLICY DATA" of its standardized Trendsetter LB policy,

25  Transamerica states in large, capitalized print that it includes the Riders at "NO CHARGE" and on page

26  2A affirms the premium is "EXCLUDING RIDERS" in the following manner:[17]

27

28  [17] Plaintiffs' counsel highlighted the phrase "NO CHARGE" and "EXCLUDING RIDERS" on the copy
    of the Trendsetter LB policy data sheet as depicted for illustrative purposes. A true and correct copy of

11

```
                        P O L I C Y   D A T A

                                      OCT 08 2019   POLICY DATE

          EXPIRY DATE   OCT 08 2067                   57   AGE OF INSURED

          INSURED    GRADY LEE HARRIS JR         [REDACTED]   POLICY NUMBER

          FACE AMOUNT   $250,000              OCT 08 2019   DATE OF ISSUE

          SEX OF INSURED   MALE                            LAST DATE TO
                                              MAR 14 2032   CONVERT
          OWNER       THE INSURED
                                                PREFERRED  CLASS OF RISK
          FIRST PREMIUM                         NON-SMOKER
          INCREASE DATE   OCT 08 2049

          - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          THE CHARGE FOR ANY ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER IS SHOWN
          BELOW.  ONLY A BRIEF DESCRIPTION IS GIVEN.  THE COMPLETE PROVISIONS ARE
          INCLUDED IN THE RIDER.

          RIDER NUMBER   SCHEDULE OF ADDITIONAL BENEFITS          ANNUAL PREMIUM*
          ------------   -------------------------------          ---------------

                         NONE                                      NO CHARGE

          - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          TOTAL ANNUAL PREMIUM ON POLICY DATE                         $2,715.00*

          *THE "ANNUAL PREMIUM" AND "TOTAL ANNUAL PREMIUM ON POLICY DATE" LISTED ON
          THIS PAGE ARE THE AMOUNT YOU WILL PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL
          PREMIUM PAYMENT MODE.  THE AMOUNT YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY
          PURSUANT TO ANY OTHER PAYMENT MODE.

          INITIAL PREMIUM AMOUNT AND MODE        $233.49 MONTHLY       PAC
                  TOTAL PAYMENTS PER YEAR                            $2,801.88

                              SCHEDULE OF PREMIUMS
          TOTAL FIRST YEAR PREMIUMS (SEE FOLLOWING PAGES FOR PREMIUMS FOR LATER YEARS):

          POLICY YEAR    ANNUALLY     SEMI-ANNUALLY     QUARTERLY     MONTHLY
          YEARS 1 - 30  $2,715.00       $1,384.65        $699.11      $233.49

          TOTAL PAYMENTS
          PER YEAR     $2,715.00       $2,769.30       $2,796.44     $2,801.88

          THE SCHEDULE OF PREMIUMS ABOVE IS FOR PAC BILLING ONLY.  A SCHEDULE OF
          PREMIUMS FOR OTHER PAYMENT MODES WILL BE PROVIDED ON REQUEST.

          TL23 CA              CONTINUED ON THE FOLLOWING PAGE             PAGE 2
```

the pages 2 and 2A of the Trendsetter LB policy, without such highlighting, is included in Plaintiffs'
Exhibits 2 and 3, attached hereto.

Class Action Complaint
Case No.:

POLICY   DATA   (CONTINUED)
SCHEDULE OF NON-GUARANTEED PREMIUMS
ANNUAL PREMIUMS• -

| POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS | POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS |
|---|---|---|---|
| OCT 08 2020 | $2,715.00 | OCT 08 2044 | $2,715.00 |
| OCT 08 2021 | 2,715.00 | OCT 08 2045 | 2,715.00 |
| OCT 08 2022 | 2,715.00 | OCT 08 2046 | 2,715.00 |
| OCT 08 2023 | 2,715.00 | OCT 08 2047 | 2,715.00 |
| OCT 08 2024 | 2,715.00 | OCT 08 2048 | 2,715.00 |
| OCT 08 2025 | 2,715.00 | OCT 08 2049 | 55,495.00 |
| OCT 08 2026 | 2,715.00 | OCT 08 2050 | 61,892.50 |
| OCT 08 2027 | 2,715.00 | OCT 08 2051 | 68,287.50 |
| OCT 08 2028 | 2,715.00 | OCT 08 2052 | 74,685.00 |
| OCT 08 2029 | 2,715.00 | OCT 08 2053 | 81,082.50 |
| OCT 08 2030 | 2,715.00 | OCT 08 2054 | 87,477.50 |
| OCT 08 2031 | 2,715.00 | OCT 08 2055 | 93,875.00 |
| OCT 08 2032 | 2,715.00 | OCT 08 2056 | 98,882.50 |
| OCT 08 2033 | 2,715.00 | OCT 08 2057 | 108,295.00 |
| OCT 08 2034 | 2,715.00 | OCT 08 2058 | 117,267.50 |
| OCT 08 2035 | 2,715.00 | OCT 08 2059 | 126,920.00 |
| OCT 08 2036 | 2,715.00 | OCT 08 2060 | 137,307.50 |
| OCT 08 2037 | 2,715.00 | OCT 08 2061 | 148,480.00 |
| OCT 08 2038 | 2,715.00 | OCT 08 2062 | 160,492.50 |
| OCT 08 2039 | 2,715.00 | OCT 08 2063 | 173,232.50 |
| OCT 08 2040 | 2,715.00 | OCT 08 2064 | 186,917.50 |
| OCT 08 2041 | 2,715.00 | OCT 08 2065 | 201,600.00 |
| OCT 08 2042 | 2,715.00 | OCT 08 2066 | 217,360.00 |
| OCT 08 2043 | 2,715.00 | | |

THE "SCHEDULE OF NON-GUARANTEED PREMIUMS" ON THIS PAGE SHOWS THE AMOUNT
YOU PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL PREMIUM PAYMENT MODE.  THE
AMOUNT YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY PURSUANT TO ANY OTHER
PAYMENT MODE.

•INCLUDES ANNUAL POLICY FEE OF $30.00.  POLICY FEE MAY BE HIGHER IF YOU PAY
PURSUANT TO ANY PAYMENT MODE OTHER THAN ANNUAL.

TL23 CA                    CONTINUED ON THE FOLLOWING PAGE                    PAGE 2A

26.     At no point on the "POLICY DATA" pages or anywhere else in the policy does Transamerica define the term "NO CHARGE", explain the term's meaning, or qualify it in anyway. Accordingly, it is afforded its plain and ordinary meaning. *See AIU Insurance Company v. Superior Court,* 799 P.2d 1253, 1264 (Cal. 1990) ("The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage', controls judicial interpretation. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.") (internal citations omitted).

27.     The term "no charge" is ordinarily and commonly understood to mean that there is no fee or enhance monetary compensation for inclusion of an item or service. Stated differently, the term means that an item or service is free. *See* Merriam-Webster Dictionary, At No Charge, https://www.merriam-webster.com/dictionary/no%20charge (described as an idiom that means "without having to pay").  When reasonable consumers see the term "NO CHARGE" in a Transamerica life

13

Class Action Complaint
Case No.:

1   insurance policy in reference to automatically included Riders, they ascribe this ordinary and usual

2   meaning to it and form the reasonable impression that they are getting those items listed as at "NO

3   CHARGE" for free and are only paying the same amount of level premium that they would otherwise be

4   paying for the same basic Trendsetter Series level premium term life insurance absent the Riders. This

5   reasonable impression was further affirmed by the policy premium being represented as "EXCLUDING

6   RIDERS."

7         28.     Transamerica's use of the term "NO CHARGE" to describe the costs of the CHI and CRI

8   Riders in its standardized Trendsetter LB policy terms and conditions may, based on actuarial science, be

9   technically true for this specific policy. Nonetheless, use of the term "NO CHARGE" in this manner is,

10   in reality, misleading and deceptive to the average consumer because by representing the Riders as having

11   "NO CHARGE" in Transamerica's Trendsetter LB policy and affirming therein the premium is

12   "EXCLUDING RIDERS," it gives consumers the false impression that they are paying the same amount

13   of level premium that they would otherwise be paying for Transamerica's Trendsetter Series basic

14   underlying level premium term life insurance without the Riders and thus could not obtain that level

15   premium term life insurance at a cheaper price at least with a Trendsetter Series policy.  In reality,

16   consumers can in fact buy the Trendsetter Series basic level premium term life insurance without inclusion

17   of these Riders at a dramatically lower level premium price through purchase of the unbundled Trendsetter

18   Super policy. As Exhibit 1 illustrates, the level premium price for purchasing the exact same basic

19   Trendsetter Series term life insurance through the bundled Trendsetter LB policy can be almost 27% more

20   expensive than the level premium price for purchasing the same insurance through the unbundled

21   Trendsetter Super policy.  On information and belief, Plaintiffs' differential for their Trendsetter LB

22   policies is an extra 14% for Mr. Guthrie (or $4,050 over his 15-year level premium period), and an extra

23   16.2% for Mr. Harris (or $13,200 over his 30-year level premium period).

24         29.     Transamerica knew it made the misleading and deceptive "NO CHARGE" statement in its

25   Trendsetter LB policy's terms and conditions as it appears prominently and uniformly on the "POLICY

26   DATA" page of this standardized policy, which it delivered to Plaintiffs and the Class.  Indeed, the "NO

27   CHARGE" statement is not part of the policy form Transamerica filed with the California Insurance

28

Commissioner, but instead is a statement of cost for the Riders that Transamerica adds to the "POLICY DATA" page when it issues the policy, which it does for each Transamerica LB policy it issued to Plaintiffs and the Class. Transamerica also knows, or has reason to know, that it is charging consumers substantially more – approximately 14% to 27% more – for the exact same basic Trendsetter Series level premium term life insurance in its bundled Trendsetter LB policy with the Riders than in its unbundled Trendsetter Super policy without the Riders.  Yet, Transamerica failed to correct the misleading "NO CHARGE" statement, failed to inform Plaintiffs and the Class in any correspondence, written solicitations, proposals, or other written communications that the Trendsetter Super policy provided the same basic Trendsetter Series level premium term life insurance absent the Riders at a lower premium than the Trendsetter LB policy with the Riders. Absent Transamerica disclosing these material facts to them, Plaintiffs and members of the Class have no way of knowing the exact cost of, or cost difference between, Transamerica's Trendsetter Series term life insurance policies before being provided a price quote, as they do not possess knowledge of Transamerica's premium rates, criteria necessary to calculate the amount of premium they would be charged for Trendsetter LB or Trendsetter Super policies, let alone the actuarial and underwriting knowledge or background necessary to make this calculation. In fact, such pricing and underwriting criteria is not something that is made available to consumers by Transamerica. Rather, Plaintiffs and members of the Class must rely upon Transamerica to provide them price quotes, comparisons, and proposals for these policies.  But Transamerica chose instead to keep this material information concealed from Plaintiffs and the Class.

30.     Besides a common law duty to disclose material information to render a misleading representation non-misleading, California imposes a statutory duty on either party at the beginning of an insurance contract to "communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." Cal. Ins. Code § 332.[18] The insurance code defines concealment as "the neglect to disclose that which a party knows, and ought to communicate," and it entitles the injured

---

[18] *See Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490 (Cal. Ct. App. 2003) (applying Section 300 statutory duty to insurance policy when insurer failed to disclose impending changes to policy during negotiation).

1  party to rescind insurance regardless of whether it was done intentionally or unintentionally. Cal. Ins.

2  Code § 330-31. Because Transamerica made the misleading "NO CHARGE" statement about the Riders

3  to Plaintiffs and the Class in their Trendsetter LB policies and affirmed therein that the premium is

4  "EXCLUDING RIDERS," Transamerica had a duty to disclose to Plaintiffs and the Class that the same

5  basic Trendsetter Series level premium term life insurance provided in their Trendsetter LB policies with

6  the Riders could be obtained at a significantly lower premium in a Trendsetter Super policy without the

7  Riders.

8      31.    This duty of disclosure is even more imperative here given that the policy was delivered to

9  Plaintiffs and the Class with the misleading "NO CHARGE" statement and provided them a 30-day free

10 look period requiring a complete and accurate description of the policy, so that the policy owner may

11 make a fully informed decision on whether to keep the policy, seek to change it, or cancel it and have the

12 premiums returned. This free look provision is required by Cal. Ins. Code § 10127.9. Transamerica

13 incorporates this free look provision on the cover page of its Trendsetter LB policies, as follows:

14

15     **IMPORTANT – 30 DAY RIGHT TO CANCEL – You have purchased a life insurance contract. Referred to below as a "policy". Carefully review it for limitations.**

16     **This policy may be returned within 30 days from the date you received it for a full refund by returning it to the insurance company or agent who sold you this policy.**

17

18     32.    In short, Transamerica does not completely or accurately describe the Trendsetter LB

19 policies delivered to Plaintiffs and the Class because by representing there was "NO CHARGE" for the

20 Riders it misleadingly implies the same Transamerica Trendsetter Series basic underlying level premium

21 term life insurance with the Riders costs the same as without the Riders. Of course, this is not true given

22 the availability of the Trendsetter Super that has same basic level term insurance without the Riders at a

23 far cheaper price. By incorporating this misleading "NO CHARGE" statement reinforced by the

24 affirmation that the premium is "EXCLUDING RIDERS" into every Trendsetter LB policy delivered to

25 Plaintiffs and the Class with a 30-day free look period during which they must decide if they are going to

26 keep or cancel the policy, Transamerica had a duty under Cal. Ins. Code § 330-32, Cal. Ins. Code §

27 10127.9 and the common law to disclose to Plaintiffs and the Class that the same basic Trendsetter Series

28

16

1  level premium term life insurance provided in their Trendsetter LB policies with the Riders could be

2  obtained at a significantly lower level premium in a Trendsetter Super policy without the Riders.  Here,

3  Transamerica made no attempt to provide Plaintiffs and members of the Class with written proposals,

4  price quotes, correspondence or any other written communication disclosing the fact that they could obtain

5  the same basic level premium term life insurance as that provided in the Trendsetter LB policy, absent the

6  Riders, through Transamerica's Trendsetter Super policy, at a significantly lower level premium.[19]

7  Without this disclosure, no reasonable consumer would closely investigate the provisions of free "NO

8  CHARGE" Riders that were automatically included in their Trendsetter LB policies, or even suspect they

9  could, let alone have reason to inquire, whether they could obtain the same basic Trendsetter Series level

10  premium term life insurance without the Riders at a lower level premium, or reasonably expect the level

11  premium would be some 14% to 27% lower.  Thus, reasonable consumers, like Plaintiffs and the Class,

12  had no knowledge of the material facts necessary for them to assess during their 30-day free look period

13  whether the Riders purportedly included at "NO CHARGE" on their Trendsetter LB policies confer a

14  benefit that justifies paying a 14% to 27% higher premium.[20]  Rather, Plaintiffs and the Class were left by

15  Transamerica to be misled by its "NO CHARGE" for the Riders statement in their Trendsetter LB policies

16  into believing that they could not get the same basic Trendsetter Series level premium term life insurance

17  far cheaper, absent the Riders, at least in a Trendsetter Series policy.

18     33.     Had Transamerica not made this unqualified "NO CHARGE" for the Riders statement in

19  their policies or given them a proposal showing them that they could obtain the same basic Trendsetter

20  Series level premium term life insurance without the Riders at a level premium some 14% to 27% lower,

21

---

22  [19] California Insurance Code § 10508 requires all life insurers to maintain records of all "correspondence,
23  written solicitations or proposals, or other written communication sent by the insurer to a prospect,
     applicant, or insured, or received from him or her by the insurer, excluding printed material in general use
     distributed by the insurer, either directly or indirectly through its life agents" for a period of five years
24  following actual delivery of the insurance policy. *See* Cal. Ins. Code §§ 10508(c)(6), (d).

25  [20] In fact, it is likely that most consumers would not find the 16% to 27% extra premium for the Trendsetter
26  LB policy with the Riders was justified since the primary reason consumers purchase term life insurance
     is to permit their beneficiaries to obtain a total death benefit in the event of their death; it is not to provide
27  themselves with benefits while they are alive. *Accord* National Association of Insurance Commissioners,
     *Life Insurance Buyer's Guide* (2007) (advising consumers to "[k]eep in mind the major reason you buy
28  life insurance is to cover the financial effects of unexpected or untimely death.").

Class Action Complaint
Case No.:

1    Plaintiffs and the members of the Class would not have been misled or deceived and this would have

2    affected their purchasing decisions, including their decision not to cancel and return the policies within

3    the 30-day free look period. As a result of Transamerica's misconduct, Plaintiff and the members of the

4    Class not only lost the full and fair opportunity to cancel and return for a full refund their Trendsetter LB

5    policies during the 30-day free look period, but have paid substantially higher level premiums than they

6    could have paid for the same basic Trendsetter Series level premium term life insurance.  Moreover,

7    because Plaintiffs and the members of the Class are older than when their Trendsetter LB policies were

8    issued and may have developed health conditions or other factors that would cause their premiums to be

9    higher for a newly issued policy than they would have been at the time their Trendsetter LB policies were

10   originally issued, they could not be in the same position if they cancel their Trendsetter LB policies today

11   and purchased a Trendsetter Super policy that they would have been had they done that during the 30-day

12   free look period.

13                              **PLAINTIFFS' EXPERIENCES**

14          34.     In 2017, Plaintiff Brian Guthrie became interested in purchasing individual level premium

15   term life insurance as a means of providing for his family members in the event of his death. Accordingly,

16   that same year, he applied for and Transamerica issued him a Trendsetter LB 15-year level premium term

17   life insurance policy with a face amount of $500,000, which included the CHI Rider, CRI Rider and TI

18   Rider purportedly at "NO CHARGE" according to the "Policy Data" page of his policy, which also

19   affirmed the premium is "EXCLUDING RIDERS." Transamerica issued this policy to Mr. Guthrie on

20   May 18, 2017. On the cover page of his policy, Transamerica printed a free look period notice, informing

21   him that he had 30 days to review the policy and return it for a full refund. In a form letter sent by

22   Transamerica's New Business and Underwriting Department, Transamerica informed Mr. Guthrie that his

23   policy date had been changed from May 18, 2017 to June 2, 2017. Mr. Guthrie's policy and the form letter

24   are attached hereto as Exhibit 2.

25          35.     In 2019, Plaintiff Grady Lee Harris, Jr. became interested in purchasing individual level

26   premium term life insurance as a means of providing for his family members in the event of his death.

27   Accordingly, that same year, he applied for and Transamerica issued to him a Trendsetter LB 30-year

28

                                              18

level premium term life insurance policy with a face amount of $250,000, which included the CHI Rider, CRI Rider and TI Rider purportedly at "NO CHARGE" according to the "Policy Data" page of his policy, which also affirmed the premium is "EXCLUDING RIDERS." Transamerica issued this policy to Mr. Harris on October 8, 2019. On the cover page of his policy, Transamerica printed a free look period notice, informing him that he had 30 days to review the policy and return it for a full refund. Mr. Harris' policy is attached hereto as Exhibit 3.

36.     Mr. Guthrie's and Mr. Harris' primary motivation for purchasing the Trendsetter LB policies was to obtain the basic level premium term life insurance, which would pay a death benefit to their beneficiaries if they died while the policy was in effect and guarantees a level premium for the designated number of years for that death benefit. The premium cost during the level premium period was the most important factor in Mr. Guthrie's and Mr. Harris' decision to purchase the Trendsetter LB policies. Mr. Guthrie and Mr. Harris were intrigued, however, by Transamerica's Trendsetter LB policy's promise that the Riders were included in the policy at "NO CHARGE" and affirming the premium charged to them is "EXCLUDING RIDERS." Transamerica printed this representation in large, capitalized print on the "Policy Data" page of Mr. Guthrie's and Mr. Harris' Trendsetter LB policy.

37.     Like other reasonable consumers, Mr. Guthrie and Mr. Harris understood Transamerica's unqualified "NO CHARGE" statement to mean that they could not purchase the same basic Trendsetter Series level premium term life insurance offered by Transamerica, absent the Riders, at a lower level premium price. Plaintiffs relied on Transamerica's misleading and deceptive statement that the Riders came at "NO CHARGE" (reinforced by stating the premium is "EXCLUDING RIDERS"), when purchasing the Trendsetter LB policy and during the 30 days that Transamerica afforded them to review their policies and return said policies for a full refund. Transamerica's "NO CHARGE" for the Riders representation and reinforcing statement that the premium is "EXCLUDING RIDERS" were material to Plaintiffs' decision to purchase and not return the Trendsetter LB policy.

38.     On information and belief, Mr. Guthrie could in fact receive the same basic Trendsetter Series level premium term life insurance that he has in his Trendsetter LB policy for approximately a 14% cheaper 15-year level premium price through the Trendsetter Super policy without the Riders – a savings

19

1   of about $4,050 over the 15-year level premium period.  Mr. Harris could also receive the same basic

2   Trendsetter Series level premium term life insurance that he has in his Trendsetter LB policy for

3   approximately a 16.2% cheaper 30-year level premium price through the Trendsetter Super policy without

4   the Riders – a savings of about $13,200 over the 30-year level premium period.  The Trendsetter Super

5   policy did not offer as an option and did not include the CHI Rider and CRI Rider, but a TI Rider could

6   be added at no additional cost.

7       39.     Had Transamerica's "NO CHARGE" for the Riders statement not misled Mr. Guthrie and

8   Mr. Harris into believing that they could not have purchased the Trendsetter Series basic level premium

9   term life insurance at a cheaper level premium price without the Riders in their policies or informed them

10  of these material facts, they would have had a reason to weigh the potential benefits, if any, the Riders

11  provide, and could have made an informed decision concerning whether having the Riders in their bundled

12  Trendsetter LB policies justifies paying approximately 14% to 16% more for the same level premium term

13  life insurance coverage offered by Transamerica's unbundled Trendsetter Super product and this would

14  have affected their decisions to purchase the Trendsetter LB policy.  Indeed, Plaintiffs would have

15  examined the Riders more closely during their free look period to determine whether the benefits the

16  Riders could confer warranted paying a substantially higher premium price for the same exact basic level

17  premium term life insurance offered in the unbundled Trendsetter Super policy. Upon examination of the

18  Riders, Plaintiffs could have discovered that the terms and conditions of the Riders creates a substantial

19  risk that insureds could receive only a nominal accelerated death benefit payout in exchange for

20  surrendering a significant and valuable portion of their death benefit. The CHI Rider provides that insureds

21  who become chronically ill may only be able to receive $300 in accelerated death benefits in exchange

22  for surrendering anywhere between 24% and 90% of the total value of their policy. Similarly, the CRI

23  Rider provides that insureds who become critically ill may only be able to receive $1,000 in accelerated

24  death benefits in exchange for surrendering up to 90% of the total value of their policy.  Given the

25  substantial risks inherent in the Riders that they would receive little or no benefit from them and the fact

26  that both Trendsetter LB and Super policies offer terminal illness coverage, Plaintiffs would have

27  determined that inclusion of these Riders in the Trendsetter LB policy did not justify paying a 14% to 16%

28

Class Action Complaint
Case No.:

higher premium for the same basic Trendsetter Series level premium term life insurance that they could obtain in the Trendsetter Super policy and would have instead purchased the Trendsetter Super policy.

40.     Indeed, the substantial risk of nominal benefit inherent in the CHI Rider became a reality for Mr. Guthrie when he was diagnosed with a chronic illness two years after he purchased his Trendsetter LB policy and requested a quote from Transamerica regarding the accelerated death benefits he would be entitled to receive under that Rider. By letter, Transamerica informed Mr. Guthrie that he qualified for benefits under the CHI Rider due to his chronic illness, but the amount of accelerated death benefits Transamerica would pay him was only $300. By that point, Mr. Guthrie had already paid about $540.00 in extra premiums to Transamerica for his Trendsetter LB policy over what he would have paid for a Trendsetter Super policy without the CHI Rider. In the same letter, Transamerica further stated that if he were to elect to receive the $300 accelerated death benefit, Transamerica would reduce the face amount of his $500,000 policy by 24%, resulting in a total death benefit loss of $120,000. Ultimately, Mr. Guthrie, weighed the nominal benefit of receiving only $300 and the consequence of surrendering $120,000 of his total policy death benefit, and decided not to elect to receive benefits under the CHI Rider.

41.     Mr. Guthrie and Mr. Harris have not received any accelerated death benefits under the Riders included in their policies.

42.     At the time Transamerica made the "NO CHARGE" statement on Plaintiffs' policies, and during the free look period, Transamerica made no attempt to disclose additional material facts to the Plaintiffs, including the existence of the cheaper, materially identical level premium term life insurance in the unbundled Trendsetter Super policy, which would have corrected its misleading and deceptive statement. Transamerica's conduct violated its statutory and common law duties of disclosure to Plaintiffs arising from its misleading "NO CHARGE" representation, thereby depriving Plaintiffs of their contractual and statutory rights to an adequate free look period, as it prevented Plaintiffs from understanding the terms and conditions of their policies and from weighing the benefits and disadvantages of purchasing and not returning their Trendsetter LB policies within their 30-day free look period.

43.     Had Plaintiffs known during the 30-day free look period that Transamerica offers the same basic Trendsetter Series term life insurance at a dramatically lower level premium price through its

21

1 unbundled Trendsetter Super policy, this would have impacted their decision to purchase and/or cancel

2 the more expensive bundled Trendsetter LB policy.

3    44.    Thus, Transamerica's use of the misleading and deceptive "NO CHARGE" statement

4 (reinforced by stating the premium is "EXCLUDING RIDERS") is negligent, if not fraudulent, at common

5 law, but at a minimum constitutes unfair and fraudulent conduct within the meaning of the UCL, violates

6 the duties of good faith disclosure under Cal. Ins. Code § 330-32, and frustrates purpose and intent of Cal.

7 Ins. Code § 10127.9.

8                          **CLASS ACTION ALLEGATIONS**

9    45.    This action is brought and may properly be maintained as a class action pursuant to Cal.

10 Civ. Code § 382.  Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as

11 representative members of the following proposed statewide class ("Class") pursuant to Cal. Civ. Proc.

12 Code § 382:

13    All persons in the California within the four-year period prior to the date this Action was filed
      through the date the Class is certified who paid for, were issued, and did not cancel within 30
14    days after receipt a Transamerica Trendsetter LB individual term life insurance policy.

15    Excluded from the Class are: (i) Transamerica, the officers, employees, principals, affiliated
      entities and directors of Transamerica at all relevant times, members of their immediate
16    families and their legal representatives, heirs, successors or assigns and any entity in which
      Transamerica has or had a controlling interest; (ii) the judges to whom this action is assigned
17    and any members of their immediate families; (iii) governmental entities; (iv) any person that
      timely and properly excludes himself or herself from the Class in accordance with Court-
18    approved procedures; and (v) any Trendsetter LB policy under which a death benefit or
      accelerated death benefit has been paid by Transamerica.
19

20    46.    Plaintiffs reserve the right to re-define the Class or amend the Class definition prior to class

21 certification.

22    **A.   The Parties are Numerous and Ascertainable**

23    47.    The proposed Class is so numerous that it is impractical to bring them all before the Court.

24 Though the exact number and identities of the members of the Class is unknown at this time, they likely

25 number thousands of people, because the Trendsetter LB policy is widely offered and sold across the State

26 of California, as Defendant's largest life insurance market is the State of California.  Indeed, due to the

27 nature of Defendant's business, Plaintiffs believe there are tens of thousands of members of the Class

28

Class Action Complaint
Case No.:

geographically dispersed across the state. Therefore, individual joinder of all members of the Class would be impracticable.  The Class is ascertainable because its definition is objective and specific and the members of the Class can be identified by objective criteria – the purchase of, issuance to, and retention of the Trendsetter LB policy during the Class Period. Individual notice can be provided to members of the Class who can be identified through reasonable effort, and to other Class Members by electronic means, or other appropriate means. Moreover, because California Insurance Code §§ 10508 and 10508.5 require Defendant to maintain records relating to all life insurance policies sold by Defendant and its agents in the state, Class Members may be identified through such records and there is no concern that the Class includes individuals who were not exposed to Transamerica's misleading and deceptive statement.

**B.  There is a Well-Defined Community of Interest**

48.      In order to determine if there is a well-defined community of interest such that the question is one of a common or general interest, a court should consider: (1) whether common questions of law and facts predominate; (2) whether the representatives of the Class' claims or defenses are typical of the class; and (3) whether the representatives of the Class can adequately represent the Class.

**i.      Common Questions of Law and Facts Predominate**

49.      This action presents predominant questions of law and facts common to the Class, including, but not limited to, the following:

a.  Whether Defendant engaged in the misleading and deceptive conduct alleged;

b.  Whether and when Defendant stated in its standardized Trendsetter LB policy terms that the Riders were automatically included at "NO CHARGE";

c.  Whether the Transamerica's Trendsetter LB and Trendsetter Super policies provide the same basic term life insurance coverage;

d.  Whether Defendant charges higher level premiums for the bundled Trendsetter LB policy than the unbundled Trendsetter Super;

e.  Whether Defendant's "NO CHARGE" representation in its Trendsetter LB policies issued to Plaintiffs and the Class is and was likely to deceive Plaintiffs and Class Members or the general public;

23

f.   Whether Defendant's "NO CHARGE" statement is an unfair practice; and

g.   The appropriate measure of restitution.

### ii.   Plaintiffs' Claims Are Typical of the Class

50.     Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs were consumers in California who paid for, were issued, and did not cancel within 30 days after receipt Defendant's Trendsetter LB policy based on Defendant's representation in the policy that the Riders came at "NO CHARGE," which misleadingly implied that they could not purchase Defendant's Trendsetter Series basic level premium term life insurance at a cheaper level premium rate, absent the Riders.  Plaintiffs, therefore, are no different in any relevant respect from any other Class Member, and the relief sought is common to the Class.

### iii.   The Class Representatives Can Adequately Represent the Class

51.     Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no interests that are antagonistic to or that irreconcilably conflict with those of other members of the Class. Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation, including substantial experience in the types of claims alleged herein.

### C.   A Class Action Is Superior To All Other Available Methods For The Fair And Efficient Adjudication Of Plaintiffs' And Class Members' Claims

52.     A class action is superior to all other available methods for the fair and efficient adjudication of Plaintiffs' and Class Members' claims.  A class action is superior to preserve Class Members' claims who would otherwise forego litigation given the burden and expense of individual prosecution of their claims.  Individualized litigation would burden the courts, would increase the delay and expense to all parties and the Court, and would produce the potential for inconsistent or contradictory judgments and would establish incompatible standards of conduct. The individual prosecution of separate actions would create a risk of adjudications which may be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Certification of a class action to resolve these disputes will reduce the possibility of repetitious litigation involving thousands of members of the Class, and allow supervision by a single court.

24

### FIRST CAUSE OF ACTION
**("Unfair" Business Practices in Violation of the UCL, Bus. & Prof. Code §§ 17200, *et seq.*)**

53.   Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

54.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

55.   A business act or practice is "unfair" under the UCL if the alleged conduct is tethered to any underlying constitutional, statutory, or regulatory provision, or threatens an incipient violation of an antitrust law, or violated the policy or spirit of an antitrust law.

56.   As described herein, Transamerica's use of the statement "NO CHARGE" (reinforced by stating the premium is "EXCLUDING RIDERS") on its standardized Trendsetter LB policy to describe the costs of the automatically included Riders reasonably misled and deceived consumers into believing that they could not purchase Transamerica's Trendsetter Series basic term life insurance, absent the Riders, at a cheaper level premium rate, when in fact they could purchase this same basic Trendsetter Series level premium term life insurance for between 14% to 27% cheaper through Transamerica's unbundled Trendsetter Super policy. As a result of making its misleading and deceptive "NO CHARGE" representation in its Trendsetter LB policies when Plaintiffs and Class Members had 30-day right to cancel the policies after receipt, Transamerica had a duty to disclose this material information to Plaintiffs and the Class under Cal. Ins. Code §§ 330-32 and under the common law. Moreover, by placing the misleading and deceptive "NO CHARGE" statement (reinforced by stating the premium is "EXCLUDING RIDERS") on the Trendsetter LB policy form it delivered to Plaintiffs and the Class, Transamerica deprived and prevented Plaintiffs and Class Members from being able to fully and fairly understand all the terms and conditions of their policy and to weigh the actual advantages and disadvantages of keeping the policy during their free look period. As such, Transamerica conduct undermines the policy and spirit of California Insurance Code § 10127.9 requiring life insurers to provide a free look period during which policyholder can examine the terms, conditions and benefits of their policies and decide whether to keep the policy or cancel and return it for a full refund, and Transamerica's unfair conduct is tethered to that

25

statutory provision as well as Cal. Ins. Code §§ 330-32. By committing the acts and practices alleged above, Defendant has engaged, and continues to engage, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

57.     A business act or practice is also "unfair" under the UCL if the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

58.     As described herein, Transamerica issued to Plaintiffs and members of the Class Trendsetter LB individual term life insurance policies with a 30 day right to cancel and return wherein the policy misleadingly represented the Accelerated Death Benefit Riders as being included at "NO CHARGE" when, in fact, Transamerica had another Trendsetter policy called Trendsetter Super that offered the same basic level premium term life insurance coverage without the Riders for a significantly lower level premium (*i.e.*, approximately 14% to 27% lower).   Transamerica's failure to disclose that it had another Trendsetter Series policy that provided the same basic level premium term life insurance coverage for a significantly lower level premium in light of its representation in the Trendsetter LB policy that the Riders were "NO CHARGE" (reinforced by stating the premium is "EXCLUDING RIDERS") misleadingly portrayed the Trendsetter LB policy as costing the same as a Trendsetter Series level premium term policy without the Riders which simply was not true.   Transamerica had to duty to disclose this material information about its Trendsetter Super policy as part of its obligations under Cal. Ins. Code §§ 330-32, its duty to correct its materially misleading "NO CHARGE" representation and otherwise as explained herein.   Because this misleading "NO CHARGE" representation was made by Transamerica to Plaintiffs and members of the Class, as further defined herein, in each Trendsetter LB policy issued to them and at a time when they had a 30 day right to examine the policy and decide whether to keep or return it for a full refund, Transamerica's misleading statement made without disclosing the cost of a comparable Trendsetter Super policy was both unfair and deceptive to Plaintiffs and the Class and materially affected their decision whether to keep the policy or return it for a full refund.   As a result, Plaintiffs and the Class have paid (and will continue to pay) higher premiums for the same basic level

Class Action Complaint
Case No.:

premium term life insurance coverage they could have had in a Trendsetter Super policy for substantially lower premiums.

59.     This practice of Transamerica, described herein, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. The gravity of the harm to Plaintiffs and Class Members resulting from such unfair acts and practices outweighs any conceivable reasons, justifications and/or motives of Transamerica for engaging in such deceptive acts and practices.  By committing the acts and practices alleged above, Transamerica has engaged, and continues to engage, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

60.     Additionally, a business act or practice is also "unfair" under the UCL if the consumer's injury is substantial, the injury is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

61.     As discussed herein, Plaintiffs and Class Members suffered substantial injury because of Transamerica's misleading and deceptive conduct, their injuries are not outweighed by any conceivable countervailing benefits to consumers or competition, and Plaintiffs' and Class Members' injuries are not injuries which consumers could have reasonably avoided. By committing the acts and practices alleged above, Transamerica has engaged, and continues to engage, in unfair business practices within the meaning of California Business and Professions Code §§ 17200, *et seq.*

62.     Through its unfair acts and practices, Transamerica has obtained money from Plaintiffs and Class Members who paid Transamerica higher premiums for the same basic level premium term life insurance coverage in their Trendsetter LB policies that they could have had in a Trendsetter Super policy for substantially lower level premiums.  As such, Plaintiffs and Class Members have been injured and request that this Court cause Transamerica to restore this money to Plaintiffs and Class Members.

### SECOND CAUSE OF ACTION
**("Unlawful" Business Practices in Violation of The UCL, Bus. & Prof. Code §§ 17200, *et seq.*)**

63.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

Class Action Complaint
Case No.:

64.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

65.    The statute "prohibits 'unlawful' practices 'forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made.'" *Khan v. CitiMortgage, Inc.,* 975 F. Supp. 2d 1127, 1144 (E.D. Cal. 2013) (quoting *Saunders v. Superior Court,* 27 Cal.App.4th 832, 838, 33 Cal.Rptr.2d 438 (1994)).

66.    California's Insurance Code prohibits concealment and requires each party to a contract of insurance to "communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." Cal. Ins. Code §§ 330-32.

67.    "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins. Code § 334.

68.    The provisions of the Insurance Code apply to contract formation and modification. Cal. Ins. Code § 361.

69.    As described herein, Transamerica violated, and continues to violate California Insurance Code §§ 330-32. Transamerica's use of the statement "NO CHARGE" (reinforced by stating the premium is "EXCLUDING RIDERS") on its standardized Trendsetter LB policy to describe the costs of the automatically included Riders reasonably misled and deceived consumers into believing that they could not purchase Transamerica's Trendsetter Series basic level premium life insurance, absent the Riders, at a cheaper level premium rate, when in fact they could purchase this same basic Trendsetter Series level premium term life insurance for between 14% to 27% cheaper through Transamerica's unbundled Trendsetter Super policy. As a result of making its misleading and deceptive "NO CHARGE" representation (reinforced by stating the premium is "EXCLUDING RIDERS"), Transamerica had a duty to disclose this material information to Plaintiffs and the Class under Cal. Ins. Code §§ 330-32 and under the common law.

28

70.     Moreover, by placing the misleading and deceptive "NO CHARGE" statement on the Trendsetter LB policy form it delivered to Plaintiffs and the Class, Transamerica deprived and prevented Plaintiffs and Class Members from being able to fully and fairly understand all the terms and conditions of their policy and to weigh the actual advantages and disadvantages of keeping the policy during their free look period. As such, Transamerica frustrates the purpose and intent of California Insurance Code § 10127.9, requiring life insurers to provide a free look period during which policyholder can examine the terms, conditions and benefits of their policies and decide whether to keep the policy or cancel and return it for a full refund, and therefore violates, this state statutory provision. By committing the unlawful acts and practices alleged above, Defendant has engaged, and continues to be engaged, in unlawful business practices within the meaning of California Business and Professions Code § 17200.

71.     Furthermore, as described herein, Transamerica issued to Plaintiffs and Class Members a Trendsetter LB individual term life insurance policy with a 30 day right to cancel and return wherein the policy misleadingly represented the Riders as being included at "NO CHARGE" (reinforced by stating the premium is "EXCLUDING RIDERS") when, in fact, Transamerica had another Trendsetter policy called Trendsetter Super that offered the same basic level premium term life insurance coverage without all of the "Riders" for a significantly lower level premium (*i.e.*, approximately 14% to 27% lower). Transamerica's failure to disclose that it had another Trendsetter policy that provided the same basic level premium term life insurance coverage for a significantly lower level premium in light of its representation in the Trendsetter LB policy that the Riders were "NO CHARGE" misleadingly portrayed the Trendsetter LB policy as costing the same as a Trendsetter Series level premium term policy without the Riders which simply was not true.  Transamerica had to duty to disclose this material information about its Trendsetter Super policy as part of its obligations under Cal. Ins. Code §§ 330-32, its duty to correct its materially misleading "NO CHARGE" representation and otherwise as explained herein.  Because this misleading "NO CHARGE" representation was made by Transamerica to Plaintiffs and the Class in each Trendsetter LB policy issued to them and at a time when they had a 30 day right to examine the policy and decide whether to keep or return it for a full refund, Transamerica's misleading statement made without disclosing the cost of a comparable Trendsetter Super policy was unlawful, unfair and deceptive to Plaintiffs and the

1  Class and materially affected their decision whether to keep the policy or return it for a full refund.  As a

2  result, Plaintiffs and the Class have paid (and will continue to pay) higher level premiums for the same

3  basic level premium term life insurance coverage they could have had in a Trendsetter Super policy for

4  substantially lower level premiums.

5        72.     Through its unlawful acts and practices, Transamerica has obtained money from Plaintiffs

6  and Class Members who paid Transamerica higher premiums for the same basic level premium term life

7  insurance coverage in their Trendsetter LB policies that they could have had in a Trendsetter Super policy

8  for substantially lower level premiums.  As such, Plaintiffs and Class Members have been injured and

9  request that this Court cause Transamerica to restore this money to Plaintiffs and Class Members.

10  **THIRD CAUSE OF ACTION**
("Fraudulent" Business Practices in Violation of
11  The UCL, Bus. & Prof. Code §§ 17200, *et seq.*)

12        73.     Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if

13  fully set forth herein.

14        74.     The UCL defines unfair business competition to include any "unlawful, unfair or

15  fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus.

16  & Prof. Code §17200.

17        75.     A business act or practice is "fraudulent" under the UCL if it actually deceives or is likely

18  to deceive members of the consuming public.

19        76.     Transamerica's act and practice of stating that the Riders are at "NO CHARGE"

20  (reinforced by stating the premium is "EXCLUDING RIDERS") in the Trendsetter LB policy has the

21  effect of misleading consumers to believe that they could not purchase Transamerica's Trendsetter Series

22  basic term life insurance at a cheaper premium rate for the level premium period, without inclusion of the

23  Riders.  In reality, Transamerica sells the Trendsetter Series basic term life insurance, without inclusion

24  of the Riders, at a 14% to 26.7% cheaper premium rate for the level premium period in its unbundled

25  Trendsetter Super policy.

26        77.     As a result of the conduct described above, Transamerica has been, and will continue to

27  be, unjustly enriched at the expense of Plaintiffs and Class Members.  Specifically, Transamerica has

28

30

1  received higher level premium payments from Plaintiffs and Class Members than that which Plaintiffs

2  and Class Members would have otherwise tendered.

3        78.     Through its unfair acts and practices, Transamerica has obtained money from Plaintiffs

4  and Class Members who paid Transamerica higher premiums for the same basic level premium term life

5  insurance coverage in their Trendsetter LB policies that they could have had in a Trendsetter Super policy

6  for substantially lower level premiums.  As such, Plaintiffs and Class Members have been injured and

7  request that this Court cause Transamerica to restore this money to Plaintiffs and Class.

8  **JURY DEMAND**

9       Plaintiffs demand a jury trial on all causes of action and/or issues so triable.

10  **PRAYER FOR RELIEF**

11       WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request an

12  award, relief and entry of a judgment, as follows:

13       A.     An order certifying that this action is properly brought and may be maintained as a class

14  action under Cal. Civ. Code § 382; that Plaintiffs be appointed representatives of the Class; and that

15  Plaintiffs' undersigned counsel be appointed Lead Counsel for the Class.

16       B.     An award to Plaintiffs and all Class Members of restitution, in an amount to be determined

17  at trial.

18       C.     An order requiring Defendant to pay all costs associated with Class notice and

19  administration of Class-wide relief.

20       D.     For attorneys' fees and expenses pursuant to all applicable laws.

21       E.     For pre and post judgment interest; and

22       F.     For such other and further relief as the Court may deem just and proper.

23  //

24  //

25  //

26  //

27  //

28  //

31

Class Action Complaint
Case No.:

1   Dated: May 7, 2021

2                                         FEINSTEIN DOYLE PAYNE
                                          & KRAVEC, LLC
3
                                          By:
4                                             Wyatt A. Lison (SBN – 316775)

5                                         Joseph N. Kravec, Jr. (*Pro hac vice*
                                            application to be filed)
6                                         **FEINSTEIN DOYLE PAYNE**
                                          **& KRAVEC, LLC**
7                                         429 Fourth Avenue, Suite 1300
                                          Pittsburgh, PA 15219
8                                         Tel.: 412-281-8400
                                          Fax: 412-281-1007
9                                         Email: wlison@fdpklaw.com
                                          Email: jkravec@fdpklaw.com
10
                                          *ATTORNEYS FOR PLAINTIFFS*
11                                        *AND THE PROPOSED CLASS*

12                                        Benjamin Blakeman (SBN – 60596)
                                          **BLAKEMAN LAW**
13                                        11601 Wilshire Boulevard, Suite 2080
                                          Los Angeles, CA 90025
14                                        Tel: 213-629-9922
                                          Fax: 213-232-3230
15                                        Email: ben@lifeinsurance-law.com

16                                        *ATTORNEY FOR PLAINTIFFS*

17

18

19

20

21

22

23

24

25

26

27

28

                                          32

# EXHIBIT 1

# TERM4SALE
### TERM LIFE INSURANCE QUOTES

Home | News & Reviews | Life Insurance 101 | Calculators | Trends | For Life Agents | About Us

March 12th, 2020

Gender: Female
Birthdate: October 15th, 1954
Health Class: Regular Non-Smoker
Actual Age: 65 Nearest Age: 65
State: California
Amount of Insurance: $2,000,000

**Modify Your Quote**

Can you qualify for these premiums?

If you want to find out more about your health and lifestyle, we can tell you more about whether the products you see here are available to you

**Health Analyzer**

**Spreadsheet Results**

## LIFE INSURANCE NEEDS CALCULATOR



**How Much Life Insurance Do I Need?**

**Read Message**

COMPULIFE & TERM4SALE: President Bob Barney has an important message for you to read

### Important Information About This Quote

Please read and and verify that the information that you entered is accurate. If the age or other information is wrong, it will affect the premium that the company actually charges.

---

**25 Year Level Term Guaranteed**

A.M. Best Ratings as of Mar 6 2020

Transamerica Life Insurance Company
Transelect Super 25
A.M. Best Rating A
Non-Smoker Rg

$30,110.00 /yr or $2,589.46 /mo

**How to Purchase**

Transamerica Life Insurance Company
Transelect LB 25
A.M. Best Rating A
Non-Smoker Rg

$38,150.00 /yr or $3,280.90 /mo

**How to Purchase**

Powered by COMPULIFE

### About This Comparison

The information used in this comparison has been taken from the rate cards and rate manuals which life companies routinely publish and distribute to life agents and brokers. To the best of COMPULIFE's ability we have done everything we can to ensure that the information contained in the comparison is up-to-date and accurate. However, WE CANNOT GUARANTEE ACCURACY.

In the event that there is a discrepancy between the information contained in this comparison, and any life company authorized illustration and/or policy, the policy shall govern.

Any customer who is FIRST to discover an error at any of the premiums quoted in the comparison is enabled to receive a finder's fee of $100 from COMPULIFE. To receive your $100 please mail a copy of the comparison which contains the error, with a copy of the life company illustration and/or policy, together with your name and address, to:

COMPULIFE Software, Inc.
1909 Paradise Camp Road
Harrodsburg, KY 40330

(888) 798-3488

Copyright © 2020, COMPULIFE Software, Inc.
COMPULIFE® is a registered trademark of COMPULIFE Software, Inc.
Term4Sale® is a registered trademark of COMPULIFE Software, Inc.

COMPULIFE thanks you for viewing our Term4Sale website. We would encourage you to tell your relatives and friends about "Term4Sale" which can be found at:

term4sale.com or term4sale.com

# EXHIBIT 2



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA
Administrative Office
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(319) 355-8511

**TSLB15**

(Referred to as the Company, we, our or us)

**Policy Number:** 

**Face Amount:**   $500,000

**Policy Date:** MAY 18, 2017

**Insured:** BRIAN GUTHRIE

**Owner:** BRIAN GUTHRIE

We will pay the death benefit to the Beneficiary if the Insured dies while this policy is In Force.  All payments are subject to the provisions of this policy.

Signed for the Company at Cedar Rapids, Iowa, on the Date of Issue.

Secretary                                    President

**IMPORTANT – 30 DAY RIGHT TO CANCEL** – You have purchased a life insurance contract, referred to below as a "policy". Carefully review it for limitations.

This policy may be returned within 30 days from the date you received it for a full refund by returning it to the insurance company or agent who sold you this policy.

Term Insurance
Premiums Payable until the Insured's Age 105
Death Benefit Payable at Death of the Insured

Premiums are Subject to Change as Stated in Schedules of Premiums Provision,
But Will Not Exceed Specified Guaranteed Premiums
See Schedule of Guaranteed Premiums shown in Policy Data

Nonparticipating – No Dividends

TL19 CA REV

This policy is a legal contract between you and the Company.

## READ YOUR POLICY CAREFULLY

## GUIDE TO POLICY PROVISIONS

Assignment of the Policy ............................................................................. 4
Beneficiary's Rights ..................................................................................... 4
Change of Beneficiary .................................................................................. 4
Death Benefit ............................................................................................... 5
Definitions .................................................................................................... 3
Dividends ..................................................................................................... 8
Grace Period for Paying Premiums ............................................................. 6
Incontestability of the Policy ....................................................................... 7
Interest from Date of Death ........................................................................ 5
Misstatement of Age or Sex ....................................................................... 7
Ownership Provisions .................................................................................. 4
Payment of the Death Benefit ..................................................................... 5
Policy Contract ............................................................................................ 6
Policy Data .................................................................................................. 2
Policy Date .................................................................................................. 3
Premiums ..................................................................................................... 5
Proof of Death ............................................................................................. 5
Reinstatement ............................................................................................. 6
Riders ........................................................................................................... 7
Schedules of Premiums ............................................................................... 2
Settlement Provisions .................................................................................. 8
Suicide ......................................................................................................... 7
Termination of Insurance ............................................................................ 7
Your Rights .................................................................................................. 8

P O L I C Y   D A T A

|  |  |  |  |
|---|---|---|---|
| | | MAY 18 2017 | POLICY DATE |
| EXPIRY DATE | MAY 18 2070 | 52 | AGE OF INSURED |
| INSURED | BRIAN GUTHRIE | ▉▉▉▉▉ | POLICY NUMBER |
| FACE AMOUNT | $500,000 | MAY 18 2017 | DATE OF ISSUE |
| SEX OF INSURED | MALE | | LAST DATE TO |
| OWNER | THE INSURED | MAY 18 2032 | CONVERT |
| FIRST PREMIUM | | RATED | CLASS OF RISK |
| INCREASE DATE | MAY 18 2032 | NON-SMOKER | |

- - - - - - - - - - - - - - - - - - - - - - - - -

THE CHARGE FOR ANY ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER IS SHOWN
BELOW.  ONLY A BRIEF DESCRIPTION IS GIVEN.  THE COMPLETE PROVISIONS ARE
INCLUDED IN THE RIDER.

| RIDER NUMBER | SCHEDULE OF ADDITIONAL BENEFITS | ANNUAL PREMIUM* |
|---|---|---|
| | NONE | NO CHARGE |

- - - - - - - - - - - - - - - - - - - - - - - - -

TOTAL ANNUAL PREMIUM ON POLICY DATE                          $2,895.00*

*THE "ANNUAL PREMIUM" AND "TOTAL ANNUAL PREMIUM ON POLICY DATE" LISTED ON
THIS PAGE ARE THE AMOUNT YOU WILL PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL
PREMIUM PAYMENT MODE.  THE AMOUNT YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY
PURSUANT TO ANY OTHER PAYMENT MODE.

INITIAL ANNUAL PREMIUM FOR POLICY EXCLUDING RIDERS:          $1,940.00
RATED EXTRA POLICY PREMIUM:                                    $955.00

INITIAL PREMIUM AMOUNT AND MODE          $248.97 MONTHLY       PAC
          TOTAL PAYMENTS PER YEAR                            $2,987.64

SCHEDULE OF PREMIUMS
TOTAL FIRST YEAR PREMIUMS (SEE FOLLOWING PAGES FOR PREMIUMS FOR LATER YEARS):

| POLICY YEAR | ANNUALLY | SEMI-ANNUALLY | QUARTERLY | MONTHLY |
|---|---|---|---|---|
| YEARS 1 - 15 | $2,895.00 | $1,476.45 | $745.46 | $248.97 |
| | | | | |
| TOTAL PAYMENTS | | | | |
| PER YEAR | $2,895.00 | $2,952.90 | $2,981.84 | $2,987.64 |

POLICY   DATA   (CONTINUED)

THE SCHEDULE OF PREMIUMS ABOVE IS FOR PAC BILLING ONLY.  A SCHEDULE OF
PREMIUMS FOR OTHER PAYMENT MODES WILL BE PROVIDED ON REQUEST.

8431-24-00-0000006-0005-0000133

TL19 CA                 CONTINUED ON THE FOLLOWING PAGE            PAGE 2A



P O L I C Y   D A T A   ( C O N T I N U E D )

SCHEDULE OF NON-GUARANTEED PREMIUMS
- ANNUAL PREMIUMS -

| POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS | POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS |
|---|---|---|---|
| MAY 18 2018 | $2,895.00 | MAY 18 2044 | $82,605.00 |
| MAY 18 2019 | 2,895.00 | MAY 18 2045 | 99,000.00 |
| MAY 18 2020 | 2,895.00 | MAY 18 2046 | 113,020.00 |
| MAY 18 2021 | 2,895.00 | MAY 18 2047 | 126,985.00 |
| MAY 18 2022 | 2,895.00 | MAY 18 2048 | 140,950.00 |
| MAY 18 2023 | 2,895.00 | MAY 18 2049 | 154,965.00 |
| MAY 18 2024 | 2,895.00 | MAY 18 2050 | 179,775.00 |
| MAY 18 2025 | 2,895.00 | MAY 18 2051 | 225,405.00 |
| MAY 18 2026 | 2,895.00 | MAY 18 2052 | 255,115.00 |
| MAY 18 2027 | 2,895.00 | MAY 18 2053 | 282,610.00 |
| MAY 18 2028 | 2,895.00 | MAY 18 2054 | 307,860.00 |
| MAY 18 2029 | 2,895.00 | MAY 18 2055 | 335,080.00 |
| MAY 18 2030 | 2,895.00 | MAY 18 2056 | 369,880.00 |
| MAY 18 2031 | 2,895.00 | MAY 18 2057 | 375,340.00 |
| MAY 18 2032 | 15,330.00 | MAY 18 2058 | 399,900.00 |
| MAY 18 2033 | 17,515.00 | MAY 18 2059 | 426,115.00 |
| MAY 18 2034 | 19,825.00 | MAY 18 2060 | 461,485.00 |
| MAY 18 2035 | 23,685.00 | MAY 18 2061 | 494,205.00 |
| MAY 18 2036 | 27,835.00 | MAY 18 2062 | 500,030.00 |
| MAY 18 2037 | 32,265.00 | MAY 18 2063 | 500,030.00 |
| MAY 18 2038 | 36,910.00 | MAY 18 2064 | 500,030.00 |
| MAY 18 2039 | 41,790.00 | MAY 18 2065 | 500,030.00 |
| MAY 18 2040 | 49,125.00 | MAY 18 2066 | 500,030.00 |
| MAY 18 2041 | 56,950.00 | MAY 18 2067 | 500,030.00 |
| MAY 18 2042 | 65,070.00 | MAY 18 2068 | 500,030.00 |
| MAY 18 2043 | 73,645.00 | MAY 18 2069 | 500,030.00 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE "SCHEDULE OF NON-GUARANTEED PREMIUMS" ON THIS PAGE SHOWS THE AMOUNT
YOU PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL PREMIUM PAYMENT MODE.  THE
AMOUNT YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY PURSUANT TO ANY OTHER
PAYMENT MODE.

INCLUDES ANNUAL POLICY FEE OF $30.00.  POLICY FEE MAY BE HIGHER IF YOU PAY
PURSUANT TO ANY PAYMENT MODE OTHER THAN ANNUAL.

8431-24-00-0000006-0006-0000134

P O L I C Y   D A T A   ( C O N T I N U E D )

### SCHEDULE OF GUARANTEED PREMIUMS
### - ANNUAL PREMIUMS -

| POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS | POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS |
|---|---|---|---|
| MAY 18 2018 | $2,895.00 | MAY 18 2044 | $96,420.00 |
| MAY 18 2019 | 2,895.00 | MAY 18 2045 | 107,610.00 |
| MAY 18 2020 | 2,895.00 | MAY 18 2046 | 119,775.00 |
| MAY 18 2021 | 2,895.00 | MAY 18 2047 | 132,660.00 |
| MAY 18 2022 | 2,895.00 | MAY 18 2048 | 146,730.00 |
| MAY 18 2023 | 2,895.00 | MAY 18 2049 | 162,375.00 |
| MAY 18 2024 | 2,895.00 | MAY 18 2050 | 179,775.00 |
| MAY 18 2025 | 2,895.00 | MAY 18 2051 | 372,940.00 |
| MAY 18 2026 | 2,895.00 | MAY 18 2052 | 411,730.00 |
| MAY 18 2027 | 2,895.00 | MAY 18 2053 | 452,955.00 |
| MAY 18 2028 | 2,895.00 | MAY 18 2054 | 496,215.00 |
| MAY 18 2029 | 2,895.00 | MAY 18 2055 | 500,030.00 |
| MAY 18 2030 | 2,895.00 | MAY 18 2056 | 500,030.00 |
| MAY 18 2031 | 2,895.00 | MAY 18 2057 | 500,030.00 |
| MAY 18 2032 | 29,130.00 | MAY 18 2058 | 500,030.00 |
| MAY 18 2033 | 31,695.00 | MAY 18 2059 | 500,030.00 |
| MAY 18 2034 | 34,575.00 | MAY 18 2060 | 500,030.00 |
| MAY 18 2035 | 37,935.00 | MAY 18 2061 | 500,030.00 |
| MAY 18 2036 | 42,015.00 | MAY 18 2062 | 500,030.00 |
| MAY 18 2037 | 46,785.00 | MAY 18 2063 | 500,030.00 |
| MAY 18 2038 | 51,810.00 | MAY 18 2064 | 500,030.00 |
| MAY 18 2039 | 57,210.00 | MAY 18 2065 | 500,030.00 |
| MAY 18 2040 | 63,090.00 | MAY 18 2066 | 500,030.00 |
| MAY 18 2041 | 69,720.00 | MAY 18 2067 | 500,030.00 |
| MAY 18 2042 | 77,430.00 | MAY 18 2068 | 500,030.00 |
| MAY 18 2043 | 86,385.00 | MAY 18 2069 | 500,030.00 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE "SCHEDULE OF GUARANTEED PREMIUMS" ON THIS PAGE SHOWS THE AMOUNT YOU
PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL PREMIUM PAYMENT MODE.   THE AMOUNT
YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY PURSUANT TO ANY OTHER PAYMENT MODE.

INCLUDES ANNUAL POLICY FEE OF $30.00.  POLICY FEE MAY BE HIGHER IF YOU PAY
PURSUANT TO ANY PAYMENT MODE OTHER THAN ANNUAL.

8431-24-00-0000006-0007-0000135

## DEFINITIONS

| | |
|---|---|
| **Age** | A person's age in years on his or her last birthday, unless otherwise specified. For purposes of this policy, the Insured's Age changes on each Policy Anniversary. |
| **Beneficiary** | A person designated to receive all or a portion of the death benefit on the death of the Insured. You may name both a Primary and Contingent Beneficiary. A Primary or Contingent Beneficiary named on the application may be changed as provided in this policy. |
| **Date of Issue** | The date this policy is prepared in our office. The Date of Issue is shown in the Policy Data. The Date of Issue may or may not be the same as the Policy Date. |
| **Expiry Date** | The date on which coverage under this policy expires. The Expiry Date is the Policy Anniversary at the Insured's Age 105 and is shown in the Policy Data. |
| **Face Amount** | The amount upon which the death benefit is determined. The initial Face Amount is shown in the Policy Data. |
| **In Force** | Insurance coverage is in effect and has not terminated. |
| **Insured** | The person whose life is insured under this policy. The Insured is identified in the Policy Data. |
| **Lapse** | Termination of this policy at the end of the grace period due to non-payment of premiums. If this policy Lapses, the Insured's life will no longer be insured under the terms of this policy. |
| **Monthly Policy Date** | The day of each month coinciding with the Policy Date. If there is no day in a calendar month that coincides with the Policy Date, the Monthly Policy Date for that month will be the first day of the following month. |
| **Policy Anniversary** | The same day and month as the Policy Date for each year this policy remains In Force. |
| **Policy Date** | The date coverage is effective under this policy. We will use the Policy Date to determine the premium due dates, Monthly Policy Dates, Policy Anniversaries, and Policy Years. The Policy Date is shown in the Policy Data. |
| **Policy Year** | The 12 month period directly preceding a Policy Anniversary. |
| **Reinstate** | To restore coverage after this policy has Lapsed, in accordance with the Reinstatement provision. |
| **Rider** | An attachment to this policy that provides an additional benefit. |
| **Written Request** | A signed request in a form satisfactory to us that is received at our Administrative Office. |
| **You and your** | The owner of this policy. The owner as of the Date of Issue is shown in the Policy Data. Ownership may be transferred as provided in this policy. Following a transfer of ownership, you and your will refer to the new owner. |

TL19 CA                                        Page 3

## OWNERSHIP

**Owner of the Policy**

The owner may exercise all rights under this policy during the Insured's lifetime, including the right to transfer ownership subject to applicable law and regulation. If ownership is shared by more than one person, all such persons must act together to exercise a right. Unless otherwise specified, if a co-owner dies during the Insured's lifetime, the co-owner's interest in this policy will pass to the remaining co-owners.   If the owner or all co-owners die during the Insured's lifetime, ownership will pass to the contingent owner, if one has been named; otherwise, ownership will pass to the owner's estate. You may change the owner by filing a Written Request with us. We will not be bound by any change of ownership until we record it in our records.  Unless otherwise specified by you, the change will then take effect as of the date the change is signed by you, subject to any payments made or actions taken by us prior to our recording of the change.

**Assignment of the Policy**

You may assign this policy by filing a Written Request with us.  We will not be bound by any assignment until we record it in our records.   Unless otherwise specified by you, the assignment will then take effect on the date the assignment is signed by you, subject to any payments made or actions taken by us prior to our recording of the assignment.  We assume no responsibility for the validity or effect of any assignment of this policy or of any interest in it.  Any death benefit which becomes payable to an assignee will be payable in a single sum and will be subject to proof of the assignee's interest and the extent of the assignment.

## THE BENEFICIARY

**Who Receives the Death Benefit**

When the death benefit is payable under this policy, we will pay it to the Primary Beneficiary named by you in accordance with this policy.  If no Primary Beneficiary has been designated, or if the interest of all designated Primary Beneficiaries has ended before we make payment of the death benefit, we will pay the death benefit to the Contingent Beneficiary, if one has been named.  If the interest of all designated Primary and Contingent Beneficiaries has ended before we make payment of the death benefit, we will pay the death benefit to you. If you are not living at the time, we will pay the death benefit to the executor or administrator of your estate.

Unless you specify otherwise, the following will apply:

1. If any Beneficiary dies before the Insured, at the same time as the Insured, or within 30 days after the Insured, that Beneficiary's interest in the death benefit will end, except as to any death benefits we have already paid to that Beneficiary.
2. If a Beneficiary is a partnership, we will pay the death benefit to the partnership as it existed when the Insured died.

**How to Change a Beneficiary**

You may name or change a Primary or Contingent Beneficiary while the Insured is living by sending us a Written Request.  The change will not be effective until we record it in our records.  Even if the Insured is not living when we record the change, the change will take effect as of the date it was signed.  However, any benefits we pay before we record the change will not be subject to the change.

A Beneficiary designated irrevocably may not be changed without the written consent of that Beneficiary.

TL19 CA                                    Page 4

## PAYMENT OF THE DEATH BENEFIT

**Proof of Death**      We will pay any benefit payable because of death when we receive due proof that the Insured's death occurred while this policy was In Force.  The proof must be sent to us at our Administrative Office.  We will send appropriate forms to the Beneficiary upon request.  Any of our agents will help the Beneficiary fill out the forms without charge.

**Death Benefit**      The amount of the death benefit is equal to:

                    (a)     the Face Amount of this policy,

    plus  (b)     the amount payable under any attached Rider, subject to its terms,

    plus  (c)     the amount of any portion of a paid premium which applies to a period beyond the Insured's date of death (excluding any premiums waived under any Rider attached to this policy),

    minus (d)     the amount of any portion of a premium due under the Grace Period provision.

The amount of the death benefit may be affected by the Misstatement of Age or Sex in the Application provision of this policy.

**Interest from Date of Death**      We will pay interest on the death benefit under this policy after we receive due proof of the Insured's death.  We will pay interest on the death benefit from the date of death to the date of payment.  The annual interest rate will be at least 1%.

## PREMIUMS

**Premium**      To keep this policy In Force, each premium must be paid in advance.  Premiums should be sent to our Administrative Office or as otherwise instructed by us.  We will give you a receipt if you ask for one.  The first premium is due on the Policy Date.  Subsequent premiums are payable while the Insured is living and within the grace period.  If a part of the premium ceases to be payable under the provisions of a rider, the premium will be reduced accordingly.  The mode of premium payment may be changed on any Policy Anniversary to any other mode shown in the Policy Data.

**Schedules of Premiums**      Premiums for this policy (excluding premiums for certain Riders) will remain level until the First Premium Increase Date shown in the Policy Data.  Beginning on the First Premium Increase Date, premiums will increase annually.

The Policy Data includes two schedules of annual premiums.  For any Policy Year after the First Premium Increase Date, we may charge a lower premium than the guaranteed annual premium, but we will not charge a higher annual premium.  Any lower annual premium will be in effect for one year and will apply to all policies having the same plan, issue year, class of risk, face amount, sex, and premium schedule as this policy.

The Schedule of Non-Guaranteed Premiums shown in the Policy Data is based on our current premium scale, but is not guaranteed. Any change in the non-guaranteed premium rates will be prospective and will be subject to our expectation as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; regulatory changes; and any applicable federal, state and local taxes.

The semi-annual, quarterly and monthly premiums for each Policy Year will be determined on the same basis used to determine the initial semi-annual, quarterly and monthly premiums.

**Grace Period**  If premiums are not paid when they are due, this policy will Lapse. We will allow a period of 61 days after the premium due date for payment of each premium after the first premium. This means that if a premium is not paid on or before the date it is due, you may pay that premium during the 61 day period immediately following the due date. The Insured's life will continue to be insured during this 61 day period. During the grace period, we will not charge any interest on the premium due. If you do not pay the premium due before the end of the grace period, this policy will Lapse and all coverage will terminate. You will have the entire grace period within which to remit payment. Any payments sent by U.S. mail must be postmarked within the grace period. If the Insured dies during the grace period before the premium is paid, we will deduct the portion of the premium required to provide insurance from the premium due date to the date of the Insured's death from the death benefit payable under this policy.

**Reinstatement**  If this policy Lapses, you may Reinstate it as provided in this section. Any Reinstatement must be made during the lifetime of the Insured and within three years from the end of the grace period. Before we Reinstate your policy, we will require:

1. Your Written Request to Reinstate this policy,
2. The Insured's written consent to Reinstatement,
3. Evidence of insurability satisfactory to us that the Insured is insurable at the same class of risk/substandard rating/flat extra as applied to this policy immediately prior to Lapse, and
4. Payment of all overdue premiums with interest from the due date of each premium. The interest rate is 6% per annum, compounded annually.

The date of Reinstatement will be the Monthly Policy Date on or following the date the application for Reinstatement is approved by us, so long as the Insured is still living.

## GENERAL PROVISIONS

**This Policy is Our Contract with You**  This policy is issued in consideration of the application and the payment of premiums as provided in this policy.

This policy, any amendment(s) or endorsement(s), and a copy of the application(s) and any questionnaires for issuance or Reinstatement of this policy attached to it contain the entire contract between you and us. Any statements made in such application(s), questionnaires or any amendments either by you or by the Insured will be considered representations and not warranties. Also, any written statement made either by you or by the Insured will not be used to void this policy nor defend against a claim under this policy unless the statement is contained in the application(s), questionnaires or any amendments thereto.

TL19 CA                                     Page 6

Any extra benefit rider attached to this policy will become a part of this policy and will be subject to all of the terms and conditions of this policy unless we state otherwise in the rider.

We reserve the right to add future Riders or endorsements to this policy, except where prohibited by law.

**Incontestability**

We cannot contest this policy, except for non-payment of premium, after it has been In Force during the lifetime of the Insured for two years after the later of:

1. The Date of Issue; and
2. The effective date of Reinstatement of this policy.

If this policy is Reinstated, the original contestability period will continue to apply. In addition, a new two year contestability period will apply from the date of Reinstatement with respect to statements made in the application for Reinstatement.

The Insured, the owner and the Beneficiary are obligated to cooperate in any contestability investigation that we may conduct, including supplying us with necessary authorizations for medical and other information.

**Amount Payable Is Limited in the Event of Suicide**

If the Insured, whether sane or insane, dies by suicide within two years from the Date of Issue, our liability will be limited to an amount equal to the premiums paid for this policy.

If this policy is Reinstated, a new two year period will apply beginning on the date of Reinstatement. If the Insured, whether sane or insane, dies by suicide within two years from the Reinstatement date, our liability will be limited to an amount equal to the premiums paid from the date of Reinstatement.

**Misstatement of Age or Sex in the Application**

If there is a misstatement of the Insured's date of birth or sex in the application, we will adjust the death benefit to that which the premiums paid would have purchased at the correct Age or sex.

**Riders**

Riders, if any, are listed in the Policy Data. Any Rider will become part of this policy and will be subject to all of the terms and conditions of this policy, unless we state otherwise in the Rider.

**Who Can Make Changes in the Policy**

No change or waiver of any of the provisions of this policy will be valid unless made in writing by us and signed by an officer of the Company. Any change or waiver must be signed by our President or a Vice President together with our Secretary. No agent or other person has the authority to change or waive any provision of this policy.

**Termination of Insurance**

This policy will terminate and all coverage on the Insured's life will end on the earliest of the following dates or events:

1. The Expiry Date; or
2. The date this policy Lapses; or
3. The date we receive your Written Request to terminate; or
4. The date this policy is converted pursuant to a Conversion Option Endorsement; or
5. The date of the Insured's death.

Our acceptance of a premium for any period after the date of termination of this policy shall create no liability by us with respect to this policy, nor will it constitute a waiver of the termination.  Any premium paid for this policy following its termination will be refunded.

**No Dividends are Payable**

This is nonparticipating insurance.  It does not participate in our profits or surplus. We do not distribute past surplus or recover past losses by changing the premium rates.

**Your Rights**

During the Insured's lifetime and unless otherwise provided in this policy, you have the exclusive right to assign this policy and to exercise every right, privilege and option this policy grants or that we allow.

To exercise any of these rights, or to apply for the death benefits or any benefits under this policy, communicate with our nearest representative or directly with our Administrative Office.  Contact your agent if you desire additional services or information.  Please notify us promptly of any change of address.

## SETTLEMENT PROVISIONS

**Lump Sum Payment**

When the death benefit is payable, we will pay it in a lump sum, unless a settlement option is elected.

**Settlement Options**

During the Insured's lifetime, you may request that we pay the death benefit under one of the following settlement options.  We will also use any other method of payment that is agreeable to you and us.  After the Insured's death, a Beneficiary may elect to receive such Beneficiary's share of the death benefit under a settlement option.  However, you may provide that the Beneficiary will not be permitted to change the settlement option you have selected.  If a settlement option is requested, we will prepare an agreement to be signed which will state the terms and conditions under which the payments will be made.  This agreement will include a statement regarding the withdrawal value, if any, and to whom any remaining proceeds will be paid following the death of the person receiving the payments.

**Annuity**

We will use the benefit as a single premium to buy an annuity.  The annuity may be payable to one or two payees.  It may be payable for a guaranteed period, or for life with or without a guaranteed period as long as we agree to it.  The annuity payment will not be less than what our newly issued immediate annuity contracts with the same features are then paying.

**Benefit Deposited with Interest**

We will hold the benefit on deposit with us and it will earn interest.  Such interest will be at a rate declared by us from time to time, but not less than an annual interest rate of 1%, and may differ from the rate we pay under other options.  We will pay the earned interest monthly, quarterly, semi-annually or annually, as requested.  The payee may withdraw part or all of the benefit and earned interest at any time.

**Conditions**

Settlements of less than $10,000 will be paid in a lump sum and may not be applied under any settlement option.  We may change the payment frequency if payments under an option become less than $100.

A corporation may receive payments under a life income option only if the payments are based on the life of the surviving spouse or child of the Insured.



**Payments Exempt from the Claims of Creditors**

To the extent permitted by law:

1. no payment of death benefit or interest we make will be subject to the claims of any creditor; and
2. if you provide that the option selected cannot be changed after the Insured's death, the payments will not be subject to the debts or contracts of the person receiving the payments.



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA  52499
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 238-4302

(Referred to as the Company, we, our or us)

### CHRONIC ILLNESS ACCELERATED DEATH BENEFIT RIDER

We have issued this rider as a part of the policy to which it is attached.  Except as otherwise specifically set forth below, it is subject to all of the terms of the policy.

**NOTICE:**  This rider is not intended for favorable tax treatment under Section 101(g) of the Internal Revenue Code [26 U.S.C. 101(g)] and benefits advanced under this rider may be taxable in certain circumstances.  You should consult with your tax advisor regarding the tax treatment of receiving an Accelerated Death Benefit.

**30 DAY RIGHT TO CANCEL** – You may cancel this rider by sending it to us or to the agent from whom it was purchased.  You must return the rider to us or the agent before midnight of the 30th day after the day you receive it.   Return of the rider by first-class mail is effective on being postmarked, properly addressed and postage prepaid.  We must return all payments made for this rider within 30 days after we receive the returned rider.  Return of this rider shall void the rider from the beginning, and both parties shall be in the same position as if no rider had been issued.

The policy's benefits and values, as well as any benefits and values provided by affected riders, will be reduced if an Accelerated Death Benefit is paid.  Benefits and values (if applicable) include without limitation: face amounts of the policy and of any affected riders, policy values, accumulation values, net cash values, cash surrender values and loan values.  Payment of an Accelerated Death Benefit may affect eligibility for Medicaid or other government benefits and entitlements.  Payment of an Accelerated Death Benefit under this rider is not conditioned on the receipt of long-term care or medical services.

**THIS RIDER IS RENEWABLE FOR THE LIFE OF THE POLICY PROVIDED ANY REQUIRED PREMIUMS ARE PAID AND THE POLICY REMAINS IN FORCE.  THIS RIDER WILL TERMINATE ON THE DATE THE POLICY TERMINATES.  TERMINATION OF THIS RIDER WILL NOT AFFECT ANY CLAIM FOR BENEFITS FOR CHRONIC ILLNESS OCCURRING WHILE THE RIDER WAS IN EFFECT.**

**Rider Benefit**   If the Insured becomes Chronically Ill while the policy and rider are in effect, you may elect to receive an Accelerated Death Benefit payment subject to the provisions of the policy and this rider and the following conditions:

1.  The Insured must be certified by a Licensed Health Care Practitioner as being a Chronically Ill individual within the last 12 months and while the policy and rider are In Force; and
2.  The policy must be In Force at the time of your Accelerated Death Benefit request; and
3.  The Face Amount of the policy at the time the Accelerated Death Benefit request is received must be at least $25,000; and
4.  The 30 day waiting period must have expired; and
5.  We must receive the written consent of all irrevocable Beneficiaries (if any) and all assignees (if any).

8431-24-00-0000005-0012-0000140

LR02 CA                                    Page 1

**Definitions**

**Accelerated Death Benefit** is a portion of the policy death benefit that is paid prior to the death of the Insured due to the Insured's Chronic Illness. The payment of an Accelerated Death Benefit reduces the Face Amount and values of the policy and the death benefit payable to the Beneficiary(ies) upon death. Death benefits under riders are not eligible for Accelerated Death Benefits.

**Activities of Daily Living (ADLs)** – Bathing, Continence, Dressing, Eating, Toileting and Transferring.

1. **Bathing** means the ability to wash oneself by sponge bath; or in either a tub or shower, including the act of getting into and out of the tub or shower.

2. **Continence** means the ability to maintain control of bowel and bladder function; or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).

3. **Dressing** means the ability to put on and take off all items of clothing and any necessary braces, fasteners or artificial limbs.

4. **Eating** means the ability to feed oneself by getting food into the body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously.

5. **Toileting** means the ability to get to and from the toilet, get on and off the toilet and perform associated personal hygiene.

6. **Transferring** means the ability to move into or out of a bed, chair or wheelchair.

**Chronically Ill** means that the Insured has been certified by a Licensed Health Care Practitioner after the later of the Date of Issue or the Policy Date as:

1. being unable to perform, without Substantial Assistance from another person for a period of at least 90 days, at least two out of the six Activities of Daily Living due to a loss of functional capacity to perform the activity; or

2. requiring Substantial Supervision by another person, for a period of at least 90 consecutive days, to protect the Insured from threats to health and safety due to Severe Cognitive Impairment.

**Immediate Family** means you or the Insured's spouse/partner and any one of the following people who are related to you or the Insured: parents, children, brothers and sisters.

**Insured** means only the Insured under the policy to which this rider is attached. It does not include any other individuals covered under other riders.

**Licensed Health Care Practitioner** is a Physician, a registered nurse, or a licensed social worker. Licensed Health Care Practitioner does not include:

1. You, the Insured, your Immediate Family or the Insured's Immediate Family; or

2. A person who lives with you, the Insured, your Immediate Family or the Insured's Immediate Family; or

3. A person in the same medical practice as you, the Insured, your Immediate Family or the Insured's Immediate Family; or

4. A business partner of you, the Insured, your Immediate Family or the Insured's Immediate Family.

Physician is any person bearing the designation of Medical Doctor (M.D.) or Doctor of Osteopathy licensed within the United States and practicing within the scope of his or her license issued by the jurisdiction in which such person's services are rendered.  Physician does not include:

1. You, the Insured, or an Immediate Family Member; or

2. A person who lives with you, the Insured, or an Immediate Family Member; or

3. A person in the same medical practice as you, the Insured, or an Immediate Family Member; or

4. A business partner of you, the Insured, or an Immediate Family Member.

**Severe Cognitive Impairment** means a loss or deterioration in intellectual capacity that is (a) comparable to and includes Alzheimer's disease and similar forms of irreversible dementia, and (b) measured by clinical evidence and standardized tests that reliably measure impairment in the Insured's short-term or long-term memory, orientation as to people, places, or time, and deductive or abstract reasoning.

**Substantial Assistance** means either Hands-On Assistance or Standby Assistance:

1. Hands-On Assistance means the physical assistance of another person without which the Insured would be unable to perform the Activity of Daily Living.

2. Standby Assistance is the presence of another person within arm's reach that is necessary to prevent, by physical intervention, injury to the Insured while the Insured is performing the Activity of Daily Living.

**Substantial Supervision** means continual supervision (which may include cuing by verbal prompting, gestures, or other demonstrations) by another person that is necessary to protect the Insured from threats to the Insured's health or safety (such as may result from wandering).

**Amount of Accelerated Death Benefit**

If the Insured is Chronically Ill, you may request acceleration of any amount between $1,000 and the maximum Accelerated Death Benefit as outlined below. If we approve a request for an Accelerated Death Benefit that is less than the maximum Accelerated Death Benefit we allow, you may request additional future accelerations up to the maximum stated in the Maximum Accelerated Death Benefit section below. The total of all death benefits accelerated may not exceed the maximum Accelerated Death Benefit described below.  If we approve a request to accelerate the maximum Accelerated Death Benefit because the Insured is Chronically Ill, the amount of the Accelerated Death Benefit payment will be no less than $300.

The Accelerated Death Benefit payment we make to you will be less than the amount of the death benefit which you request to accelerate.  The Accelerated Death Benefit payment for the amount of the death benefit which you request to accelerate will be calculated as A – B – C – D where A, B, C, and D are determined as follows:

A. The present value of the amount of the death benefit which you request to accelerate, which will be calculated as described below.

B. Any due or unpaid premium if we make payment during the grace period.

C. The actuarial present value of future premiums, excluding rider premiums that would otherwise be payable to keep the policy In Force during the period of the Insured's remaining lifetime at time of the acceleration, using the applicable rated age, mortality table, and interest rate.

LR02 CA                          Page 3

D. An administrative charge for each Accelerated Death Benefit request. The administrative charge for each Accelerated Death Benefit request as of January 1, 2014 is $350, but will be subject to future increases based on cumulative annual cost-of-living increases as measured by the Consumer Price Index for All Urban Consumers (CPI) since January 1, 2014. Cumulative annual cost of living increases will not exceed 5% per calendar year. In the event that the CPI is no longer published, a substantially similar index will be used. If additional Accelerated Death Benefits are paid pursuant to annual recertifications, an administrative fee of $100 will apply to those additional payments. In no event will the administrative charge exceed $1,000.

If we approve your request for an Accelerated Death Benefit, the amount that may be payable will be based in part on the Insured's remaining life expectancy as determined by us at the time of the acceleration. The longer the Insured's remaining life expectancy, the lower the payment amount will be. The shorter the Insured's remaining life expectancy, the higher the payment amount will be.

**Present Value of Accelerated Death Benefit**

The present value of the amount of the death benefit which you request to accelerate will be calculated using the following factors:

i) The applicable mortality rates, using the sex distinct, smoker distinct, ultimate, age last birthday 2001 Valuation Basic Tables.

ii) A rated age, determined using the tables in i) equal to the highest age that has a life expectancy greater than or equal to the remaining life expectancy of the Insured as determined by our physician's assessment.

iii) Annual interest at a discount rate that is the greater of:

1) The current yield on 90-day U.S. Treasury bills; or

2) The maximum statutory adjustable policy loan interest rate as of the date of your Accelerated Death Benefit request.

However, any such discount rate will never exceed 6%.

**Maximum Accelerated Death Benefit**

The maximum death benefit you may accelerate because the Insured is Chronically Ill in any 12 month period is 24% of the Face Amount of the policy at the time of the initial acceleration for Chronic Illness.

If the Insured continues to be Chronically Ill, you may request additional accelerations each year up to the maximum stated in this section, provided that a Licensed Health Care Practitioner annually recertifies the Insured as being a Chronically Ill individual.

The maximum death benefit you may accelerate because the Insured is Chronically Ill over the lifetime of the Insured is equal to the lesser of:

i) 90% of the Face Amount of the policy; or

ii) $500,000, including all other Accelerated Death Benefits previously elected or currently under review under all policies, endorsements or riders issued by us or our affiliates on the life of the Insured.

**Coordination between Accelerated Death Benefit Options**

If the Insured qualifies for an Accelerated Death Benefit under another rider to the policy and makes claim for benefits under two or more Accelerated Death Benefit riders at the same time, acceleration of death benefit will only occur under one

rider up to the maximum percentage of Face Amount allowed under the riders. Benefits will first be payable under the Terminal Illness Accelerated Death Benefit rider, if applicable. If we approve a request for an Accelerated Death Benefit that is less than the maximum Accelerated Death Benefit we allow, you may request additional future accelerations up to the maximum stated in the Maximum Accelerated Death Benefit section above.

**Effect of the Accelerated Death Benefit Payment on the Policy**

If applicable, the accumulation value, net cash value, cash surrender value, and loan balance will be reduced in the same proportion as the reduction in the Face Amount upon payment of an Accelerated Death Benefit. The premium and/or charges and monthly deductions, as applicable, for the policy will also be adjusted after the Accelerated Death Benefit is paid. If the rider is attached to a fixed premium policy, the adjusted premium will equal the appropriate premium rate applied to the reduced Face Amount plus any applicable policy fee. If the rider is attached to a flexible premium policy, the new Minimum Monthly Premium will be decreased proportionally to the reduced Face Amount plus any applicable policy fee.

We will provide you with information showing the reduced Face Amount, applicable values and new premium resulting from the Accelerated Death Benefit payment.

Payment of an Accelerated Death Benefit will not affect benefits available under any rider attached to the policy which provides benefits for accidental injury or accidental death provided the policy and rider remain in effect following the Accelerated Death Benefit payment.

**Limitation**

We will not pay any Accelerated Death Benefit under this policy for a Chronic Illness that is caused or substantially contributed to by any attempt at suicide or intentionally self-inflicted injury while sane or insane.

**Notice of Claim**

We must receive a written Accelerated Death Benefit request at our Administrative Office within 60 days after the certification of the Insured's Chronic Illness, or as soon thereafter as is reasonably possible. Notice given by or on behalf of the Insured or the Beneficiary at our Administrative Office or to any authorized agent, with information sufficient to identify the Insured, shall be deemed as notice.

**Claim Forms**

Upon receipt of a notice of a claim, we shall furnish you forms for filing proof of loss. If the forms are not furnished to you within 15 days after giving notice, you shall be deemed to have complied with the proof of loss requirements provided you submit to us within 90 days after the certification of the Insured's Chronic Illness, written proof covering the character and the extent of the occurrence or loss.

**Proof of Loss**

We must receive written proof of the Insured's Chronic Illness before we make an Accelerated Death Benefit payment. This proof must consist of a Licensed Health Care Practitioner's certification stating that the Insured is Chronically Ill and be received within 90 days after the certification of the Insured's Chronic Illness. We may request additional medical information from the Licensed Health Care Practitioner submitting the certification or from any Licensed Health Care Practitioner we consider qualified.

Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

8431-24-00-0000008-0014-0000142



**Physical Examination**   While an acceleration request is pending, we reserve the right and opportunity to have the Insured examined at our expense as often as reasonably required.

**Payment of Accelerated Death Benefits**   After we have received proof of loss, we will determine the Accelerated Death Benefit payment amount which will be fixed upon our approval of the benefit. We will send you and any irrevocable beneficiary a statement that informs you of the amount of the payment available and shows you any effect that the payment of the Accelerated Death Benefit would have on the policy's cash value accumulation account, death benefit, premium, policy loans and policy liens, as applicable. The payment amount will be less than the amount of the death benefit you request to accelerate. The size of the payment will depend, among other factors, on our sole determination of the Insured's remaining life expectancy at the time of the acceleration.

Once we receive due written proof of eligibility, we will immediately pay you the amount of the Accelerated Death Benefit in a lump sum unless you request to receive periodic payments. Upon request, we will provide you with the options available for periodic payments. If you elect periodic payments, we will provide you monthly reports if any Accelerated Death Benefits are paid out during the prior month, including an explanation of any changes to the policy, death benefits and cash values on account of the benefits being paid out, and the amount of remaining benefits that can be accelerated at the end of the prior month.

If the Insured dies before any Accelerated Death Benefit payment is made, we will instead pay the entire death benefit of the policy in accordance with the policy provisions. You may use the Accelerated Death Benefit for any purpose.

**Waiting Period**   There is a 30 day waiting period before you can claim benefits under this rider. No Accelerated Death Benefit will be paid under this rider for Chronic Illness arising during the first 30 days the policy is In Force unless the Chronic Illness results from accidental injury. Further, commencing two years from the Rider Date, no Accelerated Death Benefit claim may be reduced or denied on the grounds that the disease or physical condition not excluded from coverage by name or specific description effective on the date of loss existed prior to the Rider Date.

**Termination**   This rider will terminate on the earliest of the following dates or events:

1. The date the Maximum Accelerated Death Benefit has been accelerated, or the aggregate Maximum Accelerated Death Benefit of $500,000 under all policies, endorsements or riders has been reached; or
2. The date the policy lapses or otherwise terminates; or
3. The date of the Insured's death.

Termination of this rider will not affect any claim for benefits for Chronic Illness occurring while the rider was in effect.

**Reinstatement**   If the policy is reinstated, this rider may be reinstated on the same or more favorable terms as reinstatement of the underlying policy. Following reinstatement, you will have the same rights under this rider as you had immediately before the due date of the defaulted premium.

**Consideration**   We have issued this rider in consideration of the application and payment of the premiums for the policy.

LR02 CA                    Page 6

| | |
|---|---|
| **No Additional Cost Prior to Election** | There is no additional cost for the Accelerated Death Benefit prior to election of the Accelerated Death Benefit. |
| **Legal Actions** | No legal action may be brought to recover any Accelerated Death Benefit payments requested under this rider within 60 days after written proof of the Chronic Illness has been given to us.  No such action may be brought after three years from the time such written proof of the Insured's health condition has been given to us. |
| **Incontestability** | We cannot contest this rider after it has been In Force during the lifetime of the Insured for two years after the Rider Date.  This rider may only be contested based on a statement made in the application if the application is attached to the policy and the statement was material to the risk accepted or the hazard assumed by us. |
| **Right to Appeal** | You have the right to appeal any decision made regarding benefit eligibility. |
| **Policy Statement** | The Policy Statement for this policy will reflect payment of the Accelerated Death Benefit, if paid during the prior year, as well as resulting reductions and remaining benefits and values. |
| **No Dividends are Payable** | This rider does not participate in our profits or surplus. |
| **Nonforfeiture Values** | This rider does not have cash values or loan values. |
| **Rider Date** | The Rider Date of this rider will be the Policy Date, unless we inform you in writing of a different date. |

Signed for us at our home office.

Secretary                                        President

8431-24-00-0000006-0015-0000143



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA 52499
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 238-4302

(Referred to as the Company, we, our or us)

### CRITICAL ILLNESS ACCELERATED DEATH BENEFIT RIDER

We have issued this rider as a part of the policy to which it is attached. Except as otherwise specifically set forth below, it is subject to all of the terms of the policy.

**NOTICE:** This rider is not intended for favorable tax treatment under Section 101(g) of the Internal Revenue Code [26 U.S.C. 101(g)] and benefits advanced under this rider may be taxable in certain circumstances. You should consult with your tax advisor regarding the tax treatment of receiving an Accelerated Death Benefit.

**30 DAY RIGHT TO CANCEL** – You may cancel this rider by sending it to us or to the agent from whom it was purchased. You must return the rider to us or the agent before midnight of the 30th day after the day you receive it. Return of the rider by first-class mail is effective on being postmarked, properly addressed and postage prepaid. We must return all payments made for this rider within 30 days after we receive the returned rider. Return of this rider shall void the rider from the beginning, and both parties shall be in the same position as if no rider had been issued.

The policy's benefits and values, as well as any benefits and values provided by affected riders, will be reduced if an Accelerated Death Benefit is paid. Benefits and values (if applicable) include without limitation: face amounts of the policy and of any affected riders, policy values, accumulation values, net cash values, cash surrender values and loan values. Payment of an Accelerated Death Benefit may affect eligibility for Medicaid or other government benefits and entitlements. Payment of an Accelerated Death Benefit under this rider is not conditioned on the receipt of long-term care or medical services.

**THIS RIDER IS RENEWABLE FOR THE LIFE OF THE POLICY PROVIDED ANY REQUIRED PREMIUMS ARE PAID AND THE POLICY REMAINS IN FORCE. THIS RIDER WILL TERMINATE ON THE DATE THE POLICY TERMINATES. TERMINATION OF THIS RIDER WILL NOT AFFECT ANY CLAIM FOR BENEFITS FOR CRITICAL ILLNESS OCCURRING WHILE THE RIDER WAS IN EFFECT.**

| | |
|---|---|
| **Rider Benefit** | If the Insured becomes Critically Ill while the policy and rider are in effect, you may elect to receive an Accelerated Death Benefit payment subject to the provisions of the policy and this rider and the following conditions: |

1. The Insured must be certified by a Physician as being a Critically Ill individual within the last 12 months and while the policy and rider are In Force; and
2. The policy must be In Force at the time of your Accelerated Death Benefit request; and
3. The Face Amount of the policy at the time the Accelerated Death Benefit request is received must be at least $25,000; and
4. The 30 day waiting period must have expired; and
5. We must receive the written consent of all irrevocable Beneficiaries (if any) and all assignees (if any).

| | |
|---|---|
| **Definitions** | **Accelerated Death Benefit** is a portion of the policy death benefit that is paid prior to the death of the Insured due to the Insured's Critical Illness. The payment of an Accelerated Death Benefit reduces the Face Amount and values of the policy and |

8431-24-00-0000006-0016-0000144

LR03 CA                                Page 1

the death benefit payable to the Beneficiary(ies) upon death.  Death benefits under riders are not eligible for Accelerated Death Benefits.

**Critically Ill** means that the Insured has been diagnosed after the Rider Date with a medical condition that would, in the absence of treatment, result in the Insured's death within 12 months.

**Immediate Family** means you or the Insured's spouse/partner and any one of the following people who are related to you or the Insured: parents, children, brothers and sisters.

**Insured** means only the Insured under the policy to which this rider is attached.  It does not include any other individuals covered under other riders.

**Physician** is any person bearing the designation of Medical Doctor (M.D.) or Doctor of Osteopathy licensed within the United States and practicing within the scope of his or her license issued by the jurisdiction in which such person's services are rendered.  Physician does not include:

1. You, the Insured, your Immediate Family, or the Insured's Immediate Family; or

2. A person who lives with you, the Insured, your Immediate Family, or the Insured's Immediate Family; or

3. A person in the same medical practice as you, the Insured, your Immediate Family, or the Insured's Immediate Family; or

4. A business partner of you, the Insured, your Immediate Family, or the Insured's Immediate Family.

**Amount of Accelerated Death Benefit**

If the Insured is Critically Ill, you may request acceleration of any amount between $2,500 and the maximum Accelerated Death Benefit as outlined below.  If we approve a request for an Accelerated Death Benefit that is less than the maximum Accelerated Death Benefit that we allow, you may request additional future accelerations up to the maximum stated in the Maximum Accelerated Death Benefit section below.  The total of all death benefits accelerated may not exceed the maximum Accelerated Death Benefit described below.  If we approve a request to accelerate the maximum Accelerated Death Benefit because the Insured is Critically Ill, the amount of the Accelerated Death Benefit payment will be no less than $1,000.

The Accelerated Death Benefit payment we make to you will be less than the amount of the death benefit which you request to accelerate.  The Accelerated Death Benefit payment for the amount of the death benefit which you request to accelerate will be calculated as A − B − C − D where A, B, C, and D are determined as follows:

A. The present value of the amount of the death benefit which you request to accelerate, which will be calculated as described below.

B. Any due or unpaid premium if we make payment during the grace period.

C. The actuarial present value of future premiums, excluding rider premiums that would otherwise be payable to keep the policy In Force during the period of the Insured's remaining lifetime at time of the acceleration, using the applicable rated age, mortality table, and interest rate.

D. An administrative charge for each Accelerated Death Benefit request.  The administrative charge for each Accelerated Death Benefit request as of January 1, 2014 is $350, but will be subject to future increases based on cumulative annual cost-of-living increases as measured by the Consumer Price Index for All Urban Consumers (CPI) since January 1, 2014.



Cumulative annual cost of living increases will not exceed 5% per calendar year. In the event that the CPI is no longer published, a substantially similar index will be used. In no event will the administrative charge exceed $1,000.

If we approve your request for an Accelerated Death Benefit, the amount that may be payable will be based in part on the Insured's remaining life expectancy as determined by us at the time of the acceleration. The longer the Insured's remaining life expectancy, the lower the payment amount will be. The shorter the Insured's remaining life expectancy, the higher the payment amount will be.

**Present Value of Accelerated Death Benefit**

The present value of the amount of the death benefit which you request to accelerate will be calculated using the following factors:

1. The applicable mortality rates, using the sex distinct, smoker distinct, ultimate, age last birthday 2001 Valuation Basic Tables.

2. A rated age, determined using the tables in i) equal to the highest age that has a life expectancy greater than or equal to the remaining life expectancy of the Insured as determined by our physician's assessment.

3. Annual interest at a discount rate that is the greater of:

   1) The current yield on 90-day U.S. Treasury bills; or

   2) The maximum statutory adjustable policy loan interest rate as of the date of your Accelerated Death Benefit request.

   However, any such discount rate will never exceed 6%.

**Maximum Accelerated Death Benefit**

The maximum death benefit you may accelerate because the Insured is Critically Ill over the lifetime of the Insured is equal to the lesser of:

1. 90% of the Face Amount of the policy; or

2. $500,000, including all other Accelerated Death Benefits previously elected or currently under review under all policies, endorsements or riders issued by us or our affiliates on the life of the Insured.

**Coordination between Accelerated Death Benefit Options**

If the Insured qualifies for an Accelerated Death Benefit under another rider to the policy and makes claim for benefits under two or more Accelerated Death Benefit riders at the same time, acceleration of death benefit will only occur under one rider up to the maximum percentage of Face Amount allowed under the riders. Benefits will first be payable under the Terminal Illness Accelerated Death Benefit rider, if applicable. If we approve a request for an Accelerated Death Benefit that is less than the maximum Accelerated Death Benefit we allow, you may request additional future accelerations up to the maximum stated in the Maximum Accelerated Death Benefit section above.

**Effect of the Accelerated Death Benefit Payment on the Policy**

If applicable, the accumulation value, net cash value, cash surrender value, and loan balance will be reduced in the same proportion as the reduction in the Face Amount upon payment of an Accelerated Death Benefit. The premium and/or charges and monthly deductions, as applicable, for the policy will also be adjusted after the Accelerated Death Benefit is paid. If the rider is attached to a fixed premium policy, the adjusted premium will equal the appropriate premium rate applied to the reduced Face Amount plus any applicable policy fee. If the rider is attached to a flexible premium policy, the new Minimum Monthly Premium will be decreased proportionally to the reduced Face Amount plus any applicable policy fee.

8431-24-00-0000008-0017-0000145

We will provide you with information showing the reduced Face Amount, applicable values and new premium resulting from the Accelerated Death Benefit payment.

Payment of an Accelerated Death Benefit will not affect benefits available under any rider attached to the policy which provides benefits for accidental injury or accidental death provided the policy and rider remain in effect following the Accelerated Death Benefit payment.

**Limitation**         We will not pay any Accelerated Death Benefit under this policy for a Critical Illness that is caused or substantially contributed to by any attempt at suicide or intentionally self-inflicted injury while sane or insane.

**Notice of Claim**    We must receive a written Accelerated Death Benefit request at our Administrative Office within 60 days after the certification of the Insured's Critical Illness, or as soon thereafter as is reasonably possible. Notice given by or on behalf of the Insured or the Beneficiary at our Administrative Office or to any authorized agent, with information sufficient to identify the Insured, shall be deemed as notice.

**Claim Forms**        Upon receipt of a notice of a claim, we shall furnish you forms for filing proof of loss. If the forms are not furnished to you within 15 days after giving notice, you shall be deemed to have complied with the proof of loss requirements provided you submit to us within 90 days after the certification of the Insured's Critical Illness, written proof covering the character and the extent of the occurrence or loss.

**Proof of Loss**      We must receive written proof of the Insured's Critical Illness before we make an Accelerated Death Benefit payment. This proof must consist of a Physician's certification stating that the Insured is Critically Ill and be received within 90 days after the certification of the Insured's Critical Illness. We may request additional medical information from the Physician submitting the certification or from any Physician we consider qualified.

Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

**Physical Examination** While an acceleration request is pending, we reserve the right and opportunity to have the Insured examined at our expense as often as reasonably required.

**Payment of           After we have received proof of loss, we will determine the Accelerated Death
Accelerated Death      Benefit payment amount which will be fixed upon our approval of the benefit. We
Benefits**             will send you and any irrevocable beneficiary a statement that informs you of the amount of the payment available and shows you any effect that the payment of the Accelerated Death Benefit would have on the policy's cash value accumulation account, death benefit, premium, policy loans and policy liens, as applicable. The payment amount will be less than the amount of the death benefit you request to accelerate. The size of the payment will depend, among other factors, on our sole determination of the Insured's remaining life expectancy at the time of the acceleration.

Once we receive due written proof of eligibility, we will immediately pay you the amount of the Accelerated Death Benefit in a lump sum unless you request to receive periodic payments. Upon request, we will provide you with the options available for periodic payments. If you elect periodic payments, we will provide

you monthly reports if any Accelerated Death Benefits are paid out during the prior month, including an explanation of any changes to the policy, death benefits and cash values on account of the benefits being paid out, and the amount of remaining benefits that can be accelerated at the end of the prior month.

If the Insured dies before any Accelerated Death Benefit payment is made, we will instead pay the entire death benefit of the policy in accordance with the policy provisions.  You may use the Accelerated Death Benefit for any purpose.

**Waiting Period**

There is a 30 day waiting period before you can claim benefits under this rider.  No Accelerated Death Benefit will be paid under this rider for Critical Illness arising during the first 30 days the policy is In Force unless the Critical Illness results from accidental injury.  Further, commencing two years from the Rider Date, no Accelerated Death Benefit claim may be reduced or denied on the grounds that the disease or physical condition not excluded from coverage by name or specific description effective on the date of loss existed prior to the Rider Date.

**Termination**

This rider will terminate on the earliest of the following dates or events:

1. The date the Maximum Accelerated Death Benefit has been accelerated, or the aggregate Maximum Accelerated Death Benefit of $500,000 under all policies, endorsements or riders has been reached; or
2. The date the policy lapses or otherwise terminates; or
3. The date of the Insured's death.

Termination of this rider will not affect any claim for benefits for Critical Illness occurring while the rider was in effect.

**Reinstatement**

If the policy is reinstated, this rider may be reinstated on the same or more favorable terms as reinstatement of the underlying policy. Following reinstatement, you will have the same rights under this rider as you had immediately before the due date of the defaulted premium.

**Consideration**

We have issued this rider in consideration of the application and payment of the premiums for the policy.

**No Additional Cost Prior to Election**

There is no additional cost for the Accelerated Death Benefit prior to election of the Accelerated Death Benefit.

**Legal Actions**

No legal action may be brought to recover any Accelerated Death Benefit payments requested under this rider within 60 days after written proof of the Critical Illness has been given to us.  No such action may be brought after three years from the time such written proof of the Insured's health condition has been given to us.

**Incontestability**

We cannot contest this rider after it has been In Force during the lifetime of the Insured for two years after the Rider Date.  This rider may only be contested based on a statement made in the application if the application is attached to the policy and the statement was material to the risk accepted or the hazard assumed by us.

**Right to Appeal**

You have the right to appeal any decision made regarding benefit eligibility.

**Policy Statement**

The Policy Statement for this policy will reflect payment of the Accelerated Death Benefit, if paid during the prior year, as well as resulting reductions and remaining benefits and values.

8431-24-00-0000006 0018-0000146

**No Dividends are Payable**     This rider does not participate in our profits or surplus.

**Nonforfeiture Values**     This rider does not have cash values or loan values.

**Rider Date**     The Rider Date of this rider will be the Policy Date, unless we inform you in writing of a different date.

**Signed for us at our home office.**

_(signature)_

Secretary

_(signature)_

President

## Conversion Option Endorsement

Transamerica Life Insurance Company has issued this endorsement as a part of the policy to which it is attached.

While the policy is in force and the Insured is alive, the policy may be converted at any time prior to the earlier of the following:

1. the end of the Initial Level Premium Period or

2. the Insured's 70th birthday

The policy, subject to all conditions stated herein, may be converted to:

1. a non-flexible premium level premium whole life insurance plan that we make available at the date of the request, or

2. a flexible premium adjustable life insurance plan that we make available at the date of the request.

At least one plan of insurance will be made available for conversion to the new policy at any time while this policy is in force. Evidence of insurability will not be required for the new policy for the same, or lower, face amount at the time the request for conversion is made.

The conversion is also subject to the following conditions:

1. We must receive the written request no later than 30 days after the earlier of:
   a. the end of the Initial Level Premium Period or
   b. the Insured's 70th birthday.

2. Unless you request otherwise, the policy date of the new policy will be the date we receive your application for the conversion accompanied by the first premium, or the Insured's 70th birthday, whichever is earlier.

3. The face amount of the new policy may be for an amount up to the face amount of this policy at the time the request for conversion is made, but no less than our then published minimum for the plan selected.

4. If the conversion is exercised within 2 years from the earlier of the policy date or issue date of the original policy, the contestability provision will apply to the new policy for the balance of that 2 year period.

5. Premiums for the original policy must be paid to the date of conversion. The premium for the new policy will be at our published rate for the plan selected at the time of conversion. We will use the Insured's age on the date of conversion to determine this rate. The new policy will be issued at the class of risk of this policy, if available. If such is not available at the time of conversion, the new policy will be issued at the class of risk available which is most similar to the class of risk of this policy.

6. Until the new policy becomes effective, the original policy will continue in force subject to its provisions. The original policy will automatically terminate at the exact time the new policy becomes effective. In no event will we provide insurance under both the original policy and a new policy at the same time.

Signed for Transamerica Life Insurance Company at Los Angeles, California, and effective on the date of issue of the policy to which this endorsement is attached unless a different date is shown here.

Secretary                          President

1-008 11-106

8431-24-00-0000008-0019-0000147

# TRANSAMERICA LIFE INSURANCE COMPANY

Administrative Office:  4333 Edgewood Rd NE, Cedar Rapids, IA 52499

## ENDORSEMENT

Transamerica Life Insurance Company has issued this Endorsement as part of the Policy, Certificate or Rider to which it is attached.  The Effective Date of this Endorsement is the latter of the Effective Date of the Policy, Certificate or Rider to which it is attached or January 1, 2013.  This Endorsement is subject to all of the contract provisions that are not in conflict herewith and expires concurrently with the Policy, Certificate or Rider to which it is attached.

The **Grace Period** provision in your Policy, Certificate or Rider is modified as follows:

We will allow a Grace Period of 60 days after the premium due date for payment of each premium after the first premium. This means that if a premium is not paid on or before the date it is due, you may pay that premium during the 60 day period immediately following the due date.  The 60-day Grace Period shall not run concurrently with the period of paid coverage. The Policy, Certificate or Rider will remain in force during the Grace Period.

We will send a grace period notice to you to your last known address and to any secondary addressee or assignee that you may designate, via first-class United States mail within 30 days after a premium is due and unpaid, to advise you of the date when the Grace Period ends.

The Transamerica Life Insurance Company has caused this Endorsement to be signed by its Secretary and its President.

Secretary                          President

ENDGRCAT



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA  52499
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 238-4302

(Referred to as the Company, we, our or us)

### TERMINAL ILLNESS ACCELERATED DEATH BENEFIT ENDORSEMENT

Transamerica Life Insurance Company has issued this endorsement as a part of the policy to which it is attached.  Except as otherwise specifically set forth below, it is subject to all of the terms of the policy.

NOTICE: Benefits advanced under this option may be taxable.  As with all tax matters, the owner should consult a personal tax advisor to assess the impact of this benefit on the owner and the policy.

The Face Amount of the policy will be reduced if an accelerated death benefit is paid.  Payment of an accelerated death benefit may affect eligibility for Medicaid or other government benefits and entitlements.

### ENDORSEMENT BENEFIT

If the Insured has been diagnosed with a Terminal Illness while this endorsement is in effect, you may elect to receive an accelerated death benefit payment.  Payment of an accelerated death benefit will reduce the Face Amount of the policy.  Payments are subject to the provisions of the policy and this endorsement.

### PAYMENT OF CLAIMS

If approved, the accelerated death benefit will be paid in a lump sum to you.  If the Insured dies before payment is made, we will pay the entire death benefit of the policy to the beneficiary in accordance with the policy provisions.

### DEFINITIONS

In this endorsement:

**Immediate Family Member** means one of the following members of the Insured's or owner's family: spouse (including common law spouse), civil union partner, child, stepchild, parent, grandparent, grandchild, brother, sister, and their spouses or civil union partners.

**Insured** means only the Insured covered under the policy and not any other individual covered under any additional endorsement or rider.

**Physician** means any person bearing the designation of Medical Doctor (M.D.) or Doctor of Osteopathy practicing within the scope of his or her license issued by the jurisdiction in the United States in which such person's services are rendered.  Physician does not include:

1. You, the Insured, or an Immediate Family Member; or
2. A person who lives with you, the Insured, or an Immediate Family Member; or
3. A person in the same medical practice as you, the Insured, or an Immediate Family Member; or
4. A business partner of you, the Insured, or an Immediate Family Member.

TI03

Page 1

**Terminal Illness** is a medical condition, resulting from bodily injury or disease, or both, and:

a) which is first diagnosed by a Physician on or after the later of the Date of Issue or Policy Date; and,

b) for which the diagnosis is supported by clinical, radiological, laboratory or other evidence of the medical condition which is satisfactory to us; and,

c) which is not curable by any means available to the medical profession; and,

d) which a Physician certifies is expected to result in the death of the Insured within 12 months of diagnosis.

You must submit written certification of a Physician that confirms all of the above requirements with your accelerated death benefit request. The certification must be made within 30 days of the accelerated death benefit request.

## ACCELERATED DEATH BENEFIT AMOUNT

You may request to accelerate any amount between $5,000 and the maximum accelerated death benefit as outlined below. If we approve a request for an accelerated death benefit that is less than the maximum accelerated death benefit we allow, any future death benefit accelerated will not exceed the remaining balance of the maximum accelerated death benefit.

The accelerated death benefit payment we make to you will be less than the amount of the death benefit which you request to accelerate. The amount of the death benefit which you request to accelerate will be reduced by:

1. A 12-month actuarial discount which reflects the early payment of the accelerated death benefit amount. The annual interest rate we use will be a discount rate that is the greater of:
   a) The current yield on 90-day U.S. Treasury bills; or
   b) The Moody's Corporate Bond Yield Average as of the date of your request as published by Moody's Investors Service, Inc., or any successor thereto. In the event that the Moody's Corporate Bond Yield Average-Monthly Average Corporates is no longer published, a substantially similar average, established by regulation issued by the state insurance Commissioner will be used.
   However, any such rate will never exceed 8%.
2. Any due or unpaid premium if a claim occurs during the grace period.
3. An administrative charge for each accelerated death benefit request. The administrative charge as of the Endorsement Date is $350 but will be subject to future increases based on cumulative annual cost-of-living increases as measured by the Consumer Price Index (CPI) since 2012. Cumulative annual cost of living increases will not exceed 5% per calendar year. In the event that the CPI is no longer published, a substantially similar index will be used.

## MAXIMUM ACCELERATED DEATH BENEFIT

The maximum death benefit you may accelerate is equal to the lesser of:

1. 100% of the Face Amount of the policy; or
2. $500,000, including all other accelerated death benefits previously elected or currently under review under all policies, endorsements or riders issued by us on the life of the Insured.

## CONDITIONS OF PAYMENT

We will pay you an accelerated death benefit upon due proof that the Insured has a Terminal Illness, subject to the following conditions:

1. The Terminal Illness is first diagnosed on or after the later of the Date of Issue or Policy Date ; and

2. The policy and this endorsement are in force at the time of your accelerated death benefit request; and

3. The Face Amount of the policy at the time the accelerated death benefit request is received is at least $25,000; and

4. At the time you request to exercise the accelerated death benefit, there must be at least two (2) years remaining before the Expiry Date of the policy to which this endorsement is attached; and

5. We receive written proof of the Insured's Terminal Illness satisfactory to us, including a Physician certification; and

6. We receive a consent form signed by all irrevocable beneficiaries and all assignees in a form acceptable to us.

## LIMITATIONS

1. We will not pay any benefit under this endorsement for a Terminal Illness that is caused by or contributed to by, or results directly or indirectly from, a suicide attempt or intentionally self-inflicted injury while sane or insane.

2. You may not request an accelerated death benefit:

   a) if required by law to use the accelerated death benefit to meet the claims of creditors, whether in bankruptcy or otherwise; or

   b) if required by a government agency to use the accelerated death benefit in order to apply for, obtain, or otherwise keep a government benefit or entitlement.

## EFFECT OF THE ACCELERATED DEATH BENEFIT PAYMENT ON THE POLICY

The Face Amount will be reduced upon payment of an accelerated death benefit by the amount of the death benefit accelerated.

If acceleration of less than the full Face Amount is requested, the premium payable after the accelerated death benefit is paid will also be reduced. The reduced premium will equal the appropriate premium rate applied to the reduced Face Amount plus any applicable policy fee.

We will provide new policy data pages showing the reduced Face Amount resulting from the accelerated death benefit payment.

## NOTICE OF CLAIM

We must receive a written accelerated death benefit request at our Administrative Office within 60 days after the Physician diagnosis of the Terminal Illness, or as soon as reasonably possible. The request should include the name of the Insured, the policy number, and must be signed and dated by you. If the policy has an irrevocable beneficiary, that person(s) must also sign the request. If the policy is assigned, we must receive a completed and signed release of assignment.

## PROOF OF TERMINAL ILLNESS

We must receive written proof of the Insured's Terminal Illness before we make an accelerated death benefit payment. This proof will consist of a Physician's certification acceptable to us. We may request additional medical information from the Physician submitting the certification or any Physician we consider qualified.

## PHYSICAL EXAMINATION

While a claim is pending, we reserve the right to obtain a second medical opinion and to have the Insured examined at our expense. In the event that the second medical opinion differs from the diagnosis indicated by the Insured's own Physician, a third mutually acceptable Physician may be consulted at our expense. The benefit will be payable according to the opinion of the third Physician.

## PREMIUM

Following payment of an accelerated death benefit, premium billing and premium payment requirements will continue, subject to the adjustments described above.

## LEGAL ACTIONS

No legal action may be brought to recover any payment requested under this endorsement within 60 days after written proof of Terminal Illness has been given to us. No such action may be brought after 3 years from the time written proof of the Insured's Terminal Illness has been given to us.

## REINSTATEMENT

If the policy is Reinstated, this endorsement may be reinstated at the same time; however, we will not pay any benefit for a Terminal Illness that is first diagnosed by a Physician prior to the reinstatement date.

## TAX QUALIFICATION

This endorsement is designed to provide a federal income tax-free accelerated death benefit. To that end, the provisions of this endorsement and the policy to which it is attached are to be interpreted to ensure or maintain such tax qualification, notwithstanding any other provisions to the contrary. We reserve the right to amend this endorsement and the policy to which it is attached to reflect any clarifications that may be needed or are appropriate to maintain such qualification, or to conform this endorsement and the policy to which it is attached to any applicable changes in the tax qualification requirements. You will be sent a copy of any such amendment. However, death benefits accelerated under certain business related policies may be taxable. You should consult with your tax advisor regarding the tax treatment of your accelerated death benefit.

## TERMINATION

This endorsement will terminate on the earliest of the following dates:

1. The date the maximum accelerated death benefit has been accelerated, or the aggregate maximum accelerated death benefit of $500,000 under all policies, endorsements or riders has been reached; or

2. The date the policy's Face Amount reaches zero, terminating the policy and all attached endorsements and riders; or

3. The date the policy lapses or otherwise terminates; or

4. The date of the Insured's death.

## INCONTESTABILITY

The provisions of the policy relating to incontestability apply to this endorsement.

## ENDORSEMENT DATE

The effective date of this endorsement is the Policy Date or if later, the date the endorsement is added to your Policy.

Signed for us at our home office.

Secretary                                         President

**TRANSAMERICA®**

Transamerica Life Insurance Company
HOME OFFICE:  Cedar Rapids, Iowa
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 852-4678

## Application Amendment

**Life Insured:**   **MR. BRIAN GUTHRIE**

The Application for Policy No. ▮▮▮▮▮▮▮▮   is amended as follows:

Life Application Part I Question 1: Plan applied for:
Plan Name: Trendsetter Living Benefit 15 Year
Risk Class: Standard Non-Smoker
Table Rating: B

I/We declare that I/we have, in an identical manner, completed and signed the copy of this amendment that is attached to and made part of the Policy/Certificate Issued by the Company.

It is agreed that this amendment shall be part of the application for the policy.

Signed at ___Pasadena, CA___   on ___06.02.17___
          (City/State)          Date (mm/dd/yyyy)

_____        _____
Signature of Proposed Insured       Signature of Owner
                                 (Officer signature other than proposed insured, if
                                      owner is a corporation)

_____        _____
Signature of Other Proposed Insured    Witness (can be Licensed Producer)

_____        _____
Signature of Other Proposed Insured    Signature of Licensed Producer

8431-74-00-0000006-0024-0000152

APE1-1008



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA
Mailing Address: 4333 Edgewood Road NE
Cedar Rapids, IA 52499

## Beneficiary/Additional Insured Information Form

### PRIMARY INSURED

| 1. Last Name | First Name | 2. SS# Last 4 Digits |
|---|---|---|
| Guthrie | Brian | ▆▆ |

### OWNER - if other than Primary Insured

| | 2. TIN/SS# Last 4 Digits |
|---|---|
| | |

### ADDITIONAL/OTHER PROPOSED INSURED - if applicable

| 1. Last Name | First Name | M.I. |
|---|---|---|
| 2. Address (Cannot be a P.O. Box) | City | |

| State | Zip Code | 3. Home Phone | 4. Social Security Number |
|---|---|---|---|
| | | | |

### PRIMARY BENEFICIARY - please provide any information not provided in the base application. If more space is needed use an additional form. Must equal 100% or will be divided equally.

| Name / Address | DOB | Percent | Relationship | Phone #<br>SSN / Tax ID# |
|---|---|---|---|---|
| Zachary K Guthrie<br>▆▆▆▆ Monrovia CA 91016 | ▆▆▆ | 100 | Child | ▆▆▆▆<br>▆▆▆▆ |
| | | | | |
| | | | | |
| | | | | |

### CONTINGENT BENEFICIARY - please provide any information not provided in the base application. If more space is needed use an additional form. Must equal 100% or will be divided equally.

| Name / Address | DOB | Percent | Relationship | Phone #<br>SSN / Tax ID# |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### AGENT

☒ I attest that, on behalf of the Company, I requested all information above and the applicant provided the information completed on the form. The applicant was unable/declined to provide any information missing from the form.

Date   03/08/2017

Producer or Agent Signature   D-03/08/2017-16:50:48 Z ID-480-711

Owner Signature   D-03/08/2017-16:51:22 Z ID-482-711

DMF 2014

8431-24-0000006-0075-0000153



**TRANSAMERICA**
LIFE INSURANCE COMPANY

Transamerica Life Insurance Company
Home Office: 4333 Edgewood Road NE
Cedar Rapids, IA 52499

GA #: _____

# Individual Life Insurance Application For One Life Part 1

Proposed Insured: Brian Guthrie _____ Mr
    First      Middle    Last      Suffix   Mr./Mrs./Ms./Dr.

Birthdate: ▇▇▇▇ Age 52 Birth Place: CA _____ Male ☒ Female ☐
   Mo.   Day   Yr.

Soc. Sec. No.: ▇▇▇▇ U.S. Citizen ☒ Yes ☐ No  If no, complete Residency & Travel Questionnaire

Employer: Global Electric _____

Occupation: Engineering and Architect _____ Electrician _____    Area Code & Work Phone

Annual Income $ 100,000 _____ Net Worth $ 250,000 _____

Residence ▇▇▇▇ Monrovia CA 91016 _____ USA ▇▇▇▇
   No. & Street (Cannot be a P.O. Box)   City    State    Zip    Country   Area Code & Home Phone

Owner's Name: _____ Birthdate: _____
(If other than Proposed Insured)        Mo.   Day   Yr.

If Trust, provide name and date of Trust: _____

Relationship to Proposed Insured: _____

Address: _____
   No. & Street (Cannot be a P.O. Box)   City    State    Zip    Country   Soc. Sec. or Tax No.

U.S. Citizen ☐ Yes ☐ No  If no, VISA Type/Immigration Status: _____ E-mail: _____
                                                         (Not for Policy/Billing Notices)

Beneficiary's Name and Relationship to Proposed Insured: See Overflow Form/Supplement _____

Address: _____
   No. & Street (Cannot be a P.O. Box)   City    State    Zip    Country   Date of Trust, if Applicable

1. Plan Applied For: Trendsetter LB 30 _____ Kind Code: _____

2. Risk Classification:   Preferred Plus/Select ☐   Preferred ☒   Standard Plus ☐   Standard ☐
                  Extra Rating of ☐ _____   Other ☐ _____

3. Nicotine Classification: Nicotine ☐    Non-Nicotine ☒

4. Amount Applied For $ 500,000 _____

5. Additional Benefits by Rider: ☐ Waiver of Premium/Waiver Provision ☐ Accident Indemnity $ _____ ☐ Other _____ $ _____

6. Premium Payment Mode: ☐ Annual   ☐ Semi-Annual   ☐ Quarterly   ☒ Monthly   ☐ Other _____
                 ☒ PAC    ☐ Direct Bill

7. Complete for Flexible Premium Plans:
    Required Premium Per Year (RAP)   $ _____
    Planned Periodic Premium   $ _____
    + Initial Lump Sum   $ _____
    = Total Initial Premium   $ _____

8. If the Automatic Premium Loan (APL) provision is available, do you want the provision to be in effect? ☐ Yes ☐ No (APL will be in effect unless no is checked.)

9. Do you have any existing life insurance or annuities? If none, check this box ☐.  If yes, please list the policies below.
   a. Do you intend to discontinue, replace or change insurance with any company if the life insurance applied for is issued? Please indicate yes or no in the chart.

| Type of Coverage (Personal / Business / Employer Provided / Group) | Company/Policy Number | Face Amount | Replacement? |
|---|---|---|---|
| Personal | Transamerica / ▇▇▇▇ | $ 150,000 | ☐ Yes ☒ No |
| Personal | Transamerica / ▇▇▇▇ | $ 250,000 | ☐ Yes ☒ No |
| | | $ | ☐ Yes ☐ No |

   b. Total Accidental Death insurance inforce with all companies: $ 0 _____

**APPLICATION (NB)**
continued on next page
Page 1

8431-24-00-0000005 0026-00001S4


* D T O O 8 *

10. Is any application for life insurance pending with any other company? ☐ Yes ☒ No
If yes, give company name, amount applied for and total amount to be placed. _____

11. Are there any life insurance policies on the life of the Proposed Insured that you do not own, including but not limited to any that you have sold or settled?   ☐ Yes  ☒ No  If yes, give insurance company name, owner's name, and amount of insurance of each policy. _____

12. Mail Additional Premium Notices To: _____
Address: _____

| No. & Street | City | State | Zip | Country |
|---|---|---|---|---|

| Yes | No | "You" means any person proposed to be insured. |
|---|---|---|

☐ ☒ 13. Have you ever participated in, or within the next two years do you intend to participate in, hang-gliding, sky diving, parachuting, ultralight flying, vehicle racing, scuba diving, mountain or rock climbing, rodeos, competitive skiing or snowboarding, extreme sports or other hazardous activities? If yes, complete Sports and Hazardous Activities Questionnaire.

☐ ☒ 14. Do you plan to travel in the next 12 months for business or pleasure to a destination outside the U.S., Canada, Western Europe, Hong Kong, Australia or New Zealand? If yes, complete Residency & Travel Questionnaire.

15. Have you used nicotine at any time?    Date Last Used

☐ ☒ Cigarettes  _____
☐ ☒ Cigar/Pipe/Chewing Tobacco  _____
☐ ☒ Other  _____

16. Driver's License #: ▮▮▮▮▮▮▮  State: CA _____
In the past five years, have you been convicted of or pleaded guilty to:
☐ ☒ a. Moving violations? If yes, give dates and type. _____
☐ ☒ b. Driving under the influence of alcohol and/or other drugs? If yes, give dates. _____
☐ ☒ c. Reckless driving? If yes, give dates. _____

☐ ☒ 17. Except as a passenger on a regularly scheduled flight, has the Proposed Insured flown within the past 2 years, or does the Proposed Insured have plans to fly in the future other than as a passenger? If yes, complete Aviation Questionnaire.

☐ ☒ 18. Have you ever been convicted of a felony, misdemeanor or infraction other than a traffic violation? If yes, provide full details including state and date of offense.

☐ ☒ 19. Are you a member of the armed forces including reserves? Intend to become a member? Any deployment orders outside U.S.? If yes, give full details.

☐ ☒ 20. Is the Proposed Insured currently in bankruptcy or has the Proposed Insured been the subject of any voluntary or involuntary bankruptcy proceeding pending within the last 12 months? If yes, please provide full details including Chapter 7, 11, or 13, date filed, and date of discharge and dismissal, if any.

**Remarks:** Give details for any questions answered yes

_____
_____
_____
_____
_____

I, the Proposed Insured, and I, the Owner if different, hereby represent that the statements and answers given in this application are true, complete and correctly recorded to the best of my knowledge and belief. I/we agree: (1) this application shall consist of Part 1, Part 2, and any required application supplement(s)/amendment(s), and shall be the basis for any contract issued on this application; (2) except as otherwise provided in the conditional receipt, if issued, with the same Proposed Insured as on this application, any contract issued on this application shall not take effect until after all of the following conditions have been met: (a) the full first premium is paid, (b) the Owner has personally received the contract during the lifetime of and while the Proposed Insured is in good health, and (c) all of the statements and answers given in this application must be true and complete as of the date of Owner's personal receipt of the contract and that the contract will not take effect if the facts have changed; (3) no waiver or modification shall be binding upon Transamerica Life Insurance Company (the Company) unless in writing and signed by the President or a Vice President and the Secretary or an Assistant Secretary.



**NOTICE TO CONSUMER**

The death benefit on many business related life insurance policies will be taxable to you under Section 101(j) of the Internal Revenue Code to the extent it exceeds the premiums and other considerations paid by you for the policy unless the written Notice and Consent is obtained **prior to policy issue** and certain other requirements of such section are met. These policies are often referred to as Employer-Owned Life Insurance Policies but can also include policies owned by others such as affiliates and business owners.

You are advised to consult with your qualified tax advisor prior to purchasing this policy.

**AUTHORIZATION TO OBTAIN INFORMATION**

Transamerica Life Insurance Company (the Company)

I hereby authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company, MIB, Inc. ("MIB") or other organization, institution or person, that has any records or knowledge of me or my health, to give to Transamerica Life Insurance Company, or its reinsurers, any such information. I authorize Transamerica Life Insurance Company, or its reinsurers, to make a brief report of my personal health information to MIB. A photographic copy of this authorization shall be as valid as the original.

This authorization will be valid for 26 months, but I understand that I may revoke it at any time by giving written notice to the Company at the above address. I understand that there are limitations on my right to revoke this authorization. Any action taken in reliance on this authorization will be valid if such action has been taken prior to receipt of notice of revocation. If this authorization is used to collect information in connection with a claim for benefits, it will be valid for the duration of the claim. If the law of my state so provides, my authorization may not be revoked during a contestable investigation. I also understand that my revocation of this authorization will not result in the deletion of codes in the MIB database if such codes are reported by the Company (or the Company becomes obligated to report such codes to MIB) while this authorization is in force.

**I acknowledge** receipt of the Notice of Disclosure of Information. **I understand** that if an investigative consumer report is ordered in connection with this application, I may elect to be interviewed in connection with the preparation of the report and, upon request, I will be provided with a copy of the report. I elect to be interviewed if an investigative consumer report is prepared. ☐ Yes ☒ No

**PLEASE MAKE CHECKS PAYABLE TO THE COMPANY. DO NOT MAKE CHECKS PAYABLE TO THE AGENT OR LEAVE PAYEE SPACE BLANK.**
Amount paid with this Application $271.33_____ ☒ Check #_____ ☐ Credit Card (Complete Credit Card Order Confirmation Form)

**Caution: If your answers on this application are misstated or untrue, the insurer may have the right to deny benefits or rescind your accelerated death benefit coverage.**

Signed at Monrovia                          CA           on  03/06/2017                                      ,
              City-State                                                                    Date

X  _____                   X  _____
Signature of Proposed Insured (or parent or guardian if Proposed Insured is a minor)      Witness to Signature of Proposed Insured
            D=03/06/2017 T=18:54:25 Z ID=002-711                                      D=03/06/2017 T=18:55:43 Z ID=002-711

Signed at_____           on  _____
                        City-State                                                  Date

X  _____                   X  _____
Signature of Owner (if other than Proposed Insured)          Witness to Signature of Owner

If Owner is a Corporation, an authorized officer, other than the Proposed Insured must sign as Owner, give corporate title and full name of corporation below.

_____                      X  _____
                                                   Signature of Licensed Producer  D=03/06/2017 T=18:55:43 Z ID=002-711
_____

_____

# TRANSAMERICA
**LIFE INSURANCE COMPANY**

Transamerica Life Insurance Company
Home Office: 4333 Edgewood Road NE
Cedar Rapids, IA 52499

GA # _____

**Application Part 2**
**Health History**
☐ Paramedical ☐ Medical

File # _____

---

**1. Proposed Insured:** *(Print Full Name)*  Brian Edward Guthrie

**2. Date of Birth:** Month ___ Day ___ Year ___

**3. Social Security #** ___

**4. Name/Address/Phone of primary care physician:**

Name: _n/a_  Address: _n/a_

Phone: (____) _n/a_  City/St/Zip: _n/e_

Date and reason for last visit: _n/e_  _n/e_

Give complete details of all yes answers to questions 5 – 8, including but not limited to all dates, diagnoses, duration, outcome, treatments and medications prescribed and the names and addresses of all hospitals, attending physicians, health care providers and clinics. If additional space is required, attach sheet(s) of paper - signed, dated and witnessed.

| 5. HAVE YOU EVER HAD, BEEN TOLD BY A MEMBER OF THE MEDICAL PROFESSION THAT YOU HAVE, OR BEEN DIAGNOSED WITH OR TREATED FOR: | Yes | No | Details: |
|---|---|---|---|
| a. Seizure, fainting, stroke, loss of consciousness, tremor, paralysis, multiple sclerosis, epilepsy, or any disease or abnormality of the brain? | ☐ | ☒ | |
| b. High blood pressure, heart attack, murmur, palpitation, or anemia or any disease or abnormality of the heart, blood vessels or blood (except HIV Status)? | ☐ | ☒ | |
| c. Asthma, chronic bronchitis, pneumonia, emphysema, tuberculosis or any disease or abnormality of the lungs, bronchial tubes or respiratory system? | ☐ | ☒ | |
| d. Ulcer, colitis, hepatitis, cirrhosis, or any disease or abnormality of the esophagus, stomach, intestines, rectum, gallbladder or liver? | ☐ | ☒ | |
| e. Sugar, protein or blood in urine, sexually transmitted disease (except HIV disease), stone or any disease or abnormality of the kidney, bladder, prostate, breasts, ovaries or reproductive system? | ☐ | ☒ | |
| f. Diabetes or any disease or abnormality of the thyroid, adrenal, pituitary or other glands? | ☐ | ☒ | |
| g. Arthritis, gout, connective tissue disease, back trouble or any disease or abnormality of the joints, muscles or bones? | ☐ | ☒ | |
| h. Any disease or abnormality of the eyes, ears, nose, throat or skin? | ☐ | ☒ | |
| i. Cancer, tumor, polyp or cyst? | ☐ | ☒ | |
| j. Any physical deformity or amputation? | ☐ | ☒ | |
| k. Anxiety, depression, suicide attempt or any psychiatric, mental or emotional condition or disorder? | ☐ | ☒ | |
| l. Been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? | ☐ | ☒ | |

| 6. | Yes | No | |
|---|---|---|---|
| a. Within the past ten years, have you ever used sedatives, amphetamines, barbiturates, morphine, cocaine/crack, methamphetamine, Ecstasy (MDMA), heroin, marijuana, LSD, PCP, any hallucinogenic drug or narcotic drug except as prescribed by a physician? | ☐ | ☒ | |
| b. Have you ever been treated or counseled or been advised to seek treatment or counseling for the use of alcohol, drugs or other substance or joined an organization for alcohol or drug dependence or abuse? | ☐ | ☒ | |

| 7. OTHER THAN WHAT YOU HAVE ALREADY DISCLOSED, WITHIN THE PAST FIVE YEARS HAVE YOU: | Yes | No | |
|---|---|---|---|
| a. Consulted, been examined or been treated by any physician or practitioner? | ☐ | ☒ | |
| b. Had or been advised to have an X-ray, electrocardiogram, laboratory test or other diagnostic study (not including HIV tests)? | ☐ | ☒ | |
| c. Had observation or treatment at a clinic, hospital or other medical facility? | ☐ | ☒ | |
| d. Had or been advised to have a surgical procedure? | ☐ | ☒ | |
| e. Had dizziness, shortness of breath, pain or pressure in the chest, or persistent fever? | ☐ | ☒ | |
| f. Had any injury requiring treatment? | ☐ | ☒ | |

MPMS1006TCA

Page 1 of 3

TG

B431-24-00-0000006-0029-0000157

**Application Part 2 Continued**      File # _____

| 8. | Yes | No |
|---|---|---|
| a. Have any of your parents, brothers, sisters, or grandparents ever had cancer, diabetes, heart disease, mental illness or attempted suicide? | ☐ | ☒ |
| b. Has your weight changed by more than 15 pounds in the past year? | ☐ | ☒ |
| c. Are you now pregnant? | ☐ | ☒ |

9. **OTHER THAN THOSE ALREADY DISCLOSED, ARE YOU CURRENTLY TAKING ANY PRESCRIPTION, VITAMIN, SUPPLEMENT OR OVER-THE-COUNTER MEDICATION?** ☐ Yes ☒ No *If yes, list all and indicate why.*

*n/a*

10. **FAMILY RECORD:** Show age and present health, or if deceased, show age at death and cause of death.

| | Age If Living | Present Health | Age at Death | Cause of Death |
|---|---|---|---|---|
| Father | — | | 92 | Natural Couse |
| Mother | | | 90 | Natural Couse |
| Brothers # 1 | 57 | Healthy | | |
| Sisters # 2 | 59 · 61 | Healthy | | |

11. **WITHIN THE PAST FIVE YEARS HAVE YOU USED NICOTINE IN ANY FORM?** ☐ Yes ☒ No *If yes, indicate type, frequency and date last used.* _____

12. **FOR THE LAST 180 DAYS, HAVE YOU BEEN ACTIVELY AT WORK ON A FULL TIME BASIS AT YOUR USUAL PLACE OF BUSINESS OR EMPLOYMENT?** ☒ Yes ☐ No *If no, provide complete details.*
*Electritian*

| | Yes | No |
|---|---|---|
| 13. Do you participate in regular weekly exercise? | ☒ | ☐ |
| 14. Do you participate in athletics *(Team or Individual)*? | ☐ | ☒ |
| 15. Have you ever used any tobacco products? | ☐ | ☒ |
| 16. Do you get regular examinations by your health care provider? | ☒ | ☐ |
| 17. Do you get regular annual dental checkups? | ☐ | ☐ |
| 18. Do you clean your house or do yard work? | ☐ | ☐ |
| 19. Do you have a pet? | ☒ | ☐ |
| 20. Are you a member of a social group or volunteer for charity work? | ☐ | ☒ |

It is represented that the statements and answers given above are true, complete, and correctly recorded to the best of my knowledge and belief. To the extent allowed by law, I waive my rights to prevent disclosure of any knowledge or information about the above questions. This waiver applies to any health care provider, licensed physician, hospital, official or employee, or other person who has attended or examined me, or who has been consulted by me. I authorize such person(s) to make such disclosures. Such person(s) may also testify to their knowledge. This authorization is made on behalf of myself and any person who shall have or claim any interest in any contract of insurance issued on this application.

Signed at (City/State) _Monrovie     CA_    on    _04/23/2017_

_____
Signature of Vendor Representative
or Physician

(X) _____
Signature of Proposed Insured

_Brian Edward Guthrie_
Print name of Proposed Insured

MPM31008TCA        Page 2 of 3

8431-24-00-0000006-0030-0000158



Transamerica Life Insurance Company
4333 Edgewood Road NE
Cedar Rapids, IA 52499

April 12, 2019

Brian Guthrie

█████████████, CA 92382-3083

RE:   Policy #: █████████
      Insured: Brian Guthrie

Dear Brian Guthrie:

Thank you for being a valued member of the Transamerica family.

We've enclosed the requested Duplicate Policy. Please keep this with your important documents.

As a reminder, the policy data pages won't reflect any expired benefits or coverage, or any changes you've requested since the policy was issued.

Questions? Contact your insurance agent or give us a call us at 800-852-4678, weekdays 9 - 6 ET. You can also reach us by fax at 866-622-5051 or email at tii.customerservice@transamerica.com. We're glad to help.

Best regards,

Customer Contact Center
Transamerica Life Insurance Company

U.S. Savings Bonds are administered by American Bond Services

8431-74-00-0000006-001-0000159



**TRANSAMERICA**
4333 Edgewood Rd NE
Cedar Rapids, IA 52499

Transamerica Life Insurance Company
HOME OFFICE: Cedar Rapids, Iowa
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 852-4678

MR. BRIAN GUTHRIE
███████████████████
MONROVIA CA 91016

June 06, 2017

File Number:    ████████
Insured(s):    MR. BRIAN GUTHRIE

Dear Brian Guthrie

Thank you for your recent purchase of this life insurance coverage. Since everyone is
concerned with getting the most value for their money, Transamerica Life Insurance Company
is pleased to advise you that the policy date for your coverage has been advanced to June 02, 2017
The due date of all premiums will be based upon the new policy date.

Please keep this letter with your policy.

If you have any questions or need additional assistance, please contact our office at (800) 295-3990.

Sincerely,

New Business and Underwriting Department

cc:  108WF
     15ZVP      HAYK YEGHOYAN

8431-24-00-0000008-0032-0000160



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(319) 355-8511

**Term Insurance**
**Premiums Payable until the Insured's Age 105**
**Death Benefit Payable at Death of the Insured**

**Premiums are Subject to Change as Stated in Schedules of Premiums Provision,**
**But Will Not Exceed Specified Guaranteed Premiums**
**See Schedule of Guaranteed Premiums shown in Policy Data**

**Nonparticipating – No Dividends**

TL19 CA

3

# EXHIBIT 3



# WEALTH + HEALTH LIVES HERE.

## transamerica.com

You work hard to build a fulfilling future for yourself and your family — a future worth protecting. We're excited that you chose Transamerica to help you make the most of your wealth + health.

This booklet has important information about your policy. Please take a few moments to review it and let us know if you have questions. It's a good idea to keep this booklet with your other important documents.

# INFORMATION ABOUT YOUR POLICY

**You'll find important information about your policy behind this page. Please review the documents – there may be a form that needs to be returned. Let us know if you have any questions.**

TRANSAMERICA·

**Life Insurance Buyer's Guide**

This guide can help you when you shop for life insurance. It discusses how to:

- Find a Policy That Meets Your Needs and Fits Your Budget

- Decide How Much Insurance You Need

- Make Informed Decisions When You Buy a Policy

*Prepared by the National Association of Insurance Commissioners*

The National Association of Insurance Commissioners is an association of state insurance regulatory officials. This association helps the various insurance departments to coordinate insurance laws for the benefit of all consumers.

**This guide does not endorse any company or policy.**

**Reprinted by Transamerica Life Insurance Company**

**Important Things to Consider**

1. Review your own insurance needs and circumstances. Choose the kind of policy that has benefits that most closely fit your needs. Ask an agent or company to help you.

2. Be sure that you can handle premium payments. Can you afford the initial premium? If the premium increases later and you still need insurance, can you still afford it?

3. Don't sign an insurance application until you review it carefully to be sure all the answers are complete and accurate.

4. Don't buy life insurance unless you intend to stick with your plan. It may be very costly if you quit during the early years of the policy.

5. Don't drop one policy and buy another without a thorough study of the new policy and the one you have now. Replacing your insurance **may be costly.**

6. Read your policy carefully. Ask your agent or company about anything that is not clear to you.

7. Review your life insurance program with your agent or company every few years to keep up with changes in your income and your needs.

BGNAIC12                                     1

### Buying Life Insurance

When you buy life insurance, you want coverage that fits your needs.

First , decide how much you need — and for how long — and what you can afford to pay. Keep in mind the major reason you buy life insurance is to cover the financial effects of unexpected or untimely death. Life insurance can also be one of many ways you plan for the future.

Next , learn what kinds of policies will meet your needs and pick the one that best suits you.

Then , choose the combination of policy premium and benefits that emphasizes protection in case of early death, or benefits in case of long life, or a combination of both.

It makes good sense to ask a life insurance agent or company to help you. An agent can help you review your insurance needs and give you information about the available policies. If one kind of policy doesn't seem to fit your needs, ask about others.

This guide provides only basic information. You can get more facts from a life insurance agent or company or from your public library.

### What About the Policy You Have Now?

If you are thinking about dropping a life insurance policy, here are some things you should consider:

● If you decide to replace your policy, don't cancel your old policy until you have received the new one. You then have a minimum period to review your new policy and decide if it is what you wanted.

● It may be costly to replace a policy. Much of what you paid in the early years of the policy you have now, paid for the company's cost of selling and issuing the policy. You may pay this type of cost again if you buy a new policy.

● Ask your tax advisor if dropping your policy could affect your income taxes.

● If you are older or your health has changed, premiums for the new policy will often be higher. You will not be able to buy a new policy if you are not insurable.

● You may have valuable rights and benefits in the policy you now have that are not in the new one.

● If the policy you have now no longer meets your needs, you may not have to replace it. You might be able to change your policy or add to it to get the coverage or benefits you now want.

● At least in the beginning, a policy may pay no benefits for some causes of death covered in the policy you have now.

In all cases, if you are thinking of buying a new policy, check with the agent or company that issued you the one you have now. When you bought your old policy, you may have seen an

illustration of the benefits of your policy. Before replacing your policy, ask your agent or company for an updated illustration. Check to see how the policy has performed and what you might expect in the future, based on the amounts the company is paying now.

### How Much Do You Need?

Here are some questions to ask yourself:

● How much of the family income do I provide? If I were to die early, how would my survivors, especially my children, get by? Does anyone else depend on me financially, such as a parent, grandparent, brother or sister?

● Do I have children for whom I'd like to set aside money to finish their education in the event of my death?

● How will my family pay final expenses and repay debts after my death?

● Do I have family members or organizations to whom I would like to leave money?

● Will there be estate taxes to pay after my death?

● How will inflation affect future needs?

As you figure out what you have to meet these needs, count the life insurance you have now, including any group insurance where you work or veteran's insurance. Don't forget Social Security and pension plan survivor's benefits. Add other assets you have: savings, investments, real estate and personal property. Which assets would your family sell or cash in to pay expenses after your death?

### What Is the Right Kind of Life Insurance?

All policies are not the same. Some give coverage for your lifetime and others cover you for a specific number of years. Some build up cash values and others do not. Some policies combine different kinds of insurance, and others let you change from one kind of insurance to another. Some policies may offer other benefits while you are still living. Your choice should be based on your needs and what you can afford.

There are two basic types of life insurance: **term insurance** and **cash value insurance** . Term insurance generally has lower premiums in the early years, but does not build up cash values that you can use in the future. You may combine cash value life insurance with term insurance for the period of your greatest need for life insurance to replace income.

**Term Insurance** covers you for a term of one or more years. It pays a death benefit only if you die in that term. Term insurance generally offers the largest insurance protection for your premium dollar. It generally does not build up cash value.

You can renew most term insurance policies for one or more terms even if your health has changed. Each time you renew the policy for a new term, premiums may be higher. Ask what the premiums will be if you continue to renew the policy. Also ask if you will lose the right to renew the policy at some age. For a higher premium, some companies will give you the right to keep the policy in force

BGNAIC12                                                            3

for a guaranteed period at the same price each year. At the end of that time you may need to pass a physical examination to continue coverage, and premiums may increase.

You may be able to trade many term insurance policies for a cash value policy during a conversion period — even if you are not in good health. Premiums for the new policy will be higher than you have been paying for the term insurance.

**Cash Value Life Insurance** is a type of insurance where the premiums charged are higher at the beginning than they would be for the same amount of term insurance. The part of the premium that is not used for the cost of insurance is invested by the company and builds up a cash value that may be used in a variety of ways. You may borrow against a policy's cash value by taking a policy loan. If you don't pay back the loan and the interest on it, the amount you owe will be subtracted from the benefits when you die, or from the cash value if you stop paying premiums and take out the remaining cash value. You can also use your cash value to keep insurance protection for a limited time or to buy a reduced amount without having to pay more premiums. You also can use the cash value to increase your income in retirement or to help pay for needs such as a child's tuition without canceling the policy. However, to build up this cash value, you must pay higher premiums in the earlier years of the policy. Cash value life insurance may be one of several types; whole life, universal life and variable life are all types of cash value insurance.

*Whole Life Insurance* covers you for as long as you live if your premiums are paid. You generally pay the same amount in premiums for as long as you live. When you first take out the policy, premiums can be several times higher than you would pay initially for the same amount of term insurance. But they are smaller than the premiums you would eventually pay if you were to keep renewing a term policy until your later years.

Some whole life policies let you pay premiums for a shorter period such as 20 years, or until age 65. Premiums for these policies are higher since the premium payments are made during a shorter period.

**Universal Life Insurance** is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage. Increases may require proof that you qualify for the new death benefit. The premiums you pay (less expense charges) go into a policy account that earns interest. Charges are deducted from the account. If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower. If it keeps dropping, eventually your coverage will end. To prevent that, you may need to start making premium payments, or increase your premium payments, or lower your death benefits. Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value.

**Variable Life Insurance** is a kind of insurance where the death benefits and cash values depend on the investment performance of one or more separate accounts, which may be invested in mutual funds or other investments allowed under the policy. Be sure to get the prospectus from the company when buying this kind of policy and STUDY IT CAREFULLY. You will have higher death benefits and cash value if the underlying investments do well. Your benefits and cash value will be lower or may disappear if the investments you chose didn't do as well as you expected. You may pay an extra premium for a guaranteed death benefit.

Life Insurance Illustrations

You may be thinking of buying a policy where cash values, death benefits, dividends or premiums may vary based on events or situations the company does not guarantee (such as interest rates). If

so, you may get an illustration from the agent or company that helps explain how the policy works. The illustration will show how the benefits that are not guaranteed will change as interest rates and other factors change. The illustration will show you what the company guarantees. It will also show you what could happen in the future. Remember that nobody knows what will happen in the future. You should be ready to adjust your financial plans if the cash value doesn't increase as quickly as shown in the illustration. You will be asked to sign a statement that says you understand that some of the numbers in the illustration are not guaranteed.

### Finding a Good Value in Life Insurance

After you have decided which kind of life insurance is best for you, compare similar policies from different companies to find which one is likely to give you the best value for your money. A simple comparison of the premiums is not enough. There are other things to consider. For example:

- Do premiums or benefits vary from year to year?

- How much do the benefits build up in the policy?

- What part of the premiums or benefits is not guaranteed?

- What is the effect of interest on money paid and received at different times on the policy?

Remember that no one company offers the lowest cost at all ages for all kinds and amounts of insurance. You should also consider other factors:

- How quickly does the cash value grow? Some policies have low cash values in the early years that build quickly later on. Other policies have a more level cash value build-up. A year-by-year display of values and benefits can be very helpful. (The agent or company will give you a policy summary or an illustration that will show benefits and premiums for selected years.)

- Are there special policy features that particularly suit your needs?

- How are nonguaranteed values calculated? For example, interest rates are important in determining policy returns. In some companies increases reflect the average interest earnings on all of that company's policies regardless of when issued. In others, the return for policies issued in a recent year, or a group of years, reflects the interest earnings on that group of policies; in this case, amounts paid are likely to change more rapidly when interest rates change.



Revised April 29th, 2019

## NOTICE OF PRIVACY PRACTICES TRANSAMERICA COMPANIES

This Notice is provided to you by the Transamerica companies listed at the end of this Notice. We value our customers and your trust in us, especially when you share your personal information with us. We understand that the privacy and security of that personal information is important to you. We call this information "data". This Notice describes the data we collect and how we use, share and protect such data. The types of data we collect and share depend on the type of product or service you have with us. Also, Transamerica websites' and applications' Terms of Use and Privacy Statements provide additional detail on the treatment and handling of data when interacting with these sites or applications. If your relationship with us ends, we will continue to handle your data in accordance with this Notice.

**Data That We Collect:** We collect the following types of data:

| Data | Typical Data Sources |
|------|---------------------|
| Name, email and physical address, age, social security and driver's license numbers, employment, financial and health data and history. | • You directly, when you submit applications and forms and engage in communications with us<br>• Employers, healthcare providers, other insurance companies and other authorized entities |
| Data about your transactions with us. Data about your transactions with unaffiliated third parties ("Third Parties") that is shared with Transamerica. Transactional data collected as part of your interaction with Transamerica or provided by Third Parties can include, but is not limited to, account balances, accrued benefits, coverages, premiums, payment and claims history, financial transactions, and medical or health data. | • Our affiliates (companies under common ownership)<br>• Third Parties<br>• Transamerica's websites, digital platforms, and applications<br>• Assistive technologies, mobile or wearable devices, or other similar technology |
| Credit history, employment information and other information about your creditworthiness, medical care and health. | • Consumer reporting agencies and other service providers we use such as third party data suppliers<br>• Your employers, healthcare providers, other insurance companies and other authorized entities |
| Data about products and services you obtain or in which you might be interested. | • You<br>• Third Parties with whom we have joint marketing arrangements<br>• Other Third Parties as allowed |
| Data you provide to Third Parties when you have authorized the Third Party to share such data with other parties. This includes data collected through Third Party applications, websites, or other digital interfaces, data you share with us, data you have authorized us to receive, or data you have authorized Third Parties to share with us. | • Third Party applications, websites, or other digital interfaces where you have agreed to share your data<br>• Assistive technologies, mobile or wearable devices, or other similar technology |

**How We Use Your Data:** We use data to provide our services and for purposes allowed by law, this includes use authorized by you. For example, we may use your data to:

- Process claims and transactions,
- Research, develop, and market products and services,
- Prevent and prosecute fraud or criminal activities,
- Support online customer experiences, digital platforms, and/or applications you elect to participate in
- Maintain your accounts,
- Comply with applicable laws and for security purposes,
- Maintain, operate, and market our business, or

**Sharing Data:** We may share your data with Third Parties and affiliates as permitted or required by law, or when you authorize us to do so. In certain situations, our ability to share information is limited by other restrictions, such as certain contractual agreements with plan sponsors or similar arrangements. **We will honor those restrictions to the extent they conflict with the terms of this Notice.**

We may also share your data with Third Parties in certain circumstances, such as:

- Those who provide services to support our business, including processing claims, account maintenance, and marketing and sales,
- Credit bureaus,
- Insurance regulators, law enforcement, governmental authorities and other Third Parties in response to legal process or as required by law,
- Health care professionals, including to verify coverage or to provide information relating to a medical condition,
- Governmental agencies so they can decide if you are eligible for public benefits,
- Other financial companies in connection with joint marketing efforts,

STD419-LTR

- Other insurance companies (including successor insurers), agents and insurance support organizations to coordinate your benefits or in connection with insurance transactions involving you,
- Group policyholders, for example, regarding claims experience or to support service audits,
- Certificate or policyholders regarding the status of an insurance transaction,
- Those who have a legal or beneficial interest in your assets (such as creditors with a lien on your account),
- Your employer or plan sponsor as needed to support the administration of employee accounts (but only as permitted by law and only if you have established an account in connection with your employer),
- Your representatives and lawyers,
- To prevent and prosecute fraud or criminal activities,
- To conduct actuarial or research studies, and
- In connection with the sale or merger of all or part of our business

Our affiliates include a broad range of companies who provide financial services. These include insurance companies and agencies, and investment advisors. They also include agencies and broker/dealers who may not be included in the scope of this Notice. If we serve you through one of these professionals not covered under the Notice, you may contact them directly for information regarding their privacy practices. Specific contact information for these professionals can be found on your statements and other correspondence from them. We do not share information about your creditworthiness among our affiliates. The Transamerica affiliated companies with whom we may share your other information may include our companies with a Transamerica or Stonebridge name. For example, we may share your data with our affiliates:

- For their everyday business purposes;
- So they can tell you about products and services they offer;
- So they can determine which of their products and services may be of interest to you;
- So they can provide various services to us to support our business, such as claims processing, maintaining your account, and marketing products and services to you; or
- So they can audit themselves or their agents

**Your Choice to Limit Marketing by Transamerica Affiliates:** You may limit our affiliates' use of certain types of data to market their own products and services to you ("Opt Out"). To do this, choose one of the Opt Out methods set forth below. This data relates to your transactions and experiences with us. For example, this may include the products you own and your account history. Your choice to limit marketing offers from our affiliates will apply for at least 5 years from when you Opt Out. Once that period expires, we will send you a renewal Notice. That renewal Notice will allow you to continue to limit marketing offers from our affiliates for at least another 5 years. If you have already Opted Out of marketing offers from our affiliates, you do not need to Opt Out again until you receive a renewal Notice. If you hold a policy or account jointly with someone else, your Opt Out elections will apply to everyone on the account. When you are no longer our customer, we will continue to share your data as described in this Notice (including your Opt Out, if applicable). However, you may contact us at any time to elect to Opt Out.

**To Opt Out:** To limit our sharing of data with affiliates for marketing by affiliates as described above, you may:
- Call us at 877-257-4690 and our menu will prompt you through your choice(s), or
- Visit us online at **www.transamerica.com/optout**

**Your Right of Access and Correction:** You have a right of access and correction with respect to data we collect except data that relates to and is collected in connection with a claim or criminal or civil lawsuit involving you. You must make your request to us in writing listing the account or policy numbers with the data you are requesting to access. If you tell us of an error in the data, we will review it and if we agree, we will correct our records. If we don't agree, you may dispute our findings in writing and send your statement to us. We will include your statement whenever we provide your disputed information to anyone outside Transamerica. This is a summary of your rights. For a copy of our more detailed Notice of Insurance Information Practices as applicable to your product or service, please send a written request to 6400 C St. SW Cedar Rapids, IA 52499-0001.

**Protecting Your Data:** We maintain appropriate controls to limit access to data to persons who need access to it in order to do their jobs or to provide products and services to you. We train our workforce in the proper handling of data. In addition, we maintain other physical, technical, and administrative or procedural safeguards to protect your data.

**Other Privacy Protections for Vermont Residents only.** We will not share data we collect about you with Third Parties, except as permitted by Vermont law or authorized by you. We may still share data about our transactions or experiences with you with our affiliates. **For California Residents only.** If you are a California resident, you will receive a separate notice with additional choices.

We may revise this Notice. If we make material changes, we will notify you as required by law. This Notice is provided by the following Transamerica companies and any separate accounts established for products they offer:

| | |
|---|---|
| Transamerica Advisors Life Insurance Company | Transamerica Capital, Inc |
| Transamerica Casualty Insurance Company | Transamerica Financial Life Insurance Company |
| Transamerica Investors Securities Corporation | Transamerica Life Insurance Company |
| Transamerica Premier Life Insurance Company | Transamerica Retirement Advisors, LLC |
| Transamerica Retirement Solutions, LLC | Stonebridge Benefit Services, Inc |

STD419-LTR

## NOTICE OF PROTECTION PROVIDED BY
## CALIFORNIA LIFE AND HEALTH INSURANCE GUARANTEE ASSOCIATION

This notice provides a brief summary regarding the protections provided to policyholders by the California Life and Health Insurance Guarantee Association ("the Association"). The purpose of the Association is to assure that policyholders will be protected, within certain limits, in the unlikely event that a member insurer of the Association becomes financially unable to meet its obligations. Insurance companies licensed in California to sell life insurance, health insurance, annuities and structured settlement annuities are members of the Association. The protection provided by the Association is not unlimited and is not a substitute for consumers' care in selecting insurers. This protection was created under California law, which determines who and what is covered and the amounts of coverage.

Below is a brief summary of the coverages, exclusions and limits provided by the Association. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations or the rights or obligations of the Association.

### COVERAGE

● **Persons Covered**

Generally, an individual is covered by the Association if the insurer was a member of the Association *and* the individual lives in California at the time the insurer is determined by a court to be insolvent. Coverage is also provided to policy beneficiaries, payees or assignees, whether or not they live in California.

● **Amounts of Coverage**

The basic coverage protections provided by the Association are as follows:

  ● **Life Insurance, Annuities and Structured Settlement Annuities**

  For life insurance policies, annuities and structured settlement annuities, the Association will provide the following:

    ● **Life Insurance**
      80% of death benefits but not to exceed $300,000
      80% of cash surrender or withdrawal values but not to exceed $100,000

    ● **Annuities and Structured Settlement Annuities**
      80% of the present value of annuity benefits, including net cash withdrawal and net cash surrender values but not to exceed $250,000

  The maximum amount of protection provided by the Association to an individual, for *all* life insurance, annuities and structured settlement annuities is $300,000, regardless of the number of policies or contracts covering the individual.

● **Health Insurance**
The maximum amount of protection provided by the Association to an individual, as of April 1, 2011, is $470,125. This amount will increase or decrease based upon changes in the health care cost component of the consumer price index to the date on which an insurer becomes an insolvent insurer.

GANCA0811                          1

## COVERAGE LIMITATIONS AND EXCLUSIONS FROM COVERAGE

The Association may not provide coverage for this policy. Coverage by the Association generally requires residency in California. You should not rely on coverage by the Association in selecting an insurance company or in selecting an insurance policy.

The following policies and persons are among those that are excluded from Association coverage:

- A policy or contract issued by an insurer that was not authorized to do business in California when it issued the policy or contract

- A policy issued by a health care service plan (HMO), a hospital or medical service organization, a charitable organization, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company, an insurance exchange, or a grants and annuities society

- If the person is provided coverage by the guaranty association of another state

- Unallocated annuity contracts; that is, contracts which are not issued to and owned by an individual and which do not guaranty annuity benefits to an individual

- Employer and association plans, to the extent they are self-funded or uninsured

- A policy or contract providing any health care benefits under Medicare Part C or Part D

- An annuity issued by an organization that is only licensed to issue charitable gift annuities

- Any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as certain investment elements of a variable life insurance policy or a variable annuity contract

- Any policy of reinsurance unless an assumption certificate was issued

- Interest rate yields (including implied yields) that exceed limits that are specified in Insurance Code Section 1607.02(b)(2)(C)

---------------------------------------------------------------------------------------------------

## NOTICES

Insurance companies or their agents are required by law to give or send you this notice. Policyholders with additional questions should first contact their insurer or agent. To learn more about coverages provided by the Association, please visit the Association's website at www.califega.org, or contact either of the following:

California Life and Health Insurance
Guarantee Association
P.O Box 16860
Beverly Hills, CA 90209-3319
(323) 782-0182

California Department of Insurance
Consumer Communications Bureau
300 South Spring Street
Los Angeles, CA 90013
(800) 927-4357


Insurance companies and agents are not allowed by California law to use the existence of the Association or its coverage to solicit, induce or encourage you to purchase any form of insurance. When selecting an insurance company, you should not rely on Association coverage. If there is any inconsistency between this notice and California law, then California law will control.

### IMPORTANT INFORMATION TO POLICYHOLDERS

In the event you need to contact someone about this policy for any reason, please contact your Insurance Agent who sold you your policy.

If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:

**Customer Service Department**
**4333 Edgewood Rd NE**
**Cedar Rapids, IA  52499**

**Telephone Number:**
**1-800 852-4678**

If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact the California Department of Insurance at:

**California Department of Insurance**
**Consumer Services Division**
**300 South Spring Street, South Tower**
**Los Angeles, CA  90013**

**Telephone Number:**
**In state toll-free calls:  1-800-927-4357 (HELP)**
**Out-of-state calls:  213-897-8921**
**For TDD (Telecommunication Devices for the Deaf),**
**please call: 800-482-4833**

**http://www.insurance.ca.gov/0500-about-us/02-department/01-csmcb/consumer-services.cfm**

If in the future you consider making changes to the status of your policy, you should consult with a licensed insurance or financial advisor.

CNCA1015

Postage
Required
Post Office will
not deliver
without proper
postage.

To return documents:
- Remove reply
  envelope from
  booklet by tearing
  at the perforation

- Once removed
  from booklet:
- Insert document(s)
  within the reply
  envelope
- Adhere flap after
  folding over

Remove Reply Envelope Along Perforation

PRIVACY NOTICE CORRESPONDENCE
TRANSAMERICA
6400 C ST SW
CEDAR RAPIDS  IA   52404-7463

PNBRE-LP2015

NAME
ADDRESS
CITY                                    STATE              ZIP

# YOUR POLICY PAGES

**Your policy and other related documents are behind
this page. It's a good idea to keep this booklet with your
important papers so you can reference it any time.**

TRANSAMERICA


**TRANSAMERICA**
LIFE INSURANCE COMPANY

Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 852-4678
(Referred to as the Company, we, our or us)

Policy Number: ███████

**Face Amount:** $250,000

**Policy Date:** OCT 08, 2019

Insured: GRADY LEE HARRIS JR

Owner: GRADY LEE HARRIS JR

We will pay the death benefit to the Beneficiary if the Insured dies while this policy is In Force. All payments are subject to the provisions of this policy.

Signed for the Company at Cedar Rapids, Iowa, on the Date of Issue.

Jay Orlandi, Secretary

Blake Bostwick, President

**IMPORTANT – 30 DAY RIGHT TO CANCEL – You have purchased a life insurance contract. Referred to below as a "policy". Carefully review it for limitations.**

**This policy may be returned within 30 days from the date you received it for a full refund by returning it to the insurance company or agent who sold you this policy.**

Term Insurance
Premiums Payable until the Insured's Age 105
Death Benefit Payable at Death of the Insured

Premiums are Subject to Change as Stated in Schedules of Premiums Provision,
But Will Not Exceed Specified Guaranteed Premiums
See Schedule of Guaranteed Premiums shown in Policy Data

Nonparticipating – No Dividends
Convertible

TL23 CA

Page 1

This policy is a legal contract between you and the Company.

**READ YOUR POLICY CAREFULLY**

## GUIDE TO POLICY PROVISIONS

Assignment of the Policy ....................................................................................... 4
Beneficiary's Rights ............................................................................................. 4
Change of Beneficiary .......................................................................................... 4
Death Benefit....................................................................................................... 5
Definitions........................................................................................................... 3
Dividends ........................................................................................................... 8
Grace Period for Paying Premiums ......................................................................... 6
Incontestability of the Policy ................................................................................. 7
Interest from Date of Death .................................................................................. 5
Misstatement of Age or Sex .................................................................................. 8
Ownership Provisions............................................................................................ 4
Payment of the Death Benefit ............................................................................... 5
Policy Contract .................................................................................................... 7
Policy Data.......................................................................................................... 2
Policy Date.......................................................................................................... 3
Premiums ........................................................................................................... 6
Proof of Death .................................................................................................... 5
Reinstatement..................................................................................................... 6
Riders................................................................................................................. 8
Schedules of Premiums ........................................................................................ 6
Settlement Provisions .......................................................................................... 8
Suicide ............................................................................................................... 7
Termination of Insurance ..................................................................................... 8
Your Rights ........................................................................................................ 8

TL23 CA                                      Page 1A

P O L I C Y   D A T A

|  |  |  | OCT 08 2019 | POLICY DATE |
|---|---|---|---|---|
| EXPIRY DATE | OCT 08 2067 |  | 57 | AGE OF INSURED |
| INSURED | GRADY LEE HARRIS JR |  | ▉▉▉▉▉ | POLICY NUMBER |
| FACE AMOUNT | $250,000 |  | OCT 08 2019 | DATE OF ISSUE |
| SEX OF INSURED | MALE |  |  | LAST DATE TO |
| OWNER | THE INSURED |  | MAR 14 2032 | CONVERT |
| FIRST PREMIUM INCREASE DATE | OCT 08 2049 |  | PREFERRED NON-SMOKER | CLASS OF RISK |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

THE CHARGE FOR ANY ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER IS SHOWN
BELOW.  ONLY A BRIEF DESCRIPTION IS GIVEN.  THE COMPLETE PROVISIONS ARE
INCLUDED IN THE RIDER.

| RIDER NUMBER | SCHEDULE OF ADDITIONAL BENEFITS | ANNUAL PREMIUM* |
|---|---|---|
|  | NONE | NO CHARGE |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

TOTAL ANNUAL PREMIUM ON POLICY DATE                          $2,715.00*

*THE "ANNUAL PREMIUM" AND "TOTAL ANNUAL PREMIUM ON POLICY DATE" LISTED ON
THIS PAGE ARE THE AMOUNT YOU WILL PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL
PREMIUM PAYMENT MODE.  THE AMOUNT YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY
PURSUANT TO ANY OTHER PAYMENT MODE.

INITIAL PREMIUM AMOUNT AND MODE          $233.49 MONTHLY         PAC
          TOTAL PAYMENTS PER YEAR                                $2,801.88

### SCHEDULE OF PREMIUMS
TOTAL FIRST YEAR PREMIUMS (SEE FOLLOWING PAGES FOR PREMIUMS FOR LATER YEARS):

| POLICY YEAR | ANNUALLY | SEMI-ANNUALLY | QUARTERLY | MONTHLY |
|---|---|---|---|---|
| YEARS 1 - 30 | $2,715.00 | $1,384.65 | $699.11 | $233.49 |
| TOTAL PAYMENTS PER YEAR | $2,715.00 | $2,769.30 | $2,796.44 | $2,801.88 |

THE SCHEDULE OF PREMIUMS ABOVE IS FOR PAC BILLING ONLY.  A SCHEDULE OF
PREMIUMS FOR OTHER PAYMENT MODES WILL BE PROVIDED ON REQUEST.

TL23 CA                    CONTINUED ON THE FOLLOWING PAGE              PAGE 2

P O L I C Y   D A T A   ( C O N T I N U E D )

SCHEDULE OF NON-GUARANTEED PREMIUMS
- ANNUAL PREMIUMS* -

| POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS | POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS |
|---|---|---|---|
| OCT 08 2020 | $2,715.00 | OCT 08 2044 | $2,715.00 |
| OCT 08 2021 | 2,715.00 | OCT 08 2045 | 2,715.00 |
| OCT 08 2022 | 2,715.00 | OCT 08 2046 | 2,715.00 |
| OCT 08 2023 | 2,715.00 | OCT 08 2047 | 2,715.00 |
| OCT 08 2024 | 2,715.00 | OCT 08 2048 | 2,715.00 |
| OCT 08 2025 | 2,715.00 | OCT 08 2049 | 55,495.00 |
| OCT 08 2026 | 2,715.00 | OCT 08 2050 | 61,892.50 |
| OCT 08 2027 | 2,715.00 | OCT 08 2051 | 68,287.50 |
| OCT 08 2028 | 2,715.00 | OCT 08 2052 | 74,685.00 |
| OCT 08 2029 | 2,715.00 | OCT 08 2053 | 81,082.50 |
| OCT 08 2030 | 2,715.00 | OCT 08 2054 | 87,477.50 |
| OCT 08 2031 | 2,715.00 | OCT 08 2055 | 93,875.00 |
| OCT 08 2032 | 2,715.00 | OCT 08 2056 | 98,882.50 |
| OCT 08 2033 | 2,715.00 | OCT 08 2057 | 108,295.00 |
| OCT 08 2034 | 2,715.00 | OCT 08 2058 | 117,267.50 |
| OCT 08 2035 | 2,715.00 | OCT 08 2059 | 126,920.00 |
| OCT 08 2036 | 2,715.00 | OCT 08 2060 | 137,307.50 |
| OCT 08 2037 | 2,715.00 | OCT 08 2061 | 148,480.00 |
| OCT 08 2038 | 2,715.00 | OCT 08 2062 | 160,492.50 |
| OCT 08 2039 | 2,715.00 | OCT 08 2063 | 173,232.50 |
| OCT 08 2040 | 2,715.00 | OCT 08 2064 | 186,917.50 |
| OCT 08 2041 | 2,715.00 | OCT 08 2065 | 201,600.00 |
| OCT 08 2042 | 2,715.00 | OCT 08 2066 | 217,360.00 |
| OCT 08 2043 | 2,715.00 | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE "SCHEDULE OF NON-GUARANTEED PREMIUMS" ON THIS PAGE SHOWS THE AMOUNT
YOU PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL PREMIUM PAYMENT MODE.  THE
AMOUNT YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY PURSUANT TO ANY OTHER
PAYMENT MODE.

*INCLUDES ANNUAL POLICY FEE OF $30.00.  POLICY FEE MAY BE HIGHER IF YOU PAY
PURSUANT TO ANY PAYMENT MODE OTHER THAN ANNUAL.

P O L I C Y   D A T A   ( C O N T I N U E D )

### SCHEDULE OF GUARANTEED PREMIUMS
### - ANNUAL PREMIUMS* -

| POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS | POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS |
|---|---|---|---|
| OCT 08 2020 | $2,715.00 | OCT 08 2044 | $2,715.00 |
| OCT 08 2021 | 2,715.00 | OCT 08 2045 | 2,715.00 |
| OCT 08 2022 | 2,715.00 | OCT 08 2046 | 2,715.00 |
| OCT 08 2023 | 2,715.00 | OCT 08 2047 | 2,715.00 |
| OCT 08 2024 | 2,715.00 | OCT 08 2048 | 2,715.00 |
| OCT 08 2025 | 2,715.00 | OCT 08 2049 | 66,052.50 |
| OCT 08 2026 | 2,715.00 | OCT 08 2050 | 78,420.00 |
| OCT 08 2027 | 2,715.00 | OCT 08 2051 | 88,632.50 |
| OCT 08 2028 | 2,715.00 | OCT 08 2052 | 120,010.00 |
| OCT 08 2029 | 2,715.00 | OCT 08 2053 | 137,700.00 |
| OCT 08 2030 | 2,715.00 | OCT 08 2054 | 144,635.00 |
| OCT 08 2031 | 2,715.00 | OCT 08 2055 | 169,600.00 |
| OCT 08 2032 | 2,715.00 | OCT 08 2056 | 205,577.50 |
| OCT 08 2033 | 2,715.00 | OCT 08 2057 | 221,280.00 |
| OCT 08 2034 | 2,715.00 | OCT 08 2058 | 247,530.00 |
| OCT 08 2035 | 2,715.00 | OCT 08 2059 | 247,530.00 |
| OCT 08 2036 | 2,715.00 | OCT 08 2060 | 247,530.00 |
| OCT 08 2037 | 2,715.00 | OCT 08 2061 | 247,530.00 |
| OCT 08 2038 | 2,715.00 | OCT 08 2062 | 247,530.00 |
| OCT 08 2039 | 2,715.00 | OCT 08 2063 | 247,530.00 |
| OCT 08 2040 | 2,715.00 | OCT 08 2064 | 247,530.00 |
| OCT 08 2041 | 2,715.00 | OCT 08 2065 | 247,530.00 |
| OCT 08 2042 | 2,715.00 | OCT 08 2066 | 247,530.00 |
| OCT 08 2043 | 2,715.00 | | |

THE "SCHEDULE OF GUARANTEED PREMIUMS" ON THIS PAGE SHOWS THE AMOUNT YOU
PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL PREMIUM PAYMENT MODE.  THE AMOUNT
YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY PURSUANT TO ANY OTHER PAYMENT MODE.

*INCLUDES ANNUAL POLICY FEE OF $30.00.  POLICY FEE MAY BE HIGHER IF YOU PAY
PURSUANT TO ANY PAYMENT MODE OTHER THAN ANNUAL.

## DEFINITIONS

| | |
|---|---|
| **Age** | A person's age in years on his or her last birthday, unless otherwise specified. For purposes of this policy, the Insured's Age changes on each Policy Anniversary. |
| **Beneficiary** | A person designated to receive all or a portion of the death benefit on the death of the Insured. You may name both a Primary and Contingent Beneficiary. A Primary or Contingent Beneficiary named on the application may be changed as provided in this policy. |
| **Date of Issue** | The date this policy is prepared in our office. The Date of Issue is shown in the Policy Data. The Date of Issue may or may not be the same as the Policy Date. |
| **Expiry Date** | The date on which coverage under this policy expires. The Expiry Date is the Policy Anniversary at the Insured's Age 105 and is shown in the Policy Data. |
| **Face Amount** | The amount upon which the death benefit is determined. The initial Face Amount is shown in the Policy Data. |
| **In Force** | Insurance coverage is in effect and has not terminated. |
| **Insured** | The person whose life is insured under this policy. The Insured is identified in the Policy Data. |
| **Lapse** | Termination of this policy at the end of the grace period due to non-payment of premiums. If this policy Lapses, the Insured's life will no longer be insured under the terms of this policy. |
| **Monthly Policy Date** | The day of each month coinciding with the Policy Date. If there is no day in a calendar month that coincides with the Policy Date, the Monthly Policy Date for that month will be the first day of the following month. |
| **Policy Anniversary** | The same day and month as the Policy Date for each year this policy remains In Force. |
| **Policy Date** | The date coverage is effective under this policy. We will use the Policy Date to determine the premium due dates, Monthly Policy Dates, Policy Anniversaries, and Policy Years. The Policy Date is shown in the Policy Data. |
| **Policy Year** | The 12 month period directly preceding a Policy Anniversary. |
| **Reinstate** | To restore coverage after this policy has Lapsed, in accordance with the Reinstatement provision. |
| **Rider** | An attachment to this policy that provides an additional benefit. |
| **Written Request** | A signed request in a form satisfactory to us that is received at our Administrative Office. |
| **You and your** | The owner of this policy. The owner as of the Date of Issue is shown in the Policy Data. Ownership may be transferred as provided in this policy. Following a transfer of ownership, you and your will refer to the new owner. |

## OWNERSHIP

**Owner of the Policy**

The owner may exercise all rights under this policy during the Insured's lifetime, including the right to transfer ownership subject to applicable law and regulation. If ownership is shared by more than one person, all such persons must act together to exercise a right. Unless otherwise specified, if a co-owner dies during the Insured's lifetime, the co-owner's interest in this policy will pass to the remaining co-owners.   If the owner or all co-owners die during the Insured's lifetime, ownership will pass to the contingent owner, if one has been named; otherwise, ownership will pass to the owner's estate. You may change the owner by filing a Written Request with us.  We will not be bound by any change of ownership until we record it in our records.  Unless otherwise specified by you, the change will then take effect as of the date the change is signed by you, subject to any payments made or actions taken by us prior to our recording of the change.

**Assignment of the Policy**

You may assign this policy by filing a Written Request with us.  We will not be bound by any assignment until we record it in our records.  Unless otherwise specified by you, the assignment will then take effect on the date the assignment is signed by you, subject to any payments made or actions taken by us prior to our recording of the assignment.  We assume no responsibility for the validity or effect of any assignment of this policy or of any interest in it.  Any death benefit which becomes payable to an assignee will be payable in a single sum and will be subject to proof of the assignee's interest and the extent of the assignment.

## THE BENEFICIARY

**Who Receives the Death Benefit**

When the death benefit is payable under this policy, we will pay it to the Primary Beneficiary named by you in accordance with this policy.  If no Primary Beneficiary has been designated, or if the interest of all designated Primary Beneficiaries has ended before we make payment of the death benefit, we will pay the death benefit to the Contingent Beneficiary, if one has been named. If the interest of all designated Primary and Contingent Beneficiaries has ended before we make payment of the death benefit, we will pay the death benefit to you. If you are not living at the time, we will pay the death benefit to the executor or administrator of your estate.

Unless you specify otherwise, the following will apply:

1. If any Beneficiary dies before the Insured, at the same time as the Insured, or within 30 days after the Insured, that Beneficiary's interest in the death benefit will end, except as to any death benefits we have already paid to that Beneficiary.

2. If a Beneficiary is a partnership, we will pay the death benefit to the partnership as it existed when the Insured died.

**How to Change a Beneficiary**

You may name or change a Primary or Contingent Beneficiary while the Insured is living by sending us a Written Request.  The change will not be effective until we record it in our records.  Even if the Insured is not living when we record the change, the change will take effect as of the date it was signed. However, any benefits we pay before we record the change will not be subject to the change.

A Beneficiary designated irrevocably may not be changed without the written consent of that Beneficiary.

TL23 CA                            Page 4

## PAYMENT OF THE DEATH BENEFIT

**Proof of Death**
We will pay any benefit payable because of death when we receive due proof that the Insured's death occurred while this policy was In Force. The proof must be sent to us at our Administrative Office. We will send appropriate forms to the Beneficiary upon request. Any of our agents will help the Beneficiary fill out the forms without charge.

**Death Benefit**
The amount of the death benefit is equal to:

|        | (a) | the Face Amount of this policy, |
|--------|-----|--------------------------------|
| plus   | (b) | the amount payable under any attached Rider, subject to its terms, |
| plus   | (c) | the amount of any portion of a paid premium which applies to a period beyond the Insured's date of death (excluding any premiums waived under any Rider attached to this policy), |
| minus  | (d) | the amount of any portion of a premium due under the Grace Period provision. |

The amount of the death benefit may be affected by the Misstatement of Age or Sex in the Application provision of this policy.

**Interest from Date of Death**
We will pay interest on the death benefit under this policy after we receive due proof of the Insured's death. We will pay interest on the death benefit from the date of death to the date of payment. The annual interest rate will be at least 1%.

We will pay additional interest at a rate of 10% annually, beginning with the date that is 31 calendar days from the latest of items 1, 2 and 3 below to the date payment is made:

1. The date we receive due proof of the Insured's death.
2. The date we receive sufficient information to determine our liability, the extent of our liability and the appropriate payee legally entitled to the death benefit.
3. The date that legal impediments to payment of the death benefit that depend on the action of parties other than us are resolved and sufficient evidence is provided to us. Legal impediments include, but are not limited to:

   a) The establishment of guardianships and conservatorships;
   b) The appointment and qualification of trustees, executors and administrators; and
   c) The submission of information required to satisfy state and federal reporting requirements.

In the event of the death of the Insured, the death benefit payable under this policy shall include a refund of all premiums, if any, paid beyond the Insured's date of death. If the refund of premiums is not paid within 30 days after we receive due proof of the death of the Insured, we will pay interest on such refund from the date of death to the date of payment. The interest rate will be determined by us, but will never be less than 1%.

TL23 CA                            Page 5

## PREMIUMS

**Premium**

To keep this policy In Force, each premium must be paid in advance. Premiums should be sent to our Administrative Office or as otherwise instructed by us. We will give you a receipt if you ask for one. The first premium is due on the Policy Date. Subsequent premiums are payable while the Insured is living and within the grace period. If a part of the premium ceases to be payable under the provisions of a rider, the premium will be reduced accordingly. The mode of premium payment may be changed on any Policy Anniversary to any other mode shown in the Policy Data.

**Schedules of Premiums**

Premiums for this policy (excluding premiums for certain Riders) will remain level until the First Premium Increase Date shown in the Policy Data. Beginning on the First Premium Increase Date, premiums will increase annually.

The Policy Data includes two schedules of annual premiums. For any Policy Year after the First Premium Increase Date, we may charge a lower premium than the guaranteed annual premium, but we will not charge a higher annual premium. Any lower annual premium will be in effect for one year and will apply to all policies having the same plan, issue year, class of risk, face amount, sex, and premium schedule as this policy.

The Schedule of Non-Guaranteed Premiums shown in the Policy Data is based on our current premium scale, but is not guaranteed. Any change in the non-guaranteed premium rates will be prospective and will be subject to our expectation as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; regulatory changes; and any applicable federal, state and local taxes.

The semi-annual, quarterly and monthly premiums for each Policy Year will be determined on the same basis used to determine the initial semi-annual, quarterly and monthly premiums.

**Grace Period**

If premiums are not paid when they are due, this policy will Lapse. We will allow a period of 61 days after the premium due date for payment of each premium after the first premium. This means that if a premium is not paid on or before the date it is due, you may pay that premium during the 61 day period immediately following the due date. The Insured's life will continue to be insured during this 61 day period. During the grace period, we will not charge any interest on the premium due. If you do not pay the premium due before the end of the grace period, this policy will Lapse and all coverage will terminate. You will have the entire grace period within which to remit payment. Any payments sent by U.S. mail must be postmarked within the grace period. If the Insured dies during the grace period before the premium is paid, we will deduct the portion of the premium required to provide insurance from the premium due date to the date of the Insured's death from the death benefit payable under this policy.

**Reinstatement**

If this policy Lapses, you may Reinstate it as provided in this section. Any Reinstatement must be made during the lifetime of the Insured and within three years from the end of the grace period. Before we Reinstate your policy, we will require:

1.  Your Written Request to Reinstate this policy,
2.  The Insured's written consent to Reinstatement,
3.  Evidence of insurability satisfactory to us that the Insured is insurable at the same class of risk/substandard rating/flat extra as applied to this policy immediately prior to Lapse, and

TL23 CA                           Page 6

4. Payment of all overdue premiums with interest from the due date of each premium. The interest rate is 6% per annum, compounded annually.

The date of Reinstatement will be the Monthly Policy Date on or following the date the application for Reinstatement is approved by us, so long as the Insured is still living.

## GENERAL PROVISIONS

| | |
|---|---|
| **This Policy is Our Contract with You** | This policy is issued in consideration of the application and the payment of premiums as provided in this policy. |

This policy, any amendment(s) or endorsement(s), and a copy of the application(s) and any questionnaires for issuance or Reinstatement of this policy attached to it contain the entire contract between you and us. Any statements made in such application(s), questionnaires or any amendments either by you or by the Insured will be considered representations and not warranties. Also, any written statement made either by you or by the Insured will not be used to void this policy nor defend against a claim under this policy unless the statement is contained in the application(s), questionnaires or any amendments thereto.

Any extra benefit rider attached to this policy will become a part of this policy and will be subject to all of the terms and conditions of this policy unless we state otherwise in the rider.

We reserve the right to add future Riders or endorsements to this policy, except where prohibited by law.

**Incontestability**
We cannot contest this policy, except for non-payment of premium, after it has been In Force during the lifetime of the Insured for two years after the later of:

1. The Date of Issue; and
2. The effective date of Reinstatement of this policy.

If this policy is Reinstated, the original contestability period will continue to apply. In addition, a new two year contestability period will apply from the date of Reinstatement with respect to statements made in the application for Reinstatement.

The Insured, the owner and the Beneficiary are obligated to cooperate in any contestability investigation that we may conduct, including supplying us with necessary authorizations for medical and other information.

**Amount Payable Is Limited in the Event of Suicide**
If the Insured, whether sane or insane, dies by suicide within two years from the Date of Issue, our liability will be limited to an amount equal to the premiums paid for this policy.

If this policy is Reinstated, a new two year period will apply beginning on the date of Reinstatement. If the Insured, whether sane or insane, dies by suicide within two years from the Reinstatement date, our liability will be limited to an amount equal to the premiums paid from the date of Reinstatement.



| | |
|---|---|
| **Misstatement of Age or Sex in the Application** | If there is a misstatement of the Insured's date of birth or sex in the application, we will adjust the death benefit to that which the premiums paid would have purchased at the correct Age or sex. |
| **Riders** | Riders, if any, are listed in the Policy Data. Any Rider will become part of this policy and will be subject to all of the terms and conditions of this policy, unless we state otherwise in the Rider. |
| **Who Can Make Changes in the Policy** | No change or waiver of any of the provisions of this policy will be valid unless made in writing by us and signed by an officer of the Company. Any change or waiver must be signed by our President or a Vice President together with our Secretary. No agent or other person has the authority to change or waive any provision of this policy. |
| **Termination of Insurance** | This policy will terminate and all coverage on the Insured's life will end on the earliest of the following dates or events: |

1. The Expiry Date; or
2. The date this policy Lapses; or
3. The date we receive your Written Request to terminate; or
4. The date this policy is converted pursuant to a Conversion Option Endorsement; or
5. The date of the Insured's death.

Our acceptance of a premium for any period after the date of termination of this policy shall create no liability by us with respect to this policy, nor will it constitute a waiver of the termination. Any premium paid for this policy following its termination will be refunded.

| | |
|---|---|
| **No Dividends are Payable** | This is nonparticipating insurance. It does not participate in our profits or surplus. We do not distribute past surplus or recover past losses by changing the premium rates. |
| **Your Rights** | During the Insured's lifetime and unless otherwise provided in this policy, you have the exclusive right to assign this policy and to exercise every right, privilege and option this policy grants or that we allow. |

To exercise any of these rights, or to apply for the death benefits or any benefits under this policy, communicate with our nearest representative or directly with our Administrative Office. Contact your agent if you desire additional services or information. Please notify us promptly of any change of address.

## SETTLEMENT PROVISIONS

| | |
|---|---|
| **Lump Sum Payment** | When the death benefit is payable, we will pay it in a lump sum, unless a settlement option is elected. |
| **Settlement Options** | During the Insured's lifetime, you may request that we pay the death benefit under one of the following settlement options. We will also use any other method of payment that is agreeable to you and us. After the Insured's death, a Beneficiary may elect to receive such Beneficiary's share of the death benefit under a settlement option. However, you may provide that the Beneficiary will not be permitted to change the settlement option you have selected. If a settlement option is requested, we will prepare an agreement to be signed which will state the |

terms and conditions under which the payments will be made. This agreement will include a statement regarding the withdrawal value, if any, and to whom any remaining proceeds will be paid following the death of the person receiving the payments.

**Annuity**

We will use the benefit as a single premium to buy an annuity. The annuity may be payable to one or two payees. It may be payable for a guaranteed period, or for life with or without a guaranteed period as long as we agree to it. The annuity payment will not be less than what our newly issued immediate annuity contracts with the same features are then paying.

**Benefit Deposited with Interest**

We will hold the benefit on deposit with us and it will earn interest. Such interest will be at a rate declared by us from time to time, but not less than an annual interest rate of 1%, and may differ from the rate we pay under other options. We will pay the earned interest monthly, quarterly, semi-annually or annually, as requested. The payee may withdraw part or all of the benefit and earned interest at any time.

**Conditions**

Settlements of less than $10,000 will be paid in a lump sum and may not be applied under any settlement option. We may change the payment frequency if payments under an option become less than $100.

A corporation may receive payments under a life income option only if the payments are based on the life of the surviving spouse or child of the Insured.

**Payments Exempt from the Claims of Creditors**

To the extent permitted by law:

1. no payment of death benefit or interest we make will be subject to the claims of any creditor; and
2. if you provide that the option selected cannot be changed after the Insured's death, the payments will not be subject to the debts or contracts of the person receiving the payments.

# Transamerica Life Insurance Company
## Cedar Rapids, Iowa
**Contact us at 4333 Edgewood Rd NE, Cedar Rapids, IA 52499**
**Telephone (800) 852-4678**
**www.transamerica.com**
(Hereinafter called the "Company," "we," "us," or "our")

### CHRONIC ILLNESS ACCELERATED DEATH BENEFIT RIDER

We have issued this rider as a part of the policy to which it is attached.  Except as otherwise specifically set forth below, it is subject to all of the terms of the policy.

**NOTICE:**  This rider is designed to provide a federal income tax-free Accelerated Death Benefit under Section 101(g) of the Internal Revenue Code to the extent that the benefit does not exceed the per diem limitation under section 7702B(d) or qualified long-term care expenses as defined in section 7702B(c) of the Internal Revenue Code, as adjusted for inflation.  However, benefits advanced under this rider may be taxable in certain circumstances.  There may be tax consequences if you own additional policies paying similar benefits.  As with all tax matters, you should consult with your tax advisor regarding the tax treatment of receiving an Accelerated Death Benefit.  This rider does not pay for or reimburse expenses reimbursable under Title XVIII of the Social Security Act.

## NOTICE TO YOU, THE OWNER

### FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL 1-800-852-4678.

This Rider is not long-term care insurance and does not provide long-term care insurance, nor is it intended to replace long-term care insurance coverage. We advise you to review carefully all limitations of this Rider, as well as those of the contract to which it is attached.

## RIGHT TO RETURN THIS RIDER WITHIN 30 DAYS OF ITS DELIVERY

You have the right to return the Accelerated Death Benefit for Chronic Illness Rider by first-class United States mail within 30 days of its delivery and to have the premium refunded if, after examination of the coverage, you are not satisfied for any reason.  The return of this Rider will void this Rider from the beginning, and the parties will be in the same position as if this Rider had not been issued.  All premiums paid and any Policy fee paid for this Rider will be fully refunded directly to the applicant within 30 days after this Rider is returned.

The policy's benefits and values, as well as any benefits and values provided by affected riders, will be reduced if an Accelerated Death Benefit is paid.  Benefits and values (if applicable) include without limitation: face amounts of the policy, rider and endorsement benefits of any affected riders and endorsements, policy and rider values, cash surrender values, death benefit and premiums.  The Accelerated Death Benefit amount is fixed at the time the Company approves the request for the accelerated death benefit.  Payment of an Accelerated Death Benefit may affect eligibility for Medicaid or other government benefits and entitlements.  Payment of an Accelerated Death Benefit under this rider is not conditioned on the receipt of long-term care or medical services.

**THIS RIDER IS RENEWABLE FOR THE LIFE OF THE POLICY PROVIDED ANY REQUIRED PREMIUMS ARE PAID AND THE POLICY REMAINS IN FORCE.  THIS RIDER WILL TERMINATE ON THE DATE THE POLICY TERMINATES.  TERMINATION OF THIS RIDER WILL NOT AFFECT ANY CLAIM FOR BENEFITS FOR CHRONIC ILLNESS OCCURRING WHILE THE RIDER WAS IN EFFECT.**

| | |
|---|---|
| **Rider Benefit** | If the Insured becomes Chronically Ill while the policy and rider are in effect, you may elect to receive an Accelerated Death Benefit payment subject to the provisions of the policy and this rider and the following conditions: |
| | 1.  The Insured must be certified by an Independent Licensed Health Care Practitioner as being a Chronically Ill individual within 12 months of the |



Accelerated Death Benefit request. If the initial Independent Licensed Health Care Practitioner does not certify that the Insured is Chronically Ill and did not examine the Insured personally, the Insured is entitled to a second assessment through personal examination by an Independent Licensed Health Care Practitioner. You may submit certification of Insured's Chronic Illness from a Licensed Health Care Practitioner of your choice, or you may request the Company to arrange for an assessment to be performed by an Independent Licensed Health Care Practitioner selected by the Company; and

2. The Face Amount of the policy at the time the Accelerated Death Benefit request is received must be at least $25,000; and

3. We must receive the signed consent of all irrevocable Beneficiaries (if any) and all assignees (if any).

If we approve your acceleration request, we will make the payment on the next Monthly Policy Date. There are no restrictions on how you use the accelerated death benefit proceeds.

**Definitions**

**Accelerated Death Benefit** is a portion of the policy death benefit that is paid prior to the death of the Insured due to the Insured's Chronic Illness. The payment of an Accelerated Death Benefit reduces the Face Amount and benefits and values of the policy and any affected riders and endorsements and the death benefit payable to the Beneficiary(ies) upon death.

**Activities of Daily Living (ADLs)** means Bathing, Continence, Dressing, Eating, Toileting and Transferring as defined below.

1. Bathing means the ability to wash oneself by sponge bath; or in either a tub or shower, including the act of getting into and out of the tub or shower.

2. Continence means the ability to maintain control of bowel and bladder function; or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).

3. Dressing means the ability to put on and take off all items of clothing and any necessary braces, fasteners or artificial limbs.

4. Eating means the ability to feed oneself by getting food into the body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously.

5. Toileting means the ability to get to and from the toilet, get on and off the toilet and perform associated personal hygiene.

6. Transferring means the ability to move into or out of a bed, chair or wheelchair.

**Available Death Benefit** means the amount payable under the policy upon the death of the Insured, plus one of the following, if applicable:

1. In the case of a single life policy, the rider death benefit payable under a Base Insured Rider, if any.

2. In the case of a joint last survivor policy, the benefit payable under a Joint Insured Term Rider, if any.

Available Death Benefit does not include amounts payable under any other riders not expressly named above.

**Chronically Ill/Chronic Illness** means that the Insured:

1. is unable to perform, without Substantial Assistance from another person for a period of at least 90 days, at least two out of the six Activities of Daily Living due to the loss of functional capacity to perform the activity; or

CRN03 CA-0119                                   Page 2

2. requires Substantial Supervision by another person, to protect the Insured from threats to health and safety due to Severe Cognitive Impairment.

**Election Percentage** means the percentage of the Available Death Benefit that you choose to accelerate in accordance with the Maximum Accelerated Death Benefit provision.

**Immediate Family Member** means anyone related to an Insured in the following manner: spouse, daughter, son, stepchild, father, mother, stepparent, sister, brother, stepsister, stepbrother, grandchild, grandparent, father-in-law, mother-in-law, or the spouse of any of these. The term "spouse" includes a common law marriage partner, domestic partner, or civil union partner, if legally recognized in the governing jurisdiction.

**Independent Licensed Health Care Practitioner** means a Licensed Health Care Practitioner who is not an employee of the Insurer and is not compensated in any manner linked to the outcome of the Chronic Illness certification.

**Insured** means only the Insured under the policy to which this rider is attached. It does not include any other individuals covered under other riders.

**Licensed Health Care Practitioner** means a Physician, a registered nurse, a Physician Assistant or a social worker, licensed in the United States. Licensed Health Care Practitioner does not include:

1. You, the Insured, or an Immediate Family Member; or

2. A person who lives with you, the Insured, or an Immediate Family Member; or

3. A person in the same medical practice as you or the Insured; or

4. A business partner of you or the Insured.

**Physician** means a doctor of medicine or osteopathy as set forth in Section 1861(r)(1) of the Social Security Act, as amended, who is legally authorized to practice medicine and surgery within the United States by the jurisdiction in which he or she performs such function or action. Physician does not include:

1. You, the Insured, or an Immediate Family Member; or

2. A person who lives with you, the Insured, or an Immediate Family Member; or

3. A person in the same medical practice as you or the Insured; or

4. A business partner of you or the Insured.

**Severe Cognitive Impairment** means a loss or deterioration in intellectual capacity that is (a) comparable to and includes Alzheimer's disease and similar forms of irreversible dementia, and (b) measured by clinical evidence and standardized tests that reliably measure the impairment in the Insured's short-term or long-term memory, orientation as to people, places, or time, and deductive or abstract reasoning, and judgment as it relates to safety awareness.

**Substantial Assistance** means either Hands-On Assistance or Standby Assistance:

1. **Hands-On Assistance** means the physical assistance of another person without which the Insured would be unable to perform the Activity of Daily Living.

2. **Standby Assistance** is the presence of another person within arm's reach that is necessary to prevent, by physical intervention, injury to the Insured while the Insured is performing the Activity of Daily Living.

**Substantial Supervision** means continual supervision (which may include cuing by verbal prompting, gestures, or other demonstrations) by another person that is necessary to protect the Insured from threats to the Insured's health or safety (such as may result from wandering).



**Amount of Accelerated Death Benefit**

If the Insured becomes Chronically Ill while the policy and rider are in effect, you may request acceleration of any amount between $1,000 and the Maximum Accelerated Death Benefit as outlined below. You may request additional accelerations for the same occurrence of Chronic Illness, if the Insured continues to be Chronically Ill and continues to be certified as Chronically Ill, and for any additional occurrences of Chronic Illness, up to the Maximum Accelerated Death Benefit. If we approve a request to accelerate the Maximum Accelerated Death Benefit because the Insured is Chronically Ill, the amount of the Accelerated Death Benefit payment will be no less than the greater of:

1. $300, and

2. 90% of the difference between the Policy Value, if any, and any Loan Balance.

If we approve a request to accelerate less than the Maximum Accelerated Death Benefit because the Insured is Chronically Ill, the amount of the Accelerated Death Benefit payment may be less than that stated above. The Accelerated Death Benefit is fixed at the time we approve the request for it.

The Accelerated Death Benefit payment we make to you will be less than the amount of the Available Death Benefit which you request to accelerate. The Accelerated Death Benefit payment will be calculated as A minus B minus C minus D where A, B, C and D are determined as follows:

A. The actuarial present value of the amount of the Available Death Benefit which you request to accelerate, which will be calculated as described below.

B. The Loan Balance, if any, at the time the Accelerated Death Benefit is paid, multiplied by the Election Percentage.

C. The actuarial present value of future premiums, including premiums for any Base Insured Rider or Joint Insured Term Rider but excluding other rider premiums, multiplied by the Election Percentage. The actuarial present value of future premiums is the amount as determined by us that would, prior to the acceleration, otherwise be payable to keep the policy In Force during the period of the Insured's remaining lifetime as determined by our physician's assessment, at time of the acceleration. This amount is determined by us using the applicable rated age, mortality tables and interest rate described under 1), 2), and 3) of the Present Value of Accelerated Death Benefit provision below.

D. An administrative charge for each Accelerated Death Benefit request. The administrative charge for each Accelerated Death Benefit request as of January 1, 2016 is $750, but will be subject to future increases based on cumulative annual cost-of-living increases as measured by the Consumer Price Index for All Urban Consumers (CPI) since January 1, 2012. Cumulative annual cost of living increases will not exceed 5% per calendar year. In the event that the CPI is no longer published, a substantially similar index will be used. In no event will the administrative charge for each Accelerated Death Benefit request exceed $1,000.

If we approve your request for an Accelerated Death Benefit, the amount that may be payable will be based in part on the Insured's remaining life expectancy as determined by us at the time of the acceleration. Generally, the longer the Insured's remaining life expectancy, the lower the payment amount will be. The shorter the Insured's remaining life expectancy, the higher the payment amount will be.

If the policy's Death Benefit Option is not Level (when applicable) when we approve your request for an Accelerated Death Benefit we will change the Death Benefit Option to Level, make any Face Amount changes in accordance with the policy, and adjust the Available Death Benefit accordingly. We will not automatically restore the original Death Benefit Option after we pay an Accelerated Death Benefit but you may request a change at that time in accordance with the policy's provisions.



| | |
|---|---|
| **Present Value of Accelerated Death Benefit** | The actuarial present value of the amount of the Available Death Benefit which you request to accelerate will be calculated using the following factors: |

1. The applicable mortality rates using mortality tables identified by us for use in the calculation. The mortality tables are based on sex distinct or unisex, smoker distinct or composite, ultimate, age last or age nearest birthday, or combined tables using such factors, depending on the definition of the mortality of the policy form to which the rider is attached.

2. A rated age, determined by us using the tables in 1) equal to the highest age that has a life expectancy greater than or equal to the remaining life expectancy of the Insured as determined by our physician's assessment.

3. Annual interest at a discount rate that is the greater of:

   1) The current yield on 90-day U.S. Treasury bills; or

   2) The maximum statutory adjustable policy loan interest rate as of the day of your Accelerated Death Benefit request.

   Note: if this rider is attached to a term policy, the discount rate will never exceed 8%.

| | |
|---|---|
| **Maximum Accelerated Death Benefit** | If the Insured continues to be Chronically Ill, you may request additional accelerations up to the lifetime maximum death benefit stated in this section, provided that a Licensed Health Care Practitioner annually recertifies the Insured as being a Chronically Ill individual. If additional Accelerated Death Benefits are paid because the Insured continues to be Chronically Ill, an administrative fee of $400 will apply to those additional payments.

The maximum death benefit you may accelerate because the Insured is Chronically Ill over the lifetime of the Insured is equal to the lesser of 90% of the Available Death Benefit or $1,500,000. The cost to have a Licensed Health Care Practitioner certify that an Insured is Chronically Ill shall not count against the lifetime maximum Death Benefit. |

| | |
|---|---|
| **Coordination between Accelerated Death Benefit Options** | If the Insured qualifies for an Accelerated Death Benefit under another rider to the policy and makes claim for benefits under two or more Accelerated Death Benefit riders at the same time, benefits will first be payable under the Terminal Illness Accelerated Death Benefit Rider, if applicable, then under the Critical Illness Accelerated Death Benefit Rider, if applicable, followed by the Chronic Illness Accelerated Death Benefit Rider, if applicable. Any subsequent Accelerated Death Benefit payable will be payable on the next Monthly Policy Date. |

| | |
|---|---|
| **Effect of the Accelerated Death Benefit Payment on the Policy** | After an Accelerated Death Benefit is paid, the policy's benefits and values, as those amounts exist on the date the Accelerated Death Benefit is paid, will be reduced by the Election Percentage. This includes, but is not limited to, the following amounts: Face Amount of the policy, death benefit, rider and endorsement benefits for affected riders and endorsements, Policy Value, Cash Surrender Value and Loan Balance.

The premium and/or charges and monthly deductions, as applicable, for the policy and any affected riders will also be adjusted after an Accelerated Death Benefit is paid. If the rider is attached to a fixed premium policy, the adjusted premium will equal the appropriate premium rate applied to the reduced Face Amount plus any applicable policy fee. If the rider is attached to a flexible premium policy, monthly deductions and affected fees and charges will be reduced in accordance with the reduced Face Amount. If the rider is attached to a flexible premium policy with a No Lapse Guarantee, any Minimum Monthly No Lapse Premium will be adjusted in accordance with the reduced Face Amount. Rider charges will be reduced in accordance with the reduced rider benefit. |

CRN03 CA-0119                    Page 5

We will provide you with information showing the reduced Face Amount, benefits, values, charges and new premium resulting from the Accelerated Death Benefit payment.

Payment of an Accelerated Death Benefit will not affect benefits available under any rider attached to the policy which provides benefits for accidental injury or accidental death provided the policy and rider remain in effect following the Accelerated Death Benefit payment.

Payment of an Accelerated Death Benefit under this Rider will not reduce any Accidental Death benefit available under the contract or any Rider attached to the contract.

**Limitations**

1. In no event will the total of all of the death benefits accelerated under this and any other Accelerated Death Benefit Rider exceed 100% of the Available Death Benefit.

2. The sum of all death benefits accelerated under this and any Critical Illness Rider may not exceed 90% of the Available Death Benefit.

3. We will not pay any Accelerated Death Benefit under this policy for a Chronic Illness that is caused by substantially or contributed to by, or results from a suicide attempt or intentionally self-inflicted injury while sane or insane.

4. You may not request an Accelerated Death Benefit:
   a) If required by law to use the Accelerated Death Benefit to meet the claims of creditors, whether in bankruptcy or otherwise; or
   b) If required by a government agency to use the Accelerated Death Benefit in order to apply for, obtain, or otherwise keep a government benefit or entitlement.

**Notice of Claim**

Notice of claim must be given to us at our Administrative Office's address or telephone number, or to our agent and should include the name of the Insured and the Policy number, or other information sufficient to identify the Insured if the Policy number is not available. Such notice should be made within 20 days after the date the Insured receives documentation that establishes the occurrence of a Chronic Illness. If it is not reasonably possible to give notice within that time, the claim may not be denied or reduced due to the delay, so long as notice is given as soon as reasonably possible.

**Claim Forms**

Claim forms should be used for filing proof of loss. We will send such form to the claimant within 15 days of receipt of notice of claim. If we fail to supply the proper claim forms within 15 days, you shall be deemed to have provided proof of loss upon sending, within the time stated in the proof of loss provision, documentation that establishes the occurrence of a Chronic Illness. You or a personal representative may obtain a claim form by calling our toll-free telephone number listed on the cover page.

**Proof of Loss**

Written proof of loss must be given to us at our Administrative Office. This includes completion of the Claim Form provided by us and documentation that establishes the occurrence of a Chronic Illness. We must receive such proof within 90 days after the date the Insured receives documentation that establishes the occurrence of a Chronic Illness. Failure to furnish such proof within such time will not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof and it was furnished as soon as reasonably possible. In any event, the proof required must be given no later than one year from the time proof is otherwise required, unless the claimant was legally incapacitated.

**Physical Examination**

We have the right to have an Insured examined by a Physician of our choice when and as often as reasonably necessary while a claim is pending. In case of death, we may request an autopsy where it is not forbidden by law. We will pay for such examination or autopsy.



**Payment of Accelerated Death Benefits**

Following a written Accelerated Death Benefit request, we will send you and any irrevocable beneficiary a statement that informs you of the amount of the Accelerated Death Benefit payment available or elected and shows you any effect that the payment of the Accelerated Death Benefit would have on the policy's Face Amount, policy and rider values, death benefit, Loan Balance and premiums. However, if we find the written proof of the Insured's Chronic Illness to be insufficient, we will instead notify you that the Accelerated Death Benefit request has been denied.

If you agree to the payment amount, we will immediately pay you or the assignee the amount of the Accelerated Death Benefit according to the Accelerated Death Benefit Payment Option you elected. No less than one month after payment of an Accelerated Death Benefit, we will provide you a report of any Accelerated Death Benefits paid out during the prior month, including an explanation of any changes to the policy, death benefits and cash values on account of the benefits being paid out, and the amount remaining benefits that can be accelerated at the end of the prior month. If the Insured dies while the policy is In Force but before any Accelerated Death Benefit payment is made, we will instead pay the entire death benefit of the policy in accordance with the policy provisions.

There are no restrictions on how you use the Accelerated Death Benefit proceeds. The payment of the Accelerated Death Benefit is not conditioned on the receipt of long-term care or medical services.

**Accelerated Death Benefit Payment Options**

You may choose one of the following options when submitting a claim for an Accelerated Death Benefit under this Rider, however, there may be tax consequences if you accept an amount above the amount that would be tax-qualified under the Internal Revenue Code:

**Option 1 – Periodic Accelerated Death Benefit Payments** – You may request to receive the Accelerated Death Benefit in periodic payments. Payments cannot be made more frequently than once a month.

If you choose periodic payments, we will send you a letter explaining your payment options to choose from. You have the option to accelerate up to the maximum allowed and to elect the benefit to be paid at 2% each month, 6% every 3 months, 12% every 6 months, or 24% annually. If periodic payments are requested but you die before all such payments are made, we may pay any remaining payments in one lump to your estate.

**Option 2 – Lump Sum Accelerated Death Benefit** – In lieu of monthly payments, you may request the Accelerated Death Benefit in one lump sum.

**Termination**

This rider will terminate on the earliest of the following dates or events:

1. The date the Maximum Accelerated Death Benefit has been accelerated; or
2. The date the policy lapses or otherwise terminates; or
3. The date the policy is surrendered or continued under any nonforfeiture option; or
4. The next Monthly Policy Date following the date you request termination of this rider; or
5. The date of the Insured's death.

Termination of this rider will not affect any claim for benefits for Chronic Illness occurring while the rider was in effect.

**Reinstatement**

If the policy is reinstated, this rider may be reinstated on the same or more favorable terms as reinstatement of the underlying policy. Following reinstatement, you will have the same rights under this rider as you had immediately before the due date of the defaulted premium.

CRN03 CA-0119                              Page 7

| | |
|---|---|
| **Consideration** | We have issued this rider in consideration of the application and payment of the premiums for the policy. |
| **No Additional Cost Prior to Election** | There is no additional cost for the Accelerated Death Benefit prior to election of the Accelerated Death Benefit. |
| **Legal Actions** | No legal action may be brought to recover any Accelerated Death Benefit payments requested under this rider within 60 days after written proof of the Chronic Illness has been given to us. No such action may be brought after three years from the time such written proof of the Insured's health condition has been given to us. |
| **Incontestability** | We cannot contest this rider after it has been In Force during the lifetime of the Insured for two years after the Rider Date. This rider may only be contested based on a statement made in the application if the application is attached to the policy and the statement was material to the risk accepted or the hazard assumed by us. |
| **Right to Appeal** | You have the right to appeal any decision made regarding benefit eligibility. |
| **Tax Qualification** | This rider is designed to qualify as an Accelerated Death Benefit under section 101(g) of the Internal Revenue Code. To that end, the provisions of this rider and the policy to which it is attached are to be interpreted to ensure or maintain such tax qualification, notwithstanding any other provisions to the contrary. We reserve the right to amend this rider and the policy to which it is attached to reflect any clarifications that may be needed or are appropriate to maintain such qualifications, or to conform this rider and the policy to which it is attached to any applicable changes in the tax qualification requirements. You will be sent a copy of any such amendment. |
| **No Dividends Are Payable** | This rider does not participate in our profits or surplus. |
| **Nonforfeiture Values** | This rider does not have cash values or loan values. |
| **Rider Date** | The Rider Date of this rider will be the Policy Date, unless we inform you in writing of a different date. |

Signed for us at our home office.

Blake Bostwick
President

Jay Orlandi
Secretary

Transamerica Life Insurance Company
Cedar Rapids, Iowa
Contact us at 4333 Edgewood Rd NE, Cedar Rapids, IA 52499
Telephone (800) 852-4678
www.transamerica.com
(Hereinafter called the "Company," "we," "us," or "our")

### CRITICAL ILLNESS ACCELERATED DEATH BENEFIT RIDER

We have issued this rider as a part of the policy to which it is attached.  Except as otherwise specifically set forth below, it is subject to all of the terms of the policy.

NOTICE: This rider is designed to provide a federal income tax-free benefit under IRC Section 104, even though it does not qualify for favorable tax treatment under IRC Section 101(g).  To that end, the provisions of this rider and the policy to which it is attached are to be interpreted to ensure or maintain such tax qualification, notwithstanding any other provisions to the contrary.  We reserve the right to amend this rider and the policy to which it is attached to reflect any clarifications that may be needed or are appropriate to maintain such qualification, or to conform this rider and the policy to which it is attached to any applicable changes in the tax qualification requirements.  You will be sent a copy of any such amendment.

### NOTICE TO YOU, THE OWNER

### FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL 1-800-852-4678.

This Rider is not long-term care insurance and does not provide long-term care insurance, nor is it intended to replace long-term care insurance coverage. We advise you to review carefully all limitations of this Rider, as well as those of the contract to which it is attached.

### RIGHT TO RETURN THIS RIDER WITHIN 30 DAYS OF ITS DELIVERY

You have the right to return the Accelerated Death Benefit for Critical Illness Rider by first-class United States mail within 30 days of its delivery and to have the premium refunded if, after examination of the coverage, you are not satisfied for any reason. The return of this Rider will void this Rider from the beginning, and the parties will be in the same position as if this Rider had not been issued.  All premiums paid and any Policy fee paid for this Rider will be fully refunded directly to the applicant within 30 days after this Rider is returned.

The policy's benefits and values, as well as any benefits and values provided by affected riders, will be reduced if an Accelerated Death Benefit is paid.  Benefits and values (if applicable) include without limitation: face amounts of the policy, rider and endorsement benefits of any affected riders and endorsements, policy and rider values, cash surrender values, death benefit and premiums.  The Accelerated Death Benefit amount is fixed at the time the Company approves the request for the accelerated death benefit. Payment of an Accelerated Death Benefit may affect eligibility for Medicaid or other government benefits and entitlements. Payment of an Accelerated Death Benefit under this rider is not conditioned on the receipt of long-term care or medical services.

**THIS RIDER IS RENEWABLE FOR THE LIFE OF THE POLICY PROVIDED ANY REQUIRED PREMIUMS ARE PAID AND THE POLICY REMAINS IN FORCE.  THIS RIDER WILL TERMINATE ON THE DATE THE POLICY TERMINATES.  TERMINATION OF THIS RIDER WILL NOT AFFECT ANY CLAIM FOR BENEFITS FOR CRITICAL ILLNESS OCCURRING WHILE THE RIDER IS IN EFFECT.**

| | |
|---|---|
| Rider Benefit | If the Insured becomes Critically Ill while the policy and rider are in effect, you may elect to receive an Accelerated Death Benefit payment subject to the provisions of the policy and this rider and the following conditions: |

      1. The Insured must be certified by a Physician as being a Critically Ill individual within 12 months of the Accelerated Death Benefit request (if the initial Physician does not certify that you are Critically Ill you are entitled to a second assessment by an independent Physician); and

2. The Face Amount of the policy at the time the Accelerated Death Benefit request is received must be at least $25,000; and

3. We must receive the signed consent of all irrevocable Beneficiaries (if any) and all assignees (if any).

If we approve your acceleration request, we will make the payment on the next Monthly Policy Date. There are no restrictions on how you may use the accelerated death benefit proceeds.

**Definitions**

**Accelerated Death Benefit** is a portion of the policy death benefit that is paid prior to the death of the Insured due to the Insured's Critical Illness. The payment of an Accelerated Death Benefit reduces the Face Amount and values of the policy and any affected riders and endorsements and the death benefit payable to the Beneficiary(ies) upon death.

**Available Death Benefit** means the amount payable under the policy upon the death of the Insured, plus one of the following, if applicable:

1. In the case of a single life policy, the rider death benefit payable under a Base Insured Rider, if any.

2. In the case of a joint last survivor policy, the benefit payable under a Joint Insured Term Rider, if any.

Available Death Benefit does not include amounts payable under any other riders not expressly named above.

**Critically Ill** means that the Insured has been diagnosed after the Rider Date with a medical condition that would, in the absence of treatment, result in the Insured's death within 12 months.

**Election Percentage** means the percentage of the Available Death Benefit that you choose to accelerate in accordance with the Maximum Accelerated Death Benefit provision.

**Immediate Family Member** means anyone related to an Insured in the following manner: spouse, daughter, son, stepchild, father, mother, stepparent, sister, brother, stepsister, stepbrother, grandchild, grandparent, father-in-law, mother-in-law, or the spouse of any of these. The term "spouse" includes a common law marriage partner, domestic partner, or civil union partner, if legally recognized in the governing jurisdiction.

**Insured** means only the Insured under the policy to which this rider is attached. It does not include any other individuals covered under other riders.

**Physician** means a doctor of medicine or osteopathy as set forth in Section 1861(r)(1) of the Social Security Act, as amended, who is legally authorized to practice medicine and surgery within the United States by the jurisdiction in which he or she performs such function or action. Physician does not include:

1. You, the Insured, or an Immediate Family Member; or

2. A person who lives with you, the Insured, or an Immediate Family Member; or

3. A person in the same medical practice as you or the Insured; or

4. A business partner of you or the Insured.

**Amount of Accelerated Death Benefit**

If the Insured becomes Critically Ill while the policy and rider are in effect, you may request acceleration of any amount between $2,500 and the Maximum Accelerated Death Benefit as outlined below. The total of all death benefits accelerated may not

CRT06 CA-0119

exceed the maximum Accelerated Death Benefit described below. You may request additional accelerations for the same occurrence of Critical Illness, if the Insured continues to be Critically Ill and continues to be certified as Critically Ill, and for additional occurrences of Critical Illness, up to the Maximum Accelerated Death Benefit. If we approve a request to accelerate the maximum Accelerated Death Benefit because the Insured is Critically Ill, the amount of the Accelerated Death Benefit payment will be no less than the greater of:

1.  $1,000, and

2.  90% of the difference between the Policy Value, if any, and any Loan Balance.

If we approve a request to accelerate less than the Maximum Accelerated Death Benefit because the Insured is Critically Ill, the amount of the Accelerated Death Benefit payment may be less than that stated above. The Accelerated Death Benefit is fixed at the time we approve the request for it.

The Accelerated Death Benefit payment we make to you will be less than the amount of the Available Death Benefit which you request to accelerate. The Accelerated Death Benefit payment will be calculated as A minus B minus C minus D where A, B, C and D are determined as follows:

A.  The actuarial present value of the amount of the Available Death Benefit which you request to accelerate, which will be calculated as described below.

B.  The Loan Balance, if any, at the time the Accelerated Death Benefit is paid, multiplied by the Election Percentage.

C.  The actuarial present value of future premiums, including premiums for any Base Insured Rider or Joint Insured Term Rider, but excluding other rider premiums, multiplied by the Election Percentage. The actuarial present value of future premiums is the amount as determined by us that would, prior to the acceleration, otherwise be payable to keep the policy In Force during the period of the Insured's remaining lifetime as determined by our physician's assessment, at time of the acceleration. This amount is determined by us using the applicable rated age, mortality tables, and interest rate described under 1), 2), and 3) of the Present Value of Accelerated Death Benefit provision below.

D.  An administrative charge for each Accelerated Death Benefit request. The administrative charge for each Accelerated Death Benefit request as of January 1, 2016 is $350, but will be subject to future increases based on cumulative annual cost-of-living increases as measured by the Consumer Price Index for All Urban Consumers (CPI) since January 1, 2012. Cumulative annual cost of living increases will not exceed 5% per calendar year. In the event that the CPI is no longer published, a substantially similar index will be used. In no event will the administrative charge for each Accelerated Death Benefit request exceed $1,000.

If we approve your request for an Accelerated Death Benefit, the amount that may be payable will be based in part on the Insured's remaining life expectancy as determined by us at the time of the acceleration. The Insured's remaining life expectancy will be calculated assuming the Insured receives medical treatment. Generally, the longer the Insured's remaining life expectancy, the lower the payment amount will be. The shorter the Insured's remaining life expectancy, the higher the payment amount will be.

If the policy's Death Benefit Option is not Level (when applicable) when we approve your request for an Accelerated Death Benefit we will change the Death Benefit Option to Level, make any Face Amount changes in accordance with the policy, and adjust the Available Death Benefit accordingly. We will not automatically restore the original Death Benefit Option after we pay an Accelerated Death Benefit but you may request



a change at that time in accordance with the policy's provisions.

**Present Value of Accelerated Death Benefit**

The actuarial present value of the amount of the Available Death Benefit which you request to accelerate will be calculated using the following factors:

1.  The applicable mortality rates using mortality tables identified by us for use in the calculation. The mortality tables we use are based upon, sex distinct or unisex distinct, smoker distinct or composite, ultimate, age last or age nearest birthday, or combined tables using such factors, depending on the definition of the mortality of the policy form to which the rider is attached.

2.  A rated age, determined by us using the tables in 1) equal to the highest age that has a life expectancy greater than or equal to the remaining life expectancy of the Insured as determined by our physician's assessment.

3.  Annual interest at a discount rate that is the greater of:

    1)  The current yield on 90-day U.S. Treasury bills; or

    2)  The maximum statutory adjustable policy loan interest rate as of the date of your Accelerated Death Benefit request.

    Note: If the rider is attached to a term policy, the discount rate will never exceed 8%.

**Maximum Accelerated Death Benefit**

The maximum death benefit you may accelerate because the Insured is Critically Ill over the lifetime of the Insured is equal to the lesser of 90% of the Available Death Benefit or $1,500,000.

**Coordination between Accelerated Death Benefit Options**

If the Insured qualifies for an Accelerated Death Benefit under another rider to the policy and makes claim for benefits under two or more Accelerated Death Benefit riders at the same time, benefits will first be payable under the Terminal Illness Accelerated Death Benefit Rider, if applicable, and next payable under the Long Term Care Rider if applicable, then under the Critical Illness Accelerated Death Benefit Rider, if applicable, followed by the Chronic Illness Accelerated Death Benefit Rider, if applicable. Any subsequent Accelerated Death Benefit payable will be payable on the next Monthly Policy Date.

**Effect of the Accelerated Death Benefit Payment on the Policy**

After an Accelerated Death Benefit is paid, the policy's benefits and values, as those amounts exist on the date the Accelerated Death Benefit is paid, will be reduced by the Election Percentage. This includes, but is not limited to, the following amounts: Face Amount of the policy, death benefit, rider and endorsement benefits for affected riders and endorsements, Policy Value, Cash Surrender Value and Loan Balance.

The premium and/or charges and monthly deductions, as applicable, for the policy and any affected riders will also be adjusted after an Accelerated Death Benefit is paid. If the rider is attached to a fixed premium policy, the adjusted premium will equal the appropriate premium rate applied to the reduced Face Amount plus any applicable policy fee. If the rider is attached to a flexible premium policy, monthly deductions and affected fees and charges will be reduced in accordance with the reduced Face Amount. If the rider is attached to a flexible premium policy with a No Lapse Guarantee, any Minimum Monthly No Lapse Premium will be adjusted in accordance with the reduced Face Amount. Rider charges will be reduced in accordance with the reduced rider benefit.

We will provide you with information showing the reduced Face Amount, benefits, values, charges and new premium resulting from the Accelerated Death Benefit payment.

Payment of an Accelerated Death Benefit will not affect benefits available under any rider attached to the policy which provides benefits for accidental injury or accidental death provided the policy and rider remain in effect following the Accelerated Death Benefit payment.

Payment of an Accelerated Death Benefit under this Rider will not reduce any Accidental Death benefit available under the contract or any Rider attached to the contract.

**Limitations**

1. In no event will the total of all of the death benefits accelerated under this and any other Accelerated Death Benefit Rider exceed 100% of the Available Death Benefit.

2. The sum of all death benefits accelerated under this and any Chronic Illness Rider may not exceed 90% of the Available Death Benefit.

3. We will not pay any Accelerated Death Benefit under this policy for a Critical Illness that is caused by or substantially contributed to by a suicide attempt or intentionally self-inflicted injury while sane or insane.

4. You may not request an Accelerated Death Benefit:
   a) If required by law to use the Accelerated Death Benefit to meet the claims of creditors, whether in bankruptcy or otherwise; or
   b) If required by a government agency to use the Accelerated Death Benefit in order to apply for, obtain, or otherwise keep a government benefit or entitlement.

**Notice of Claim**

Notice of claim must be given to us at our Administrative Office's address or telephone number, or to our agent and should include the name of the Insured and the Policy number, or other information sufficient to identify the Insured if the Policy number is not available. Such notice should be made within 20 days after the date the Insured receives documentation that establishes the occurrence of a Critical Illness. If it is not reasonably possible to give notice within that time, the claim may not be denied or reduced due to the delay, so long as notice is given as soon as reasonably possible.

**Claim Forms**

Claim forms should be used for filing proof of loss. We will send such form to the claimant within 15 days of receipt of notice of claim. If we fail to supply the proper claim forms within 15 days, you shall be deemed to have provided proof of loss upon sending, within the time stated in the proof of loss provision, documentation that establishes the occurrence of a Critical Illness. You or a personal representative may obtain a claim form by calling our toll-free telephone number listed on the cover page.

**Proof of Loss**

Written proof of loss must be given to us at our Administrative Office. This includes completion of the Claim Form provided by us and documentation that establishes the occurrence of a Critical Illness. We must receive such proof within 90 days after the date the Insured receives documentation that establishes the occurrence of a Critical Illness. Failure to furnish such proof within such time will not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof and it was furnished as soon as reasonably possible. In any event, the proof required must be given no later than one year from the time proof is otherwise required, unless the claimant was legally incapacitated.

**Physical Examination**

We have the right to have an Insured examined by a Physician of our choice when and as often as reasonably necessary while a claim is pending. In case of death, we may request an autopsy where it is not forbidden by law. We will pay for such examination or autopsy.

**Payment of Accelerated Death Benefits**

Following a written Accelerated Death Benefit request, we will send you and any irrevocable beneficiary a statement that informs you of the amount of the Accelerated Death Benefit payment available or elected and shows you any effect the payment of the Accelerated Death Benefit would have on the policy's Face Amount, policy and rider values, death benefit, Loan Balance and premiums. However, if we find the written proof of the Insured's Critical Illness to be insufficient, we will instead notify you that the Accelerated Death Benefit request has been denied.

If you agree to the payment amount, we will immediately pay you or the assignee the amount of the Accelerated Death Benefit in according to the Accelerated Death Benefit Payment Option you elected. No less than one month after payment of an Accelerated Death Benefit, we will provide you monthly reports if any Accelerated Death Benefits are paid out during the prior month, including an explanation of any changes to the policy, death benefits and cash values on account of the benefits being paid out, and the amount of remaining benefits that can be accelerated at the end of the prior month. If the Insured dies while the policy is In Force but before any Accelerated Death Benefit payment is made, we will instead pay the entire death benefit of the policy in accordance with the policy provisions.

There are no restrictions on how you use the Accelerated Death Benefit proceeds. The payment of the Accelerated Death Benefit is not conditioned on the receipt of long-term care or medical services.

**Accelerated Death Benefit Payment Options**

You may choose one of the following options when submitting a claim for an Accelerated Death Benefit under this Rider, however, there may be tax consequences if you accept an amount above the amount that would be tax-qualified under the Internal Revenue Code:

**Option 1 – Periodic Accelerated Death Benefit Payments** – You may request to receive the Accelerated Death Benefit in periodic payments. Payments cannot be made more frequently than once a month.

If you choose periodic payments, we will send you a letter explaining your payment options to choose from. You have the option to accelerate up to the maximum allowed and to elect the benefit to be paid at 2% each month, 6% every 3 months, 12% every 6 months, or 24% annually. If periodic payments are requested but you die before all such payments are made, we may pay any remaining payments in one lump to your estate.

**Option 2 – Lump Sum Accelerated Death Benefit** – In lieu of monthly payments, you may request the Accelerated Death Benefit in one lump sum.

**Termination**

This rider will terminate on the earliest of the following dates or events:
1. The date on which cumulative periodic Accelerated Death Benefit payments equal 100% of the Accelerated Death Benefit amount available under this Rider;
2. The date on which we make a lump sum Accelerated Death Benefit payment, in lieu of any periodic Accelerated Death Benefit, that equals 100% of the Accelerated Death Benefit amount available under this Rider;
3. The date the policy lapses or otherwise terminates;
4. The date the policy is surrendered or continued under any nonforfeiture option; or
5. The next Monthly Policy Date following the date you request termination of this rider; or

    6.  The date of the Insured's death.

Termination of this rider will not affect any claim for benefits for Critical Illness occurring while the rider was in effect.

| | |
|---|---|
| **Reinstatement** | If the policy is reinstated, this rider may be reinstated on the same or more favorable terms as reinstatement of underlying policy. Following reinstatement, you will have the same rights under this rider as you had immediately before the due date of the defaulted premium. |
| **Consideration** | We have issued this rider in consideration of the application and payment of the premiums for the policy. |
| **No Additional Cost Prior to Election** | There is no additional cost for the Accelerated Death Benefit prior to election of the Accelerated Death Benefit. |
| **Right to Appeal** | You have the right to appeal any decision made regarding benefit eligibility. |
| **Legal Actions** | No legal action may be brought to recover any Accelerated Death Benefit payments requested under this rider within 60 days after written proof of the Critical Illness has been given to us.  No such action may be brought after three years from the time such written proof of the Insured's health condition has been given to us. |
| **Incontestability** | We cannot contest this rider after it has been In Force during the lifetime of the Insured for two years after the Rider Date.  This rider may only be contested based on a statement made in the application if the application is attached to the policy and the statement was material to the risk accepted or the hazard assumed by us. |
| **No Dividends Are Payable** | This rider does not participate in our profits or surplus. |
| **Nonforfeiture Values** | This rider does not have cash values or loan values. |
| **Rider Date** | The Rider Date of this rider will be the Policy Date, unless we inform you in writing of a different date. |

Signed for us at our home office.

Blake Bostwick
President

Jay Orlandi
Secretary

## Conversion Option Endorsement

Transamerica Life Insurance Company has issued this endorsement as a part of the policy to which it is attached.

While the policy is in force and the Insured is alive, the policy may be converted at any time prior to the earlier of the following:

1. the end of the Initial Level Premium Period or

2. the Insured's 70th birthday

The policy, subject to all conditions stated herein, may be converted to:

1. a non-flexible premium level premium whole life insurance plan that we make available at the date of the request, or

2. a flexible premium adjustable life insurance plan that we make available at the date of the request.

At least one plan of insurance will be made available for conversion to the new policy at any time while this policy is in force. Evidence of insurability will not be required for the new policy for the same, or lower, face amount at the time the request for conversion is made.

The conversion is also subject to the following conditions:

1. We must receive the written request no later than 30 days after the earlier of:
   a. the end of the Initial Level Premium Period or
   b. the Insured's 70th birthday.

2. Unless you request otherwise, the policy date of the new policy will be the date we receive your application for the conversion accompanied by the first premium, or the Insured's 70th birthday, whichever is earlier.

3. The face amount of the new policy may be for an amount up to the face amount of this policy at the time the request for conversion is made, but no less than our then published minimum for the plan selected.

4. If the conversion is exercised within 2 years from the earlier of the policy date or issue date of the original policy, the contestability provision will apply to the new policy for the balance of that 2 year period.

5. Premiums for the original policy must be paid to the date of conversion. The premium for the new policy will be at our published rate for the plan selected at the time of conversion. We will use the Insured's age on the date of conversion to determine this rate. The new policy will be issued at the class of risk of this policy, if available. If such is not available at the time of conversion, the new policy will be issued at the class of risk available which is most similar to the class of risk of this policy.

6. Until the new policy becomes effective, the original policy will continue in force subject to its provisions. The original policy will automatically terminate at the exact time the new policy becomes effective. In no event will we provide insurance under both the original policy and a new policy at the same time.

Signed for Transamerica Life Insurance Company at Los Angeles, California, and effective on the date of issue of the policy to which this endorsement is attached unless a different date is shown here.

Secretary

President

1-008 11-106

# Transamerica Life Insurance Company
### Cedar Rapids, Iowa
## Contact us at 4333 Edgewood Rd NE, Cedar Rapids, IA 52499
### Telephone (800) 852-4678
**www.transamerica.com**
(Hereinafter called the "Company," "we," "us," or "our")

### TERMINAL ILLNESS ACCELERATED DEATH BENEFIT RIDER

We have issued this rider as a part of the policy to which it is attached. Except as otherwise specifically set forth below, it is subject to all of the terms of the policy.

This rider is designed to provide federal income tax-free Accelerated Death Benefit. To that end, the provisions of this rider and the policy to which it is attached are to be interpreted to ensure or maintain such tax qualification, notwithstanding any other provisions to the contrary. We reserve the right to amend this rider and the policy to which it is attached to reflect any clarifications that may be needed or are appropriate to maintain such qualifications, or to conform this rider and the policy to which it is attached to any applicable changes in the tax qualifications requirements. You will be sent a copy of any such amendment.

**NOTICE: Benefits advanced under this rider may be taxable in certain circumstances. As with all tax matters, you should consult with your tax advisor regarding the tax treatment of receiving an Accelerated Death Benefit.**

**The policy's benefits and values, as well as any benefits and values provided by affected riders, will be reduced if an Accelerated Death Benefit is paid. Benefits and values (if applicable) include without limitation: face amounts of the policy, rider and endorsement benefits of any affected riders and endorsements, policy and rider values, cash surrender values, death benefit and premiums. Payment of an Accelerated Death Benefit may affect eligibility for Medicaid or other government benefits and entitlements.**

## NOTICE TO YOU, THE OWNER

### FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL 1-800-852-4678.

**This Rider is not long-term care insurance and does not provide long-term care insurance, nor is it intended to replace long-term care insurance coverage. We advise you to review carefully all limitations of this Rider, as well as those of the contract to which it is attached.**

## RIGHT TO RETURN THIS RIDER WITHIN 30 DAYS OF ITS DELIVERY

You have the right to return the Accelerated Death Benefit for Terminal Illness Rider by first-class United States mail within 30 days of its delivery and to have the premium refunded if, after examination of the coverage, you are not satisfied for any reason. The return of this Rider will void this Rider from the beginning, and the parties will be in the same position as if this Rider had not been issued. All premiums paid and any Policy fee paid for this Rider will be fully refunded directly to the applicant within 30 days after this Rider is returned.

**Rider Benefit**    If the Insured becomes Terminally Ill while the policy and rider are in effect, you may elect to receive an Accelerated Death Benefit payment subject to the provisions of the policy and this rider and the following conditions:

1. The Insured must be certified by a Physician as being a Terminally Ill individual within 30 days of the Accelerated Death Benefit request; and
2. The Face Amount of the policy at the time the Accelerated Death Benefit request is received must be at least $25,000; and
3. We must receive the signed consent of all irrevocable Beneficiaries (if any) and all assignees (if any).

If we approve your acceleration request, we will make the payment on the next Monthly Policy Date.



**Definitions**

**Accelerated Death Benefit** is a portion of the policy death benefit that is paid prior to the death of the Insured due to the Insured's Terminal Illness. The payment of an Accelerated Death Benefit reduces the Face Amount and benefits and values of the policy and any affected riders and endorsements and the death benefit payable to the Beneficiary(ies) upon death.

**Available Death Benefit** means the amount payable under the policy upon the death of the Insured, plus one of the following, if applicable:

1. In the case of a single life policy, the rider death benefit payable under a Base Insured Rider, if any.

2. In the case of a joint last survivor policy, the benefit payable under a Joint Insured Term Rider, if any.

Available Death Benefit does not include amounts payable under any other riders not expressly named above.

**Election Percentage** means the percentage of the Available Death Benefit that you choose to accelerate in accordance with the Maximum Accelerated Death Benefit provision.

**Immediate Family Member** means anyone related to an Insured in the following manner: spouse, daughter, son, stepchild, father, mother, stepparent, sister, brother, stepsister, stepbrother, grandchild, grandparent, father-in-law, mother-in-law, or the spouse of any of these. The term "spouse" includes a common law marriage partner, domestic partner, or civil union partner, if legally recognized in the governing jurisdiction.

**Insured** means only the Insured covered under the policy to which this rider is attached. It does not include any other individuals covered under other riders.

**Physician** means a doctor of medicine or osteopathy as set forth in Section 1861(r)(1) of the Social Security Act, as amended, who is legally authorized to practice medicine and surgery within the United States by the jurisdiction in which he or she performs such function or action. Physician does not include:

1. You, the Insured, or an Immediate Family Member; or

2. A person who lives with you, the Insured, or an Immediate Family Member; or

3. A person in the same medical practice as you or the Insured; or

4. A business partner of you or the Insured.

**Terminally Ill** means that the Insured has a medical condition, resulting from bodily injury or disease, or both, which is expected to result in the death of the Insured within 12 months of diagnosis. The condition must be demonstrated by clinical, radiological, laboratory or other evidence of the medical condition.

**Amount of Accelerated Death Benefit**

If the Insured becomes Terminally Ill while the policy and rider are in effect, you may request acceleration of any amount between $5,000 and the maximum Accelerated Death Benefit as outlined below. If we approve a request for an Accelerated Death Benefit that is less than the maximum Accelerated Death Benefit we allow, any future death benefit accelerated will not exceed the remaining balance of the maximum Accelerated Death Benefit. The Accelerated Death Benefit is fixed at the time we approve the request for it.

The Accelerated Death Benefit payment we make to you will be less than the amount of the Available Death Benefit which you request to accelerate, but never less than the Election Percentage multiplied by the difference between the Policy Value, if any, and any Loan Balance. The Accelerated Death Benefit payment will be calculated as A minus B minus C where A, B and C are determined as follows:

A. The actuarial present value of the amount of the Available Death Benefit which you request to accelerate, which will be calculated as described below.

B. The Loan Balance, if any, at the time the Accelerated Death Benefit is paid, multiplied by the Election Percentage.

C. An administrative charge for each Accelerated Death Benefit request. The administrative charge for each Accelerated Death Benefit request as of January 1, 2016 is $350, but will be subject to future increases based on cumulative annual cost-of-living increases as measured by the Consumer Price Index for All Urban Consumers (CPI) since January 1, 2012. Cumulative annual cost of living increases will not exceed 5% per calendar year. In the event that the CPI is no longer published, a substantially similar index will be used. In no event will the administrative charge for each Accelerated Death Benefit request exceed $1,000.

**Present Value of Accelerated Death Benefit**

The actuarial present value of the amount of the Available Death Benefit which you request to accelerate will be based on a discount which reflects the early payment of the Accelerated Death Benefit amount. We assume a 12-month period for this purpose. The annual interest rate we use will be a discount rate that is the greater of:

1. The current yield on 90-day U.S. Treasury bills; or

2. The Moody's Corporate Bond Yield Average-Monthly Average Corporates as of the date of your request as published by Moody's Investors Service, Inc., or any successor thereto. In the event that the Moody's Corporate Bond Yield Average-Monthly Average Corporates is no longer published, a substantially similar average, established by regulation issued by the state insurance commissioner will be used.

Note: The discount rate will never exceed 8%

**Maximum Accelerated Death Benefit**

The maximum death benefit you may accelerate because the Insured is Terminally Ill over the lifetime of the Insured is equal to the lesser of 100% of the Available Death Benefit or $1,500,000.

**Coordination between Accelerated Death Benefit Options**

If the Insured qualifies for an Accelerated Death Benefit under another rider to the policy and makes claim for benefits under two or more Accelerated Death Benefit riders at the same time, benefits will first be payable under this rider. Any subsequent Accelerated Death Benefit payable will be payable on the next Monthly Policy Date.

**Effect of the Accelerated Death Benefit Payment on the Policy**

After an Accelerated Death Benefit is paid, the policy's benefits and values, as those amounts exist on the date the Accelerated Death Benefit is paid, will be reduced by the Election Percentage. This includes, but is not limited to, the following amounts: Face Amount of the policy, death benefit, rider and endorsement benefits for affected riders and endorsements, Policy Value, Cash Surrender Value and Loan Balance.

The premium and/or charges and monthly deductions, as applicable, for the policy and any affected riders will also be adjusted after an Accelerated Death Benefit is paid. If the rider is attached to a fixed premium policy, the adjusted premium will equal the appropriate premium rate applied to the reduced Face Amount plus any applicable policy fee. If the rider is attached to a flexible premium policy, monthly deductions and affected fees and charges will be reduced in accordance with the reduced Face Amount. If the rider is attached to a flexible premium policy with a No Lapse Guarantee, any Minimum Monthly No Lapse Premium will be adjusted in accordance with the reduced Face Amount. Rider charges will be reduced in accordance with the reduced rider benefit.

We will provide you with information showing the reduced Face Amount, benefits, values, charges and new premium resulting from the Accelerated Death Benefit payment.

Payment of an Accelerated Death Benefit under this Rider will not reduce any Accidental Death benefit available under the contract or any Rider attached to the contract.

**Limitations**

1. In no event will the total of all of the death benefits accelerated under this and any other Accelerated Death Benefit Rider exceed 100% of the Available Death Benefit.

2. We will not pay any Accelerated Death Benefit under this policy for a Terminal Illness that is caused by, or results directly from, a suicide attempt or self-inflicted injury while sane or insane.

3. You may not request an Accelerated Death Benefit:
   a) If required by law to use the Accelerated Death Benefit to meet the claims of creditors, whether in bankruptcy or otherwise; or
   b) If required by a government agency to use the Accelerated Death Benefit in order to apply for, obtain, or otherwise keep a government benefit or entitlement.

**Notice of Claim**

Notice of claim must be given to us at our Administrative Office's address or telephone number, or to our agent and should include the name of the Insured and the Policy number, or other information sufficient to identify the Insured if the Policy number is not available. Such notice should be made within 20 days after the date the Insured receives documentation that establishes the occurrence of a Terminal Illness. If it is not reasonably possible to give notice within that time, the claim may not be denied or reduced due to the delay, so long as notice is given as soon as reasonably possible.

**Claim Forms**

Claim forms should be used for filing proof of loss. We will send such form to the claimant within 15 days of receipt of notice of claim. If we fail to supply the proper claim forms within 15 days, you shall be deemed to have provided proof of loss upon sending, within the time stated in the proof of loss provision, documentation that establishes the occurrence of a Terminal Illness. You or a personal representative may obtain a claim form by calling our toll-free telephone number listed on the cover page.

**Proof of Loss**

Written proof of loss must be given to us at our Administrative Office. This includes completion of the Claim Form provided by us and documentation that establishes the occurrence of a Terminal Illness. We must receive such proof within 90 days after the date the Insured receives documentation that establishes the occurrence of a Terminal Illness. Failure to furnish such proof within such time will not invalidate nor reduce any claim if it was not reasonably possible to furnish such proof and it was furnished as soon as reasonably possible. In any event, the proof required must be given no later than one year from the time proof is otherwise required, unless the claimant was legally incapacitated.

**Physical Examination**

We have the right to have an Insured examined by a Physician of our choice when and as often as reasonably necessary while a claim is pending. In case of death, we may request an autopsy where it is not forbidden by law. We will pay for such examination or autopsy.

**Payment of Accelerated Death Benefit**

After we have received proof of loss as set forth above, we will determine the Accelerated Death Benefit payment amount. The payment amount will be less than the amount of the Available Death Benefit you request to accelerate. If you agree to the payment amount, we will immediately pay you or the assignee, the amount of the Accelerated Death Benefit in a lump sum. If the Insured dies while the policy is In Force but before any Accelerated Death Benefit payment is made, we will instead pay the entire death benefit of this policy in accordance with the policy provisions.

Upon receipt of proof of loss, and upon payment of the Accelerated Death Benefit, we will send you and any irrevocable beneficiary a statement that informs you of the amount of the payment available or elected and shows you any effect that the payment of the Accelerated Death Benefit would have on the policy's Face Amount, policy and rider values, death benefit, Loan Balance and premiums.

There are no restrictions on how you use the Accelerated Death Benefit proceeds. The payment of the Accelerated Death Benefit is not conditioned on the receipt of long-term care or medical services.

**Termination**    This rider will terminate on the earliest of the following dates or events:

1. The date the Maximum Accelerated Death Benefit has been accelerated;
2. The date the policy lapses or otherwise terminates;
3. The date the policy is surrendered or continued under any nonforfeiture option;
4. The next Monthly Policy Date following the date you request termination of this rider; or
5. The date of the Insured's death.

Termination of this rider will not affect any claim for benefits for Terminal Illness occurring while the rider was in effect.

**Reinstatement**    If the policy is reinstated, this rider may be reinstated at the same time; however, we will not pay any benefit for a Terminal Illness that is first diagnosed by a Physician after Termination and prior to the reinstatement date.

Following reinstatement, you will have the same rights under this rider as you had immediately before the due date of the defaulted premium.

**Consideration**    We have issued this rider in consideration of the application and payment of the premiums.

**No Additional Cost Prior to Election**    There is no additional cost for the Accelerated Death Benefit prior to election of the Accelerated Death Benefit.

**Legal Actions**    No legal action may be brought to recover any payment requested under this rider within 60 days after written proof of Terminal Illness has been given to us. No such action may be brought after three years from the time written proof of the Insured's Terminal Illness has been given to us.

**Incontestability**    The provisions of the policy relating to incontestability apply to this rider.

In addition, no claim commencing after two years from the date of issue of this rider shall be reduced or denied on the grounds that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage.

**No Dividends Are Payable**    This rider does not participate in our profits or surplus.

**Nonforfeiture Values**    This rider does not have cash values or loan values.

**Rider Date**    The Rider Date of this rider will be the Policy Date, unless we inform you in writing of a different date.

Signed for us at our home office.

Blake Bostwick
President

Jay Orlandi
Secretary



Transamerica Life Insurance Company
HOME OFFICE: Cedar Rapids, Iowa
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 852-4678

### Application Amendment

**Life Insured:**   MR. GRADY LEE HARRIS JR.

**The Application for Policy No.** ███████   **is amended as follows:**

Life Application Part I Question 1: Plan applied for:
Plan Name: Trendsetter LB 30 Yr. Level
Risk Class: Preferred Non-Smoker

---

I represent to the best of my knowledge and belief, that since the date of the Application for the policy no person to be covered by the policy has, except as stated below,
1.  Had a change in health due to injury or sickness; or
2.  Consulted, been examined or been treated by a physician or practitioner; or
3.  Changed occupation, aviation or military status; or
4.  Applied for insurance or reinstatement of any insurance providing income during disability or providing hospital or medical expense benefits.
The only exceptions are: (State "none" if there are no exceptions) _____

I/We declare that I/we have, in an identical manner, completed and signed the copy of this amendment that is attached to and made part of the Policy/Certificate issued by the Company.

---

It is agreed that this amendment shall be part of the application for the policy.

Signed at _____ on _____
            (City, State)                                              Date (mm/dd/yyyy)

_____          _____
Signature of Proposed Insured                        Signature of Owner
                                                   (Officer signature other than proposed insured, if
                                                            owner is a corporation)

_____          _____
Signature of Other Proposed Insured                  Witness (can be Licensed Producer)

_____          _____
Signature of Other Proposed Insured                  Signature of Licensed Producer

APE2-1008CA



Transamerica Life Insurance Company
Home Office:
Cedar Rapids, IA 52499
Administrative Office:
4333 Edgewood Rd NE Cedar Rapids, IA 52499

## IMPORTANT NOTICE TO APPLICANT/BUYER
## REGARDING ACCELERATED DEATH BENEFITS

The benefits provided by this accelerated death benefit are not intended to provide, and will never provide, long-term care insurance, nursing home insurance, or home care insurance. If you are interested in long-term care or nursing home or home care insurance, you should consult with an insurance agent licensed to sell that insurance, inquire with the insurance company offering the accelerated death benefits, or visit the California Department of Insurance Internet Website (www.insurance.ca.gov) section regarding long-term care insurance.

If you choose to accelerate a portion of your death benefit, doing so will reduce the amount that your beneficiary will receive upon your death.

Receipt of accelerated death benefits may be taxable. Prior to electing to buy the accelerated death benefit, you should seek assistance from a qualified tax advisor.

Receipt of accelerated death benefits may affect eligibility for public assistance programs, such as Medi-Cal or Medicaid. Prior to electing to buy the accelerated death benefit, you should consult with the appropriate social services agency concerning how receipt of accelerated death benefits may affect that eligibility.

09/23/2019
_____
Date

Applicant Signature

09/23/2019
_____
Date

Agent Signature

**ADB Notice CA T**



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA
Mailing Address: 4333 Edgewood Road NE
Cedar Rapids, IA 52499

## Beneficiary/Additional Insured Information Form

**PRIMARY INSURED**

| 1. Last Name | First Name | 2. SS# Last 4 Digits |
|---|---|---|
| HARRIS | GRADY | ■■ |

**OWNER - if other than Primary Insured**

| | 2. TIN/SS# Last 4 Digits |
|---|---|
| | |

**ADDITIONAL/OTHER PROPOSED INSURED - if applicable**

| 1. Last Name | First Name | M.I. |
|---|---|---|
| 2. Address (Cannot be a P.O. Box) | City | |
| State  Zip Code    3. Home Phone | 4. Social Security Number | |

**PRIMARY BENEFICIARY** - please provide any information not provided in the base application. If more space is needed use an additional form. Must equal 100% or will be divided equally.

| Name / Address | DOB | Percent | Relationship | Phone # SSN / Tax ID# |
|---|---|---|---|---|
| ASHLEY HARRIS | | 34 | Child | |
| ELLIOT HARRIS | ■■ | 33 | Child | |
| DESTANY HARRIS | ■■ | 33 | Child | |
| | | | | |

**CONTINGENT BENEFICIARY** - please provide any information not provided in the base application. If more space is needed use an additional form. Must equal 100% or will be divided equally.

| Name / Address | DOB | Percent | Relationship | Phone # SSN / Tax ID# |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**AGENT**

☒ I attest that, on behalf of the Company, I requested all information above and the applicant provided the information completed on the form. The applicant was unable/declined to provide any information missing from the form.

09/28/2019

Producer or Agent Signature _____

Date _____

Owner Signature _____

DMF 2014



Transamerica Life Insurance Company
Home Office: 4333 Edgewood Road NE
Cedar Rapids, IA 52499

CA # _____

# Individual Life Insurance Application For One Life Part 1

Proposed Insured: GRADY LEE HARRIS _____ Mr _____
             First             Middle     Last              Suffix   Mr./Mrs./Ms./Dr.

Birthdate: ▇▇▇▇     Age 37 ____ Birth Place: CA _____ Male ⊠ Female ☐
   Mo.    Day    Yr.

Soc. Sec. No.: ▇▇▇▇ _____ U.S. Citizen ⊠ Yes ☐ No  If no, complete Residency & Travel Questionnaire

Employer: GREY HARE _____

Occupation: Contractor _____ CONSULTOR _____ | Area Code & Work Phone

Annual Income $868,000 _____ Net Worth $ 3,500,000 _____

Residence: ▇▇▇▇▇▇▇▇▇▇, HAYWARD  CA 94542 _____ USA ▇▇▇▇
   No. & Street (Cannot be a P.O. Box)  City        State     Zip    Country  Area Code & Home Phone

Owner's Name: _____ Birthdate: _____
(If other than Proposed Insured)                                         Mo.   Day   Yr.

If Trust, provide name and date of Trust: _____

Relationship to Proposed Insured: _____

Address: _____
   No. & Street (Cannot be a P.O. Box)  City        State     Zip    Country  Soc. Sec. or Tax No.

U.S. Citizen ☐ Yes ☐ No  If no, VISA Type/Immigration Status: _____ E-mail: _____
                                                                      (Not for Policy/Billing Notices)

Beneficiary's Name and Relationship to Proposed Insured: See Overflow Form/Supplement _____

Address: _____
   No. & Street (Cannot be a P.O. Box)  City        State     Zip    Country  Date of Trust, if Applicable

1. Plan Applied For: Trendsetter LB 30 _____ Kind Code: _____

2. Risk Classification:   Preferred Plus/Select ⊠    Preferred ☐    Standard Plus ☐    Standard ☐
                     Extra Rating of ☐ _____    Other : ' _____

3. Nicotine Classification:  Nicotine ☐    Non-Nicotine ⊠

4. Amount Applied For $ 250,000 _____

5. Additional Benefits by Rider: ☐ Waiver of Premium/Waiver Provision ☐ Accident Indemnity $_____ ☐ Other _____ $ _____

6. Premium Payment Mode: ☐ Annual    ☐ Semi-Annual    ☐ Quarterly    ⊠ Monthly    ☐ Other _____
                      ⊠ PAC    ☐ Direct Bill

7. Complete for Flexible Premium Plans:
        Required Premium Per Year (RAP)   $ _____
        Planned Periodic Premium       $ _____
        + Initial Lump Sum           $ _____
        = Total Initial Premium       $ _____

8. If the Automatic Premium Loan (APL) provision is available, do you want the provision to be in effect? ☐ Yes ☐No (APL will be in effect unless no is checked.)

9. Do you have any existing life insurance or annuities? If none, check this box ☐. If yes, please list the policies below.
   a. Do you intend to discontinue, replace or change insurance with any company if the life insurance applied for is issued? Please indicate yes or no in the chart.

| Type of Coverage (Personal / Business / Employer Provided / Group) | Company/Policy Number | Face Amount | Replacement? |
|---|---|---|---|
| Personal | PACIFIC LIFE / UNKNOWN | $ 3,500,000 | ☐ Yes ⊠ No |
|  |  | $ | ☐ Yes ☐ No |
|  |  | $ | ☐ Yes ☐ No |

   b. Total Accidental Death insurance inforce with all companies: $ 3,500,000 _____

**APPLICATION (NB)**
continued on next page
Page 1

APA400113TCAREV



* D T 0 0 8 *

10. Is any application for life insurance pending with any other company? ☐ Yes ☒ No
If yes, give company name, amount applied for and total amount to be placed. _____

11. Are there any life insurance policies on the life of the Proposed Insured that you do not own, including but not limited to any that you have sold or settled?   ☐ Yes  ☒ No  If yes, give insurance company name, owner's name, and amount of insurance of each policy.
_____

12. Mail Additional Premium Notices To: _____
Address: _____
No. & Street                    City              State        Zip    ·    Country

| Yes | No | "You" means any person proposed to be insured. |
|---|---|---|
| ☐ | ☒ | 13. Have you ever participated in, or within the next two years do you intend to participate in, hang-gliding, sky diving, parachuting, ultralight flying, vehicle racing, scuba diving, mountain or rock climbing, rodeos, competitive skiing or snowboarding, extreme sports or other hazardous activities? If yes, complete Sports and Hazardous Activities Questionnaire. |
| ☐ | ☒ | 14. Do you plan to travel in the next 12 months for business or pleasure to a destination outside the U.S., Canada, Western Europe, Hong Kong, Australia or New Zealand? If yes, complete Residency & Travel Questionnaire. |

15. Have you used nicotine at any time?   Date Last Used

| | | | |
|---|---|---|---|
| ☐ | ☒ | Cigarettes | _____ |
| ☐ | ☒ | Cigar/Pipe/Chewing Tobacco | _____ |
| ☐ | ☒ | Other | _____ |

16. Driver's License #: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ State: CA _____
In the past five years, have you been convicted of or pleaded guilty to:

| | | |
|---|---|---|
| ☐ | ☒ | a. Moving violations? If yes, give dates and type. _____ |
| ☐ | ☒ | b. Driving under the influence of alcohol and/or other drugs? If yes, give dates. _____ |
| ☐ | ☒ | c. Reckless driving? If yes, give dates. _____ |
| ☐ | ☒ | 17. Except as a passenger on a regularly scheduled flight, has the Proposed Insured flown within the past 2 years, or does the Proposed Insured have plans to fly in the future other than as a passenger? If yes, complete Aviation Questionnaire. |
| ☐ | ☒ | 18. Have you ever been convicted of a felony, misdemeanor or infraction other than a traffic violation?  If yes, provide full details including state and date of offense. |
| ☐ | ☒ | 19. Are you a member of the armed forces including reserves? Intend to become a member? Any deployment orders outside U.S.? If yes, give full details. |
| ☐ | ☒ | 20. Is the Proposed Insured currently in bankruptcy or has the Proposed Insured been the subject of any voluntary or involuntary bankruptcy proceeding pending within the last 12 months?  If yes, please provide full details including Chapter 7, 11, or 13, date filed, and date of discharge and dismissal, if any. |

**Remarks:** Give details for any questions answered yes

_____
_____
_____
_____
_____

**I, the Proposed Insured, and I, the Owner if different, hereby represent** that the statements and answers given in this application are true, complete and correctly recorded to the best of my knowledge and belief. **I/we agree:** (1) this application shall consist of Part 1, Part 2, and any required application supplement(s)/amendment(s), and shall be the basis for any contract issued on this application; (2) except as otherwise provided in the conditional receipt, if issued, with the same Proposed Insured as on this application, any contract issued on this application shall not take effect until after all of the following conditions have been met: (a) the full first premium is paid, (b) the Owner has personally received the contract during the lifetime of and while the Proposed Insured is in good health, and (c) all of the statements and answers given in this application must be true and complete as of the date of Owner's personal receipt of the contract and that the contract will not take effect if the facts have changed; (3) no waiver or modification shall be binding upon Transamerica Life Insurance Company (the Company) unless in writing and signed by the President or a Vice President and the Secretary or an Assistant Secretary.

* D T 0 0 9 *

## NOTICE TO CONSUMER

The death benefit on many business related life insurance policies will be taxable to you under Section 101(j) of the Internal Revenue Code to the extent it exceeds the premiums and other considerations paid by you for the policy unless the written Notice and Consent is obtained **prior to policy issue** and certain other requirements of such section are met. These policies are often referred to as Employer-Owned Life Insurance Policies but can also include policies owned by others such as affiliates and business owners.

You are advised to consult with your qualified tax advisor prior to purchasing this policy.

## AUTHORIZATION TO OBTAIN INFORMATION

Transamerica Life Insurance Company (the Company)

I hereby authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company, MIB, Inc. ("MIB") or other organization, institution or person, that has any records or knowledge of me or my health, to give to Transamerica Life Insurance Company, or its reinsurers, any such information. I authorize Transamerica Life Insurance Company, or its reinsurers, to make a brief report of my personal health information to MIB. A photographic copy of this authorization shall be as valid as the original.

This authorization will be valid for 26 months, but I understand that I may revoke it at any time by giving written notice to the Company at the above address. I understand that there are limitations on my right to revoke this authorization. Any action taken in reliance on this authorization will be valid if such action has been taken prior to receipt of notice of revocation. If this authorization is used to collect information in connection with a claim for benefits, it will be valid for the duration of the claim. If the law of my state so provides, my authorization may not be revoked during a contestable investigation. I also understand that my revocation of this authorization will not result in the deletion of codes in the MIB database if such codes are reported by the Company (or the Company becomes obligated to report such codes to MIB) while this authorization is in force.

**I acknowledge** receipt of the Notice of Disclosure of Information. **I understand** that if an investigative consumer report is ordered in connection with this application, I may elect to be interviewed in connection with the preparation of the report and, upon request, I will be provided with a copy of the report. I elect to be interviewed if an investigative consumer report is prepared.  ☐ Yes  ☒ No

**PLEASE MAKE CHECKS PAYABLE TO THE COMPANY. DO NOT MAKE CHECKS PAYABLE TO THE AGENT OR LEAVE PAYEE SPACE BLANK.**

Amount paid with this Application $ _____  ☐ Check # _____  ☐ Credit Card (Complete Credit Card Order Confirmation Form)

**Caution: If your answers on this application are misstated or untrue, the insurer may have the right to deny benefits or rescind your accelerated death benefit coverage.**

Signed at HAYWARD                  CA            on 09/23/2019
City-State                                      Date

X _____
Signature of Proposed Insured (or parent or guardian if Proposed Insured is a minor)

X _____
Witness to Signature of Proposed Insured

Signed at _____            on _____
City-State                                      Date

X _____
Signature of Owner (if other than Proposed Insured)

X _____
Witness to Signature of Owner

If Owner is a Corporation, an authorized officer, other than the Proposed Insured must sign as Owner, give corporate title and full name of corporation below.

_____

_____

X _____
Signature of Licensed Producer


**TRANSAMERICA**
LIFE INSURANCE COMPANY

Transamerica Life Insurance Company
Home Office: 4333 Edgewood Road NE
Cedar Rapids, IA 52499

GA # _____
**Application Part 2**
**Health History**
☑ Paramedical ☐ Medical
File # _____

---

1. Proposed Insured: *(Print Full Name)*
GRADY L. HARRIS JR.

2. Date of Birth:
Month ▮ Day ▮ Year ▮

3. Social Security #

4. Name/Address/Phone of primary care physician:

Name: _____   Address: _____

Phone: (_____)   City/St/Zip: _____

Date and reason for last visit: ___ *No Primary Physician* ___

Give complete details of all yes answers to questions 5 - 8, including but not limited to all dates, diagnoses, duration, outcome, treatments and medications prescribed and the names and addresses of all hospitals, attending physicians, health care providers and clinics. If additional space is required, attach sheet(s) of paper - signed, dated and witnessed.

**5. HAVE YOU EVER HAD, BEEN TOLD BY A MEMBER OF THE MEDICAL PROFESSION THAT YOU HAVE, OR BEEN DIAGNOSED WITH OR TREATED FOR:**

Details: *No Health History*

| | Yes | No |
|---|---|---|
| a. Seizure, fainting, stroke, loss of consciousness, tremor, paralysis, multiple sclerosis, epilepsy, or any disease or abnormality of the brain? | ☐ | ☑ |
| b. High blood pressure, heart attack, murmur, palpitation, or anemia or any disease or abnormality of the heart, blood vessels or blood (except HIV Status)? | ☐ | ☑ |
| c. Asthma, chronic bronchitis, pneumonia, emphysema, tuberculosis or any disease or abnormality of the lungs, bronchial tubes or respiratory system? | ☐ | ☑ |
| d. Ulcer, colitis, hepatitis, cirrhosis, or any disease or abnormality of the esophagus, stomach, intestines, rectum, gallbladder or liver? | ☐ | ☑ |
| e. Sugar, protein or blood in urine, sexually transmitted disease (except HIV disease), stone or any disease or abnormality of the kidney, bladder, prostate, breasts, ovaries or reproductive system? | ☐ | ☑ |
| f. Diabetes or any disease or abnormality of the thyroid, adrenal, pituitary or other glands? | ☐ | ☑ |
| g. Arthritis, gout, connective tissue disease, back trouble or any disease or abnormality of the joints, muscles or bones? | ☐ | ☑ |
| h. Any disease or abnormality of the eyes, ears, nose, throat or skin? | ☐ | ☑ |
| i. Cancer, tumor, polyp or cyst? | ☐ | ☑ |
| j. Any physical deformity or amputation? | ☐ | ☑ |
| k. Anxiety, depression, suicide attempt or any psychiatric, mental or emotional condition or disorder? | ☐ | ☑ |
| l. Been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex (ARC)? | ☐ | ☑ |

**6.**

| | Yes | No |
|---|---|---|
| a. Within the past ten years, have you ever used sedatives, amphetamines, barbiturates, morphine, cocaine/crack, methamphetamine, Ecstacy (MDMA), heroin, marijuana, LSD, PCP, any hallucinogenic drug or narcotic drug except as prescribed by a physician? | ☐ | ☑ |
| b. Have you ever been treated or counseled or been advised to seek treatment or counseling for the use of alcohol, drugs or other substance or joined an organization for alcohol or drug dependence or abuse? | ☐ | ☑ |

**7. OTHER THAN WHAT YOU HAVE ALREADY DISCLOSED, WITHIN THE PAST FIVE YEARS HAVE YOU:**

| | Yes | No |
|---|---|---|
| a. Consulted, been examined or been treated by any physician or practitioner? | ☐ | ☑ |
| b. Had or been advised to have an X-ray, electrocardiogram, laboratory test or other diagnostic study (not including HIV tests)? | ☐ | ☑ |
| c. Had observation or treatment at a clinic, hospital or other medical facility? | ☐ | ☑ |
| d. Had or been advised to have a surgical procedure? | ☐ | ☑ |
| e. Had dizziness, shortness of breath, pain or pressure in the chest, or persistent fever? | ☐ | ☑ |
| f. Had any injury requiring treatment? | ☐ | ☑ |

* D T 2 2 4 *

**Application Part 2 Continued**                                     File # _____

8.                                                                    Yes No    *84. Mom Dead*
a. Have any of your parents, brothers, sisters, or grandparents ever had cancer,           *at 71 Lung*
   diabetes, heart disease, mental illness or attempted suicide? ........................  ☒ ☐   *Cancer*
b. Has your weight changed by more than 15 pounds in the past year? ........................  ☐ ☒
c. Are you now pregnant? ................................................................  ☐ ☒

---

9. **OTHER THAN THOSE ALREADY DISCLOSED, ARE YOU CURRENTLY TAKING ANY PRESCRIPTION, VITAMIN, SUPPLEMENT OR OVER-THE-COUNTER MEDICATION?** ☒ Yes ☐ No *If yes, list all and indicate why.*

*Vitamins (OD)*

---

10 **FAMILY RECORD:** Show age and present health, or if deceased, show age at death and cause of death.

|          | Age if Living | Present Health | Age at Death | Cause of Death |
|----------|---------------|----------------|--------------|----------------|
| Father   | 76            | Good Health    |              |                |
| Mother   |               |                | 71           | Lung Cancer    |
| Brothers # 2 | 45/52     | Good           |              |                |
| Sisters # 4  | 44-55     | Health         |              |                |

11. **WITHIN THE PAST FIVE YEARS HAVE YOU USED NICOTINE IN ANY FORM?** ☐ Yes ☒ No *If yes, indicate type, frequency and date last used.*

N/A

12. **FOR THE LAST 180 DAYS, HAVE YOU BEEN ACTIVELY AT WORK ON A FULL TIME BASIS AT YOUR USUAL PLACE OF BUSINESS OR EMPLOYMENT?** ☒ Yes ☐ No *If no, provide complete details.*
*Musician*

13. Do you participate in regular weekly exercise? ......................................... ☒ Yes ☐ No
14. Do you participate in athletics *(Team or Individual)*? ................................... ☐ Yes ☒ No
15. Have you ever used any tobacco products? ............................................... ☐ Yes ☒ No
16. Do you get regular examinations by your health care provider? .................. ☐ Yes ☒ No
17. Do you get regular annual dental checkups? ............................................... ☒ Yes ☐ No
18. Do you clean your house or do yard work? ................................................ ☒ Yes ☐ No
19. Do you have a pet? ....................................................................... ☒ Yes ☐ No
20. Are you a member of a social group or volunteer for charity work? ............... ☒ Yes ☐ No

It is represented that the statements and answers given above are true, complete, and correctly recorded to the best of my knowledge and belief. To the extent allowed by law, I waive my rights to prevent disclosure of any knowledge or information about the above questions. This waiver applies to any health care provider, licensed physician, hospital, official or employee, or other person who has attended or examined me, or who has been consulted by me. I authorize such person(s) to make such disclosures. Such person(s) may also testify to their knowledge. This authorization is made on behalf of myself and any person who shall have or claim any interest in any contract of insurance issued on this application.

Signed at (City/State) _TRACY CA._                              on _5-23-2019_

_Carlos P Vargas E_                                    _____
Signature of Vendor Representative                      Signature of Proposed Insured
or Physician
                                                       _Grady L. Harris Jr._
                                                       Print name of Proposed Insured



Transamerica Life Insurance Company
Home Office: Cedar Rapids, IA
Administrative Office:
4333 Edgewood Rd NE
Cedar Rapids, IA 52499
(800) 852-4678

**Term Insurance**
**Premiums Payable until the Insured's Age 105**
**Death Benefit Payable at Death of the Insured**

**Premiums are Subject to Change as Stated in Schedules of Premiums Provision,**
**But Will Not Exceed Specified Guaranteed Premiums**
**See Schedule of Guaranteed Premiums shown in Policy Data**

**Nonparticipating – No Dividends**

TL23 CA

TRANSAMERICA